# EXHIBIT J

1  STEVEN WANG, State Bar No. 191168
   City Attorney
2  SARI MYERS DIERKING, State Bar No. 226805
   Assistant City Attorney
3  City of Folsom
   50 Natoma Street
4  Folsom, CA 95630
   Telephone: (916) 461-6025
5  Facsimile: (916) 351-0536

6  Attorneys for Defendant
   CITY OF FOLSOM
7

**FILED/ENDORSED**

**FEB 19 2021**

By: _____
           P. Vue
        Deputy Clerk

*(Filing Fee Exempt: Gov. Code § 6103)*

8

9                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                            COUNTY OF SACRAMENTO

11

12
   HARI SHETTY, KAVITA SOOD, and
13 NEIGHBORHOOD ELECTIONS NOW
14                Plaintiffs,
15 vs.
16 CITY OF FOLSOM, *et al.*,
17                Defendants.
18
19
20
21

Case No. 34-2020-00291639

**DECLARATION OF SARI MYERS
DIERKING IN SUPPORT OF EX PARTE
APPLICATION FOR AN ORDER
ADVANCING THE HEARING DATE ON
THE CITY OF FOLSOM'S DEMURRER
TO MARCH 17, 2021**

Date:  February 23, 2021
Time:  9:00 a.m.
Dept.: 53
Judge: Hon. Shama H. Mesiwala

Complaint Filed: January 5, 2021

22  I, Sari Myers Dierking, declare:

23      1.      I am an attorney at law duly licensed to practice before all the Courts of the State

24 of California.  I am the Assistant City Attorney for the Folsom City Attorney's Office, the

25 attorneys of record for the City of Folsom in this case.  I have personal knowledge of the facts set

26 forth in this declaration.  If called upon to do so, I could and would competently testify to the

27 following facts:

28  //

-1-

1       2.      Attached hereto as **Exhibit 1** is a true and correct copy of the **Notice of Related**
2   **Case** served on the City of Folsom with Plaintiffs' Complaint.

3       3.      As a part of my work on this case, I accessed the Sacramento County Superior
4   Court's Public Case Access System to review the pleadings and papers on file in the related case
5   of *Kincaid, et al. v. San Juan Unified School District*, case number 32-2020-00286475.

6       4.      Upon review of those documents, I learned that the *Kincaid* case involves claims
7   under the California Voting Rights Act (CVRA) similar to those at issue against the City of
8   Folsom in this case.

9       5.      Through the above-referenced review I also learned that San Juan Unified School
10  District filed a demurrer in the *Kincaid* case, which requires determination of questions of law that
11  are the same or substantially identical to those raised in the City of Folsom's demurrer in this case.
12  Specifically, both demurrers are based, at least in part, on Governor Newsom's Executive Orders
13  N-34-20 and N-48-20 and plaintiffs in both cases appear to dispute the viability and/or the
14  applicability of those Executive Orders.

15      6.      Attached hereto as **Exhibit 2** is a true and correct copy of the plaintiffs' **complaint**
16  **in** *Kincaid, supra.*

17      7.      Attached hereto as **Exhibit 3** is a true and correct copy of the **memorandum of**
18  **points and authorities in support of San Juan Unified School District's demurrer** in *Kincaid,*
19  *supra.*

20      8.      Attached hereto as **Exhibit 4** is a true and correct copy of **Plaintiffs' complaint** in
21  this case.

22      9.      Attached hereto as **Exhibit 5** is a true and correct copy of the **memorandum of**
23  **points and authorities in support of the City of Folsom's demurrer** in this case.

24      10.    Attached hereto as **Exhibit 6** is a true and correct copy of the **proof of service on**
25  **the City of Folsom's demurrer**.

26      11.    The City of Folsom's demurrer in this case is scheduled for hearing on June 10,
27  2021 at 1:30 p.m. in Department 53.

28  //

-2-

1       12.    Upon review of the Court's Public Case Access System and Exhibit 3, I learned

2   that San Juan Unified School District's demurrer in *Kincaid* is scheduled for hearing on March 17,

3   2021 at 1:30 p.m. in Department 53.

4       13.    I contacted Domenic Spinelli, counsel for San Juan Unified School District, by

5   phone on February 12, 2021. I left a voicemail for Mr. Spinelli informing him that the City of

6   Folsom was interested in combining the hearing dates for the demurrers in the *Kincaid* case and

7   the instant case in the interests of judicial economy because they both involve application of

8   Executive Order N-48-20. I requested a return call to further discuss the matter.

9       14.    I contacted Mr. Spinelli by phone again on February 17, 2021. I left a voicemail

10  for Mr. Spinelli informing him that the City of Folsom intended to file an Ex Parte Application

11  requesting that the June 10, 2021 hearing date on its demurrer be advanced to March 17, 2021 to

12  be held concurrently with that of his client in the *Kincaid* case. I also told Mr. Spinelli that my

13  office had reserved a hearing date of February 23, 2021 for the Ex Parte Application and asked

14  him to let me know if he'd like to participate in the hearing so that I could convey that information

15  to the Court Clerk. I requested a return call to further discuss the matter.

16      15.    I received a voicemail from Mr. Spinelli on February 17, 2021. I returned his call

17  on February 18, 2021 and we discussed the instant Ex Parte Application. Mr. Spinelli informed

18  me that he has no objection to the City of Folsom's Ex Parte Application. I also asked Mr.

19  Spinelli if he wanted to participate in the Ex Parte hearing and he informed me that he did not need

20  to be at the hearing.

21      16.    The instant Ex Parte Application was served on counsel for both parties in *Kincaid*

22  via email. Based upon my review of the Court's Public Case Access System and Exhibit 2, Scott

23  Rafferty, Esq. is Plaintiffs' counsel in this case and also counsel for the plaintiffs in *Kincaid*.

24  Accordingly, only one copy of the Ex Parte papers was served upon Mr. Rafferty. The email from

25  my office to Mr. Rafferty and Mr. Spinelli with the Ex Parte papers also contained notice of the

26  date, time, and process for the Ex Parte hearing.

27      17.    Attached hereto as **Exhibit 7** is a true and correct copy of an email from Plaintiffs'

28  counsel, Scott Rafferty, to Folsom City Attorney Steven Wang, requesting that the instant Ex Parte

-3-

1    Application include additional information.  Mr. Wang is my supervisor and forwarded the email

2    to me for submission with the Ex Parte papers.

3

4            I declare under penalty of perjury according to the laws of the State of California that the

5    foregoing is true and correct.

6

7    Dated:  February 19, 2021

                                                    SARI MYERS DIERKING
8                                                   Assistant City Attorney
                                                    Attorney for Defendant, CITY OF FOLSOM
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SARI MYERS DIERKING IN SUPPORT OF EX PARTE APPLICATION

# EXHIBIT 1

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Scott J Rafferty 224389<br>1913 Whitecliff Ct<br>Walnut Creek CA 94596<br><br>TELEPHONE NO.: 202-380-5525　　FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* rafferty@gmail.com<br>ATTORNEY FOR *(Name):* Hari Shetty and all plaintiffs | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sacramento |
|---|
| STREET ADDRESS: 720 9th St |
| MAILING ADDRESS: 720 9th St |
| CITY AND ZIP CODE: Sacramento CA 94918 |
| BRANCH NAME: Gordon Schaber |

| PLAINTIFF/PETITIONER: Shetty et al | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: City of Folsom | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEP1.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a.  Title: Kincaid et al v. San Juan USD

　　b.  Case number: 34-2020-00286475-CU-CR-GDS

　　c.  Court: ☐ same as above

　　　　　　　☐ other state or federal court *(name and address):*

　　d.  Department: S53

　　e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

　　f.  Filing date: October 5, 2020

　　g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

　　h.  Relationship of this case to the case referenced above *(check all that apply):*

　　　　☐ involves the same parties and is based on the same or similar claims.

　　　　☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of
　　　　　 the same or substantially identical questions of law or fact.

　　　　☐ involves claims against, title to, possession of, or damages to the same property.

　　　　☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

　　　　　　☐ Additional explanation is attached in attachment 1h

　　i.  Status of case:

　　　　☐ pending

　　　　☐ dismissed ☐ with ☐ without prejudice

　　　　☐ disposed of by judgment

2.  a.  Title:

　　b.  Case number:

　　c.  Court: ☐ same as above

　　　　　　　☐ other state or federal court *(name and address):*

　　d.  Department:

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300
www.courtinfo.ca.gov

CM-015

| PLAINTIFF/PETITIONER:  Shetty et al | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: City of Folsom | |

2. *(continued)*

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply)*:

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address)*:

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply)*:

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 12/31/20

Scott J Rafferty

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ *Scott Rafferty* (signature)

(SIGNATURE OF PARTY OR ATTORNEY)

**NOTICE OF RELATED CASE**

CM-015

| PLAINTIFF/PETITIONER:  Shetty et al | CASE NUMBER: |
| DEFENDANT/RESPONDENT: City of Folsom | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1.  I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify)*:
    1913 Whitecliff Ct, Walnut Creek CA 94596

2.  I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one)*:

    a. ☐  X  deposited the sealed envelope with the United States Postal Service.

    b. ☐  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3.  The *Notice of Related Case* was mailed:

    a.  on *(date):* 12/31/20

    b.  from *(city and state):* Walnt Creek CA

4.  The envelope was addressed and mailed as follows:

    a.  Name of person served:
        Domenic Spinelli
        Street address: 601 University Ave
        City: Sacto
        State and zip code: 95825CA

    c.  Name of person served:
        Street address:
        City:
        State and zip code:

    b.  Name of person served:
        Street address:
        City:
        State and zip code:

    d.  Name of person served:
        Street address:
        City:
        State and zip code:

☐  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 12/31/20

Scott J Rafferty
(TYPE OR PRINT NAME OF DECLARANT)

▶ *(signature)*
(SIGNATURE OF DECLARANT)

**NOTICE OF RELATED CASE**

# EXHIBIT 2

1  Scott Rafferty, Esq (SBN 224389)
   1913 Whitecliff Court
2  Walnut Creek CA 94596
   202-380-5525
3  rafferty@gmail.com

4
   Attorney for Plaintiffs
5

FILED
Superior Court Of California,
Sacramento
10/5/2020
rcaddick
By_____, Deputy
Case Number:
34-2020-00286475

6          SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7                    COUNTY OF SACRAMENTO

8  MAGALI KINCAID                      Case No.:
9  BENITO JUAREZ NEIGHBORHOOD
   ASSOCIATION
10 NEIGHBORHOOD ELECTIONS NOW          COMPLAINT FOR VIOLATION OF THE
   JUAN YNIGUEZ,                       CALIFORNIA VOTING RIGHTS ACT AND
11 CAROLINA FLORES                     IN THE ALTERNATIVE, FOR VIOLATION
12 DAMARIS CANTON                      OF THE VOTING RIGHTS ACT OF 1965
                                       AND THE CALIFORNIA CONSTITUTION.
13         Plaintiffs,

14 vs.

15 SAN JUAN UNIFIED SCHOOL DISTRICT

16         Defendant

17

18 INTRODUCTION                                            3
19      PURPOSE OF THIS LITIGATION                         5
        POTENTIAL REMEDIES                                 5
20 JURISDICTION AND VENUE                                  10
21 PARTIES AND AFFECTED PUBLIC AGENCIES                    12
22 FACTUAL ALLEGATIONS                                     17
23      PART I: FACTS SUFFICIENT TO ESTABLISH CVRA LIABILITY   17
24         Establishment of a Small, Exclusionary Board    17
           Latino Population and Voting Population in SJUSD  18
25         Abridgment and Dilution of Latino Voting Rights  19
26         Racially Polarized Voting in SJUSD              21
27

28 COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
   ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 1

| | |
|---|---|
| Racially Polarized Voting in Trustee Elections | 20 |
| Impact on Other Racially Polarized Elections | 25 |
| PART II: ADDITIONAL ALLEGATIONS RELATED TO "SAFE HARBOR" CLAIMS | 26 |
| Failure to Enter Safe Harbor | 26 |
| Binding Litigation Commitment | 27 |
| Campaign for an Emergency Order to Suspend the CVRA Based on Misinformation | 29 |
| Inapplicability of Emergency Order | 31 |
| Abrogation of Litigation Commitment | 36 |
| PART III: ADDITIONAL ALLEGATIONS RELATING TO THE FEDERAL VOTING RIGHTS ACT | 37 |
| Possible Creation of a Trustee Area to Increase Latino Influence | 37 |
| Additional Probative Factors | 38 |
| Evidence of Intentional Discrimination | 44 |
| Incumbents' Resistance to Increasing the Number of Trustees | 44 |
| FIRST CAUSE OF ACTION: VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT | 49 |
| SECOND CAUSE OF ACTION: VIOLATION OF 52 U.S.C. §10301(b) AND CONSTITUTIONAL PROVISIONS | 51 |
| PRAYER FOR RELIEF | 56 |
| VERIFICATION OF COMPLAINT | 59 |

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 2

Scott Rafferty, Esq (SBN 224389)
1913 Whitecliff Court
Walnut Creek CA 94596
202-380-5525
rafferty@gmail.com

Attorney for Plaintiffs

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

| | |
|---|---|
| MAGALI KINCAID<br>BENITO JUAREZ NEIGHBORHOOD<br>ASSOCIATION<br>NEIGHBORHOOD ELECTIONS NOW<br>JUAN YNIGUEZ,<br>CAROLINA FLORES<br>DAMARIS CANTON<br><br>Plaintiffs,<br><br>vs.<br><br>SAN JUAN UNIFIED SCHOOL DISTRICT<br><br>Defendant | Case No.:<br><br>COMPLAINT FOR VIOLATION OF THE<br>CALIFORNIA VOTING RIGHTS ACT AND<br>IN THE ALTERNATIVE, FOR VIOLATION<br>OF THE VOTING RIGHTS ACT OF 1965<br>AND THE CALIFORNIA CONSTITUTION |

COMPLAINT

COME NOW PLAINTIFFS MAGALI KINCAID, BENITO JUAREZ NEIGHBORHOOD
ASSOCIATION, NEIGHBORHOOD ELECTIONS NOW, JUAN YNIGUEZ, CAROLINA
FLORES, AND DAMARIS CANTON, who complain and allege as follows:

**INTRODUCTION**

1.      This Complaint challenges the at-large method of voting for the Board of Trustees

(Board) for the San Juan Unified School District (SJUSD) because it unlawfully dilutes and

abridges the votes of Latino voters, including plaintiffs KINCAID, YNIGUEZ, and members of

BENITO JUAREZ NEIGHBORHOOD ASSOCIATION (BENITO JUAREZ), and

NEIGHBORHOOD ELECTIONS NOW (NEN) in violation of the California Voting Rights Act,

Elections Code, Section 14027, *et seq.* (CVRA). This action is filed on behalf of Latino citizens

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 3

of SJUSD whose right to an undiluted vote and a right to influence the governance of SJUSD has been abridged on the basis of race, color, or membership in a language minority group. The at-large, winner-take-all method of voting denies Latino voters an equal opportunity to elect candidates of their choice in school board elections (or even an equal opportunity to influence these elections). It also abridges the voting rights of Latino citizens by preventing the identification, recruitment, and promotion of natural leaders from disadvantaged neighborhoods. The chronic absence of authentic and viable Latino candidates of choice from communities such as Arden-Arcade results disempowers the entire Latino community. This abridges Latino influence in trustee elections and in the governance of the SJUSD after trustees are elected. At-large election also discriminates against Black voters and low-income neighborhoods generally. Trustee area elections are more competitive and more accountable, which benefits voters, neighborhoods, and students of all races.

2.        The fundamental purpose of the CVRA is to avoid unnecessary allegations of intentional discrimination by focusing on the systemic impact of at-large elections. The CVRA avoids allegations of intentional discrimination, which can not only be complex, but divisive. Part I of the Factual Allegations (paragraphs 47 to 77) demonstrates that racially polarized voting exists in SJUSD. Standing alone, these allegations are sufficient to liability under the CVRA, and to require the elimination of the system of at-large voting.

3.        SJUSD disputes the jurisdiction of this Court over the CVRA claim on grounds that the COVID-19 pandemic prevented it from implementing trustee areas during a "safe harbor" provided by the Elections Code. Part II of the Factual Allegations (paragraphs 79 to 112) demonstrates that the safe harbor does not apply, primarily because SJUSD never made a timely commitment to comply in 2020. SJUSD also violated an enforceable undertaking to consult plaintiff and seek agreement prior to any delay in implementation. SJUSD has claimed

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 4

1  that emergency actions by the Governor render it immune from CVRA enforcement.  By its
2  terms, the Executive Order that SJUSD cites (N-48-20) does not excuse noncompliance and
3  should be construed so that it does not bar access to the courts.  Part III of the Factual
4  Allegations (paragraphs 113 to 143) demonstrates that the trustees' decision to call another at-
5  large election in 2020 violates the federal Voting Rights Act of 1965, 52 U.S.C. §10301, *et seq*.
6  The federal act has no safe harbor.

7

8  4.          Unless SJUSD continues to dispute this Court's jurisdiction over the CVRA
9  claim, and unless it succeeds in doing so, the federal count and the factual allegations related to
10  state jurisdiction and to the federal count (paragraphs 64-124) are not essential and should not be
11  litigated.  Although there is a good faith basis to claim intent to deprive Latino voting rights
12  (paragraphs 124 to 143), which is highly probative to the federal claims, plaintiffs prefer to
13  resolve the Complaint based on the CVRA.

14

15              **PURPOSE OF THIS LITIGATION**

16
17  5.          The election of all trustees by plurality vote gives affluent areas with high voter
18  turnout winner-take-all control of the elected Board.  The exclusionary effect of the winner-take-
19  all election is aggravated by the extraordinary size of SJUSD, which has a larger population than
20  any city in American that elects its council at large.

21
22  6.          Low-income neighborhoods are underrepresented on the Board and have been
23  disserved by board policies.  Encina High School in Arden-Arcade is shortchanged compared to
24  nearby Rio Americano High School, which serves one of SJUSD's wealthiest neighborhoods.

25
26  7.          The limitation of at-large boards to five members was originally intended to

27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
   ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 5

1  concentrate power in members elected from wealthier neighborhoods and to perpetuate this

2  exclusivity by entrenching consensus boards whose members tend to support each other for

3  reelection. According to the National School Board Association, the typical size of a school

4  board has increased from five to seven since 2010.[1] Except for Henrico County (Virginia), no

5  district with comparable enrollment anywhere in the United States has less than seven trustees.[2]

6

7  8.        Even in California, most districts as large as SJUSD have seven trustees.[3] Unless

8  SJUSD expands its Board, incumbents would continue to enjoy a significant barrier to

9  competition from neighborhood-based candidates representing disadvantaged communities. If

10 SJUSD continues with five trustees, the only unified districts in California electing by larger

11 trustee areas would be Los Angeles USD and Long Beach USD.

12

13 9.        The incumbents maintain the five-trustee at-large Board to perpetuate their

14 incumbency but do so at the expense of the performance of SJUSD students. Several empirical

15 analyses suggest that the size of larger California districts, such as SJUSD, is "associated with

16 inferior academic performance," even after controlling for socio-economic variables and class

17 size.[4] A peer-reviewed study from California State University Northridge indicates that

18

19 _____

[1] https://cdn-files.nsba.org/s3fs-
20 public/reports/K12_National_Survey.pdf?5XEOPBQIubbzr9x.8_5rFrBRugkHKS7N#page=26
[2] According to the most recent US Dep't of Education data (2018), SJUSD ranks 98th in number
21 of students. Of schools ranking between 85th and 100th, Atlanta, Boston, Charleston, Oakland
USD and Omaha have nine trustees. Columbus, Cumberland County., Detroit, Klein ISD,
22 Lewisville ISD, Round Rock ISD, San Antonio ISD, San Bernardino USD, and Wichita have
23 seven trustees. NCES Table 215.30
https://webcache.googleusercontent.com/search?q=cache:DqgyL7ysVk0J:https://nces.ed.gov/pro
24 grams/digest/d18/tables/xls/tabn215.30.xls+&cd=1&hl=en&ct=clnk&gl=us
[3] Five member boards serve comparable enrollments in Corona-Norco USD and Santa Ana USD
25 but their electorates are only 28% and 52% the size of SJUSD. Except for Long Beach, no USD
26 with a five member board has a larger population (or more eligible voters).
https://nces.ed.gov/programs/edge/TableViewer/acsProfile/2018
27

28 COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 6

economies of scale and efficiencies from orderly planning may exhaust at above 25,000 to 35,000 students, such that larger districts "suffer from an inability to move forward." While plaintiffs will not undertake to validate these detailed findings, a more representative Board of seven trustees elected by area will remediate the alleged diseconomies and abate "top-down planning," thereby increasing the ability of "both educators and parents to evaluate and improve the education production process." *Id.*, 193.

10.        Election by seven trustee areas guarantees that each area of SJUSD will always be represented, promoting the election of skilled negotiators able to ensure that Board decisions reflect conditions that vary across the district. Trustee areas are equal in population, so the needs of students are not discounted because they live in an area with low voter turnout or a large number of school-age children who are not yet 18 or of immigrants who are not yet citizens. This not only benefits Asian and Latino immigrants, but also neighborhoods with significant numbers of immigrants from areas such as Russia, Ukraine, and the Middle East (who are not protected by the Voting Rights Act). Communities with disproportionate numbers of children and non-voting immigrants are underrepresented in at-large systems but often have the most distinctive needs.

11.        Because Latinos care passionately about the education of their children, neighborhood school board elections are the gateway to the political incorporation of Latino communities. At-large election means disadvantaged communities within SJUSD are seldom the targets of political campaigns, receive limited political mobilization, and enjoy almost no organized voter registration. The inability to influence SJUSD elections creates a cycle of decline in Latino voter turnout and participation at all levels. As a result, political choices do not

_____

[4] Driscoll, et al., "School District Size and Student Performance," 22 ECONOMICS OF EDUCATION REV. 193, 195 (review of prior research), 200-201 (empirical conclusions) (2003)

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 7

reflect needs and values that Latinos cohesively support, such as increased funding for education. But for Latino voters statewide, Proposition 51 (providing $9 billion in bonds for education) would not have passed. Local ballot measures to support SJUSD are disproportionately supported by those Latinos who do vote, so suppressing Latino turnout limits the level of bond and parcel tax support for which SJUSD may seek and obtain voter approval.

12.     Throughout American history, immigrants, first-generation Americans, and members of racial and language minorities protected by the Voting Rights Act have run for school trustee and other single-member districts and progressed from these local offices to service in state and federal elected positions. Natural Latino leaders in SJUSD lack these opportunities and have few role models for elected public service in their neighborhoods. Given the exceptional size of the District, this abridgment of the voting rights of its Latinos and other minorities may have enduring effects on the quality of democracy statewide.

13.     "Voting along racial lines deprives minority voters of their preferred representative in these circumstances [and] also allows those elected to ignore minority interests without fear of political consequences."[5] The diminution of Latino influence over governance decisions in SJUSD is an additional abridgment of the rights of Latino voters. A further consequence is neglect by elected officials for the needs of Latino neighborhoods, which contravenes the purpose of democratic elections and further abridges the rights of Latino electors in violation Elections Code, Section 14027.

14.     The at-large plurality system regularly results in the election of Boards comprised

---

[5] Thornburg v. Gingles, (1986) 478 U.S. 30, 48 & n.14, *quoting* Rogers v. Lodge (1982) 458 U.S. 613, 623. *See also* Karlan, "All Over the Map: The Supreme Court's Voting Rights Trilogy," 1993 SUP. CT. REV. 245, 248–51.

---

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 8

1   entirely of trustees who live outside disadvantaged neighborhoods, particularly those served by
2   Encina High School.  Even if they claim a desire to redress inequities, trustees who live, shop,
3   and socialize elsewhere are not as accountable to the residents of these disadvantaged areas.
4   They may be less able to discover and realize opportunities to improve the performance of
5   neighborhood schools, which can increase property values and rehabilitate the communities.

6

7   15.              Compliance in 2020 was essential for several reasons.  As footnote 9 of the
8   petition to comply detailed, the Legislature mandated that high-minority districts be scheduled
9   *for presidential years when minority turnout is relatively high.  A.B. 2123 (2018) prohibited any*
10  extension of the safe harbor that permitted an at-large election in 2020.[6]  The petition (at 12) also
11  warned that the 2020 census could undercount Latinos in the SJUSD, due in part to changes
12  proposed by the Trump Administration.  Most critically, the underrepresented areas of SJUSD
13  needed to elect trustees in 2020 so that they would have had a seat at the table when the Board
14  redistricts.

15

16  16.              SJUSD's website continues (as of October 2, 2020) to mislead the public by
17  claiming: "To protect the district from potential but unnecessary litigation costs, the board has
18  elected to make the transition for November of 2020."[7]  But its attorneys induced Governor
19  Newsom to issue an emergency order, which they claim immunizes SJUSD to violate the CVRA.
20  Their decision to "suspend" the transition to trustee area elections was intentionally
21  discriminatory, as demonstrated by procedural irregularities and contemporaneous statements
22  (paragraphs 124 to 143).  To the extent that SJUSD misrepresented facts to provide a pretext for
23  its decision may establish intent without regard to motive, but the motives of protecting
24

25  [6] Elections Code, Section 10010(e)(1)(C)(1): "The written agreement [to extend] shall include a
    requirement that the district boundaries be established no later than six months before the
26  political subdivision's next regular election to select governing board members."
    [7] https://web.archive.org/web/20200923025539/http://www.sanjuan.edu/site/Default.aspx?PageID=48519
27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
    ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 9

incumbency and "political self-preservation" also support a finding of purposeful constitutional violations.

## POTENTIAL REMEDIES

17.         Plaintiffs seek a declaration from this Court that the at-large method of election violates the CVRA (or in the alternative, the federal Act), a permanent injunction prohibiting SJUSD from holding any further at-large elections for trustee (or in the alternative an injunction prohibiting the certification of the results of any such election), and an order establishing an independent citizens' commission. The mandate of the commission will be to create trustee areas for elections from November 2022 until 2032 in a manner that fully complies the CVRA, Elections Code, Section 14027, *et seq.*, as well as with all other relevant constitutional and statutory requirements.

18.         Plaintiffs may also seek relief for traditionally underrepresented areas from the decision to hold an at-large election in November 2020, which reflected intentional violations of Plaintiffs' rights to equal protection and due process. Prior to the CVRA and independent of the federal Voting Rights Act, precedent for violations of these constitutional provisions in California included the replacement of an at-large board with a board elected by seven trustee areas.[1] This Court has authority to create remedial trustee areas for traditionally underrepresented and disadvantaged communities in SJUSD and either (1) order that two additional trustees by elected by these areas in a special election, or (2) provide that any vacancy occurring before November 2020 shall be filled by the voters of an underrepresented trustee area in a special election (without any provisional appointment by the incumbents).

_____

[1] Hernandez v. Stockton USD, No. 101016 (Sup. Ct. San Joaquin County, October 1, 1974).

_____

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 10

## JURISDICTION AND VENUE

19.          Elections Code, Section 14032 provides that any voter who is a member of a protected class and who resides in a political subdivision (as those terms are defined in Elections Code, Section 14026 and 52 U.S.C. §10310(c)) where a violation thereof is alleged may file an action pursuant to the CVRA.

20.          Although this action expects to rely primarily on evidence of racially polarized voting between Latinos and non-Latinos, Latinos frequently form coalitions with other minorities and crossover voters.

21.          Courts have recognized that aggrieved organizations and individuals have a private right of action to enforce the CVRA.  BENITO JUAREZ and NEN file on behalf of members who belong to a protected class and reside within SJUSD and as an entity whose voter registration and education activities are impeded by the discriminatory practices detailed in this complaint.

22.          Plaintiffs attempted to avoid litigation by petitioning the trustees to comply with CVRA, in accordance with the process established in AB 350 (2015).  On February 8, 2020, SJUSD received a notice of possible violation (addressed to trustee Nazima Creason in her official capacity as clerk to the Board) pursuant to Elections Code, Section 10010(e).  SJUSD had 45 days (*i.e.*, until March 24, 2020) to declare its intent to create trustee areas for the November 2020.

23.          On March 10, 2020, the Board passed resolution 2982, stating "its intent to move to a by-trustee area election system," but failing to commit to doing so in 2020.  Instead, the

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 11

1  Superintendent and four of five trustees strongly objected to complying in 2020. If the resolution
2  had complied with AB 350, SJUSD would have had 90 days (*i.e.*, until June 8, 2020) to conduct
3  five hearings, adopt a trustee area map, submit it to the County Committee on School District
4  Organization (pursuant to Education Code, section 5019, 5020, and 5030) for approval and to the
5  Sacramento County Registrar of Voters by July 1, 2020, for implementation in November 2020.

7  24.        More than 90 days have passed since SJUSD adopted the resolution of intent,
8  providing an additional reason this action is timely pursuant to Elections Code, Section
9  10010(e)(3)(B).

11  25.        PART III supports the second count, which states a claim under Section 2 of the
12  Voting Rights Act of 1965, 52 U.S.C. §10301(b). Federal district courts have jurisdiction over
13  actions brought under Section 2 and under Title I of the Civil Rights Act of 1964. 52 U.S.C.
14  §§10308(f), 10301(d). This Court has a concurrent duty to enforce federal law, including
15  Section 2, and additional federal rights, such as those set forth in 42 U.S.C. §§1983, 1985(3),
16  1988, according to its regular modes of procedure. No part of the federal Voting Rights Act
17  excludes operation of the CVRA, nor does any federal law invalidate any of its provisions. 42
18  U.S.C. §2000h-4.

20  26.        Federal law preempts the notice of claim requirement set forth in Elections Code,
21  Section 10010(e)(3)(B). Felder v. Casey (1988) 487 U.S. 131.

23  27.        Code of Civil Procedure, Section 394(a) confers venue in Sacramento County, in
24  which SJUSD is located.

## PARTIES AND AFFECTED PUBLIC AGENCIES

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 12

28.        Plaintiff Magali KINCAID is a Latino voter who resides in Arden-Arcade and
SJUSD.  Her Guatemalan and Salvadorian ancestry constitutes "Spanish heritage," so she is a
member of a "protected class" within the meaning of Elections Code, Section 14026(d) and of a
"language minority group" within the meaning of 52 U.S.C. §10310(c)(3).

29.        Plaintiff Juan YNIGUEZ is a Latino voter who resides in Carmichael and SJUSD.
His Mexican ancestry constitutes "Spanish heritage," so he is a member of a "protected class"
within the meaning of Elections Code, Section 14026(d) and of a "language minority group"
within the meaning of 52 U.S.C. §10310(c)(3).

30.        Plaintiff Carolina FLORES is a Latino activist who supports Latino immigrants,
children, and citizens throughout the Sacramento Valley.  To the extent that the discriminatory
practices detailed herein impede her voter registration activities within SJUSD, she is an
"aggrieved party" for purposes of 52 U.S.C. §10301(d) and entitled to enforce Article I, Section
7 of the California Constitution.

31.        Plaintiff Damaris CANTON is a voter who resides in Carmichael and SJUSD.
She is a member of a "protected class" within the meaning of Elections Code, Section 14026(d)
by virtue of her race and her Panamanian ancestry, which constitutes "Spanish heritage," making
her a member of a "language minority group" within the meaning of 52 U.S.C. §10310(c)(3).

32.        Plaintiff BENITO JUAREZ NEIGHBORHOOD ASSOCIATION is a California
unincorporated association formed to support Latino immigrants throughout Sacramento County,
including the promotion of food security, educational opportunity, civic engagement, citizenship,
and voter registration by eligible Latinos.  BENITO JUAREZ has standing as an association to
the extent that SJUSD's discriminatory practices impair its voter registration and education

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 13

1   activities.   BENITO JUAREZ also representshas standing to represent KINCAID and other
2   members, including persons protected by the Thirteenth, Fourteenth and Fifteenth Amendment;
3   by Section 101(a) of the Civil Rights Act of 1964, 52 U.S.C. §10101(a)(2); by Sections 4(f)(2)
4   and 14 of the Voting Rights Act, 52 U.S.C. §§10103(f)(2) and 10310(c)(3), and by the CVRA.
5   Additional BENITO JUAREZ members who are Latino electors in SJUSD join in the allegations
6   made by Plaintiffs.

7

8   33.             Plaintiff NEIGHBORHOOD ELECTIONS NOW is a California unincorporated
9   association and an organizational affiliate of the California Voting Rights Initiative.  NEN has
10  standing to represent plaintiffs and additional members, including persons protected by the
11  Thirteenth, Fourteenth and Fifteenth Amendment; by Section 101(a) of the Civil Rights Act of
12  1964, 52 U.S.C. §10101(a)(2); by Sections 4(f)(2) and 14 of the Voting Rights Act, 52 U.S.C.
13  §§10103(f)(2) and 10310(c)(3), and by the CVRA.  NEN is committed to representing the
14  interests of the groups protected by CVRA and the related federal statutes.  NEN has standing in
15  its own right to the extent that its voter registration and education activities are impeded by the
16  discriminatory practices detailed in this complaint.  NEN anticipates incorporating during the
17  pendency of this lawsuit.  Additional NEN members who are Latino electors in SJUSD join in
18  the allegations made by Plaintiffs.

19

20  34.             Defendant SJUSD is (1) a unified school district and part of the "Public School
21  System" subject to Article IX, Section 14 of the California Constitution; (2) a local education
22  agency subject to Education Code, Section 35010, *et seq.*, and the rules of the State Board of
23  Education; (3) a public entity for purposes of Government Code, Section 811.2, *et seq.*; (4) a
24  political subdivision within the meaning of Elections Code, Sections 10412, 14026(c), and
25  14051(a) and 52 U.S.C. §10301(a); (5) a "school board" for purposes of 42 U.S.C. §2000c; and
26  (6) a person for purposes of 42 U.S.C. §§1983 and 1985(3).  SJUSD acts "under color of State
27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
    ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 14

1    law" for purposes of 42 U.S.C. §§1981 and 1983. Board Policy 410 prohibits SJUSD from

2    discriminating against any individual or group based on race, color, ancestry, or ethnicity.

3

4    35.          On February 8, 2020, NEN on behalf of KINCAID, BENITO JUAREZ,

5    YNIGUEZ, FLORES, CANTON, and other neighborhood activists presented a 12-page notice

6    that SJUSD violated the CVRA and petitioning it voluntarily to comply by adopting trustee

7    areas.  Elections Code, Section 10010(e) allowed SJUSD 90 days to conduct public hearings and

8    adopt a trustee area map (*i.e.*, by June 8, 2020), provided it passed a resolution within 45 days of

9    its receipt of the notice.

10

11   36.          Kent Kern is the superintendent of SJUSD, employed pursuant to Education

12   Code, Sections 35026 and 35031, and exercises the powers and duties set forth in Section 35035.

13   With the Board president, he prepares the agenda for Board meetings, assures the Board that

14   each item meets State Board requirements, and makes a recommendation as to each item.  Board

15   Bylaw 9322.

16

17   37.          SJUSD is governed by five trustees elected at-large ("Board"), who constitute a

18   governing board as defined by Education Code, Section 211 and also a legislative body

19   exercising the powers and duties set forth in Government Code, Section 53000, *et seq.*  Meetings

20   of the Board are subject to Education Code, Section 35140, *et seq.*, and Government Code,

21   Section 54950, *et seq.*  With due notice, trustees and members of the public may place items on

22   the Board agenda.  Board Bylaw 9322.  Elections to the Board are subject to the CVRA,

23   Elections Code, Section 14026(c); Education Code, Sections 220, 5009 to 5030, 5300 to 5442,

24   and 35012 *et seq.*; and Elections Code, Section 10400, *et seq.*, Section 10600, *et seq.*

25

26   38.          Pursuant to Education Code, Sections 35041.5 and 35204, SJUSD has authorized

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
     ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 15

an independent attorney "to conduct school district litigation and administrative proceedings."
Board Bylaw 9124. SJUSD Attorneys Louis Lozano, Michael Smith, Michelle Cannon, and
Ryan Tung have apparent authority to represent actions of the Board as to money claims and
legislative acts and apparent authority to bind the Board as to procedural agreements reached to
avoid or conduct litigation.

39.        The SJUSD Board is bound by any instructions of qualified electors, convened
pursuant to Education Code, Section 35190, on the subject of the prosecution, settlement, or
compromise of this litigation.

40.        As the registrar of voters appointed by the Board of Supervisors of Sacramento
County, Courtney Bailey-Kanelos is responsible for administering the election of SJUSD trustees
and ballot measures.  The regular election for trustee has been consolidated with the statewide
general election, pursuant to requests under Elections Code, Section 10002 and 10400.  The
Elections Code directs her to implement any boundary changes, including a change from election
at-large to election by district, provided by the governing body on or before 125 days before an
election.

41.        Ms. Bailey-Kanelos denies the following representation made by attorneys for
SJUSD to Governor Gavin Newsom: "Registrar of Voters offices across the state have indicated
that they will need more than the 125 day lead time [*i.e.*, July 1, 2020] to adjust all maps as
required for the elections."  Because Ms. Bailey-Kanelos and other county elections officials
comply with orders enforcing the CVRA, prior case law does not routinely identify the registrar
or county supervisors as parties or real parties in interest at the onset of litigation.

42.        Pursuant to Education Code, Section 4020, the Sacramento County Board of

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 16

1   Education acts as the County Committee on School District Organization (County Committee).

2   The County Committee may establish trustee areas in a school district within its jurisdiction, but

3   the CVRA does not require it to do so. Section 5019(a). The County Committee can also

4   approve a proposal to establish trustee areas made by a school district or a petition of its voters.

5   Section 5019(c). Its resolution establishing trustee areas in subject to voter approval and

6   becomes effective at the next election occurring more than 120 days after voter approval. Section

7   5019(d). Only one prior reported case has named a county committee as a defendant.

8

9   43.        On May 7, 2020, the State Board of Education, acting by teleconference,

10   exercised its authority under Education Code, Section 33051, to grant SJUSD a waiver from the

11   voter approval requirement of Education Code, Section 5019. This waiver expires on March 8,

12   2022.

13

14                              **FACTUAL ALLEGATIONS**

15            **PART I:  FACTS SUFFICIENT TO ESTABLISH CVRA LIABILITY**

16
17   **Establishment of a Small, Exclusionary Board**

18   44.        At the time of the District's establishment, California was under the influence of

19   Governor Hiram Johnson and the Progressive Party, which required all school employees to be

20   citizens, excluded Chinese and Japanese, prevented Asian nationals from owning property, and

21   promoted concentrating power into very small governing bodies. At the time, school boards in

22   other states were much larger and usually elected by district.[9] California's small, at-large

23   governing boards allowed white Protestant men, generally from the most prosperous

24   neighborhoods, to dominate local government, surviving decades of political and demographic

25   change.[10]

26   ───────────────

27   [9] See New York Times, "Size of School Boards," Feb. 20, 1916, at 85.

28   ───────────────
     COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
     ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 17

45.        SJUSD established its Board with three-year terms, with vacancies filled by the county superintendent.  Pursuant to Political Code, Section 1588 (Act of June 18, 1923), SJUSD and all unified districts were limited to five trustees.  SJUSD also extended the trustees' term to four years, staggered their terms, and assumed authority to make its own appointments to vacancies.  *Compare* Political Code, Section 1563 (1916).  This allowed incumbents to run as slates and to be reelected by plurality with no runoff or transferable vote.

46.        The county committee on school district reorganization was given the power to create trustee areas and increase the Board to seven. 1976 Stat. ch. 1010.  In 1992, A.B. 2949 allowed voters to petition the county committee to make these changes. 1992 Stat. ch. 350.  But few school districts changed.  Prior to the CVRA, only six-tenths of one percent of school trustees were Latino.

**Latino Population and Voting Population in SJUSD**

47.        According to the 2010 United States Census, SJUSD had a population of 323,105. According to the data from the 2014-2018 American Community Survey (ACS), as released by the United States Bureau of the Census January 30, 2020, the population of SJUSD has grown to 339,568.

48.        According to these ACS data, Latinos are 14.5% of the population, and Blacks and Asians an additional 10.5%.   The Latino share of eligible voters (citizens of voting age or

---

[10] In the case of schools, small Boards also reduced the possibility of voters electing women, as authorized by Political Code, Section 4023 in 1907.  The ability to appoint after a strategic resignation in advance of election helped slates self-perpetuate all-male Boards after the 19th Amendment.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 18

1   CVAP) is 12.5%, making it possible to form an influence district in Arden-Arcade, possibly in

2   coalition with Black and Asian voters. The Latino share of CVAP increases each year, largely

3   because 96% of Latinos turning 18 are citizens.

4

5   49.        To avoid perpetuating the effects of past discrimination, the analysis of any

6   trustee area designed for a protected group relies on the Latino share of CVAP (12.5%), rather

7   than the Latino share of registered or actual voters. The impact of at-large and enhancing

8   practices has reduced the voter registration rate for SJUSD's Latinos, who comprise only 8.8%

9   of registered voters, and only 7.7% of those who voted in the 2018 general election.

10

11   **Abridgment and Dilution of Latino Voting Rights**

12   50.        SJUSD imposes an at-large method of election that both dilutes minority voting

13   rights by submerging minority neighborhoods in the third-largest electoral division in the State.

14   At-large election prevents Latinos in Arden-Arcade and other neighborhoods from aggregating

15   their votes and from forming coalitions with other minority groups and cross-over voters, in

16   order to elect their candidates of choice.

17

18   51.        It is not necessary for plaintiffs to prove that Latinos will be immediately able to

19   elect their candidate of choice under an alternative method of election. It is sufficient that

20   neighborhood elections will increase their influence.

21

22   52.        The challenge of supporting a campaign across the entirety of SJUSD has

23   produced a barrier so formidable that Latino organizations and their supporters have not invested

24   in recruiting and vetting candidates that would have support from the Latino community or a

25   coalition of minority voters.

26

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 19

53.         At-large, combined with the large size of SJUSD, prevents minority neighborhoods from identifying and supporting grass-roots candidates to run for school board and progress to higher office. Since enactment of the CVRA, the percentage of Latino trustees statewide has grown from 6/10 of one percent to 16%, primarily due to voluntary implementation of trustee area elections. The absence of a cadre of experienced Latino elected officials to compete for higher office endangers democracy statewide and is a further abridgment of Latino voting rights.

54.         The chronic failure to elect its candidate of choice or even to influence elections has demoralized the Latino community. The absence of competitive school board elections in minority neighborhoods diminishes organized voter registration and mobilization, creating a cycle of political exclusion. These effects, which are particularly serious in SJUSD, are independent abridgments of Latino voting rights. They result in the election of state and federal officials who are not chosen by a majority of eligible voters.

55.         Arden-Arcade and other minority neighborhoods are not represented on the Board, which impairs efforts to address special needs and inequities. At-large allows those elected to ignore minority interests without fear of political consequences. As the Supreme Court noted, the lack of influence on governance after the election is itself an abridgment of Latino voting rights.

56.         One measure of the failure to address minority interests is an excessive degree of unanimity. From January 8, 2019 to January 28, 2020, 134 out of 139 motions passed unanimously. The Board does not debate the need to address special needs within the District because the disadvantaged communities have no one to negotiate for them. This demonstrates an "abridgment" for purposes of Elections Code, Section 14027, as well as "lack of responsiveness"

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 20

1   that is probative for Senate Factor 8. *See* paragraph 128, *infra.*

2

3   57.             Shortly after the formation of SJUSD, the general law required all unified school

4   districts to elect five trustee boards at-large. The exclusionary effects noted in Paragraph 14

5   were imposed statewide, became entrenched, and persisted even after the Legislature authorized

6   districts to elect by trustee area. Until passage of the CVRA, less than one percent of school

7   trustees statewide was Latino. While the CVRA has increased the number, the continued paucity

8   of minority trustees statewide prevents the Legislature from fully understanding the needs of our

9   neighborhoods when it formulates education law and policy and sets budgets. This gap impairs

10   he influence of Latino voters, abridging their voting rights for purposes of Section 14027 on a

11   statewide basis.

12

13   **Racially Polarized Voting in SJUSD**

14

15   58.             "Racially polarized voting" means voting in which there is a difference in the

16   choice of candidates or other electoral choices that are preferred by voters in a protected class,

17   and in the choice of candidates and electoral choices that are preferred by voters in the rest of the

18   electorate. Elections Code, Section 14026(e). This difference is defined by federal case law, as

19   referring "only to the existence of a correlation between the race of voters and the selection of

20   certain candidates" and does not require proof of "causation or intent." Thornburg v. Gingles

21   (1986) 478 U.S. 30, 74. The Supreme Court recognized that its existence can be established by

22   bivariate ecological regression analysis. *Id.,* 53 & n.20. Plaintiffs have used this measurement to

23   determine polarized voting between Latinos and non-Latinos, referred to herein as "Latino

24   polarized voting." When the analysis shows that a candidate or measure receives support from

25   Latino voters that is significantly greater or less than the support of rest of the electorate, the

26   candidate or measure is positively or negatively polarized. In this case, Latinos are said to be

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 21

"cohesive" when statistical tests show that the "correlation did not happen by chance." *Id.*, 54 & n.22. "[O]nly the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Id.*, 62.

59.         Racially polarized voting means that creating a single trustee area in which Latinos or a minority coalition can aggregate their votes to influence the outcome improves representation for all Latinos in SJUSD, because Latinos as a group have shown that they are cohesive in their values, needs, and electoral choices."

60.         A jurisdiction cannot refute racially polarized voting simply by claiming a majority of voting Latinos supported an Anglo incumbent, especially if there was no Latino candidate of choice. Creating trustee areas will offer voters a wider set of candidates and, over time, break the cycle that has disengaged many Latino voters. Aggregate results at-large cannot predict outcomes after trustee areas are implemented. Cohesion among Latinos who do vote shows the potential for a larger number of eligible Latino electors to influence elections in a smaller constituency.

61.         Latino polarized voting occurs in election for trustees because there is a significant difference in the candidates that are preferred by Latino voters and the candidates that are preferred by non-Latino voters.

62.         Because Latino voters and non-Latino voters express different preferences, Latino voters are often unable to elect candidates of choice as trustees at-large.

_____

" *See* Gerken, "Understanding the Right to an Undiluted Vote," 114 HARV. LAW REV. 1663, 1677 (2001)).

_____

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 22

63.        Because Latino voters and non-Latino voters express different preferences, Latino voters lack equal influence in trustee elections, even when acting in coalition with members of other protected groups or with crossover voters.

64.        In potential trustee areas in which Latinos voters are concentrated, such as Arden-Arcade, Latinos who vote are even more politically cohesive than they are in SJUSD at-large.

**Racially Polarized Voting in Trustee Elections**

65.        Of the 75 candidates who have sought election to 28 trustee positions that have been open since 1992, only three were Latinos in a contested race. Two, Paula Villescaz and Magali Kincaid, were defeated; the third, Saul Hernandez, was not a Latino candidate of choice.[12]

66.        In the most recent election, the non-Latino majority elected Michael McKibben, who was negatively polarized by Latino voters. The non-Latino majority blocked Magali Kincaid, who only the second Latino candidate of choice to contest an election since 2004. She was strongly polarized by Latino voters but defeated by candidates who received strong support from non-Latino voters districtwide.

67.        "Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." Gingles, 478 U.S. at 57, n.25.

---

[12] The plaintiffs make the allegations contained in paragraphs 65 to 78 based on work product prepared under the direction of their attorney, which they believe to be true. The allegations will be proved at trial, if contested.

---

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 23

68.     In 2014, Paula Villescaz ran in a contested election and lost. The Latino vote polarized in her support. Although the "full endorsement list" that she provided to the League of Women Voters (LWV) in 2014 includes no Latino organizations, her personal campaign website (paulaforschoolboard.com), as it existed in April 2016, cites the endorsement of the Latino Democratic Club.

69.     In the 2016 election, Paula Villescaz was appointed in lieu of election. Her lack of opposition is a "special circumstance" depriving her success of probative evidentiary value to refute a finding of polarized voting. Gingles, 478 U.S. at 54. Even if the race were contested and Villescaz was the candidate of choice, the success of a single candidate would be "too recent [and] too limited" to disprove racially polarized voting. id. at 80.

70.     Trustee Villescaz's biography on the San Juan website states that she lives in Arden-Arcade. At least since July 2019, she has been registered to vote in Carmichael, near Garfield and Cypress Avenues.

71.     In the 2012 election, Saul Hernandez won election with 17% of the vote. His LWV endorsement list included no Latino organizations or individuals. He did not receive a significantly higher level of support from Latino as from non-Latinos. Accordingly, trustee Hernandez was not a Latino candidate of choice.

72.     In 2012, one candidate was negatively polarized, but Latinos had no one to support. Most Latinos chose to drop off or undervote the trustee election. More voted on Measure N, which was positively polarized and won overall by a margin of 5%.

73.   .     Lawrence W. Miles won election to the Board in 2004 and 2008. He had a strong

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 24

list of endorsements, but it included no Latino individuals or organizations. His personal website (larrymiles.us), as it existed in November 2004, contains no reference to Latino issues or to any Latino ancestry. His ethnicity is not currently identified in a political database used by many campaigns. He is not classified as Latino in the database that the Legislature uses for redistricting. It is possible that the 1990 census classified him as Hispanic if he was still living with a parent whose first language was Spanish. Given these circumstances, trustee Miles was not publicly recognized as Latino.

74.     Apart from these three candidates, the most recent candidate to run for trustee as a recognized Latino was Linda Cortez in 2004, who lost, winning less than 6% of the vote. Three non-Latinos, including Mr. Miles, were elected.

**Impact on Other Racially Polarized Elections**

75.     Since there was no contest in 2016 for school trustee, which is the most important official position to many in the Latino community, there was limited campaigning, which depressed Latino registration and turnout in all contests. In 2016, despite polarized support from the Latino community, the Democratic candidate for President of the United States received only 48.7% of the total vote, districtwide.

76.     The absence of viable candidates for school trustee also hurts other Latino candidates of choice in statewide elections. Latinos overwhelmingly supported Governor Newsom, but he was defeated districtwide. In 2018, the races for Attorney General, Controller, and Treasurer were also polarized, with Latinos providing significantly stronger support to the Latino or Asian candidate.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 25

77.     The 2012 race illustrates the damage that suppressing Latino engagement can do to the authenticity of state and federal elections. The Latino community strongly supported Congressman Ami Bara in the 7th District. His competitive election did provide unusual efforts to mobilize Arden-Arcade and other Latino concentrations.

78.     Latino polarized voting occurs in ballot questions, including but not limited to Propositions 51, 55, 58, 61 and 66 in 2016, which affect the rights and privileges of Latinos. Latino support for the $8 billion school bond (51), extending the millionaire's tax to fund education and healthcare (55), repealing the restriction on bilingual education (58), and pricing standards for prescription drugs (61) was significantly higher than the support from non-Latinos. Most Latino voters in SJUSD opposed restricting death penalty appeals (66), while most non-Latino voters supported doing so. The fact that Latino polarized voting occurred in so many recent propositions shows that Latinos in SJUSD have a coherent set of political values and electoral choices. This is sufficient to demonstrate a violation of the CVRA.

**PART II: ADDITIONAL ALLEGATIONS RELATED TO "SAFE HARBOR" CLAIMS**

**Failure to Enter Safe Harbor**

79.     When the notice specified in Elections Code, Section 10010(e) is received more than 135 days before the deadline to submit boundary changes for the next regular election, the resolution cannot abate litigation without committing to complete the hearings. The Legislature reemphasized this in AB 2123, which amended Section 10010(e)(1)(C)(1) to preclude extending the safe harbor beyond the boundary deadline for the next regular election.

80.     On various dates, including February 25, 2020 and March 10, 2020, SJUSD attorneys convened a quorum of trustees in non-public meetings and illegally discussed liability

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 26

1    under the CVRA without the public notice required by the Brown Act. Government Code,

2    Sections 54954.5(c) and 54956.9(e)(2). They scripted a series of aggressive objections to

3    compliance in 2020.

4

5    81.        On March 10, 2020, the Board voted unanimously to adopt Resolution 2982.

6    According to the Superintendent's recommendation, the resolution states the Board's "intent to

7    move to a by-trustee area election system commencing in November 2020" and to "complete the

8    process within 90 days of the resolution's passage." However, the text of the resolution itself

9    does not commit to implement in 2020.

10

11   82.        At the meeting, counsel for Plaintiffs advised Ms. Cannon that the commitment

12   was essential to establishing the 90-day safe harbor. The Board declined to amend the

13   resolution.

14

15   83.        During the meeting, four of five trustees made statements expressing their

16   opposition to complying in 2020. These included statements they knew to be false regarding

17   costs.[13] The attorney stated that the five-hearing process would have to be redone after the

18   census, when she knew that post-census adjustments require only one hearing. Even after the

19   resolution was adopted, the Superintendent suggested that the District wanted to wait until 2022.

20

21   84.        Given the uncertainty regarding any intent to implement in 2020, Plaintiffs sought

22

---

23   [13] Attorney: we're doing a ton of work, spending a lot of time and money now, but you're going to
     have to <u>do this again</u> in 2022." Trustee 1: "I am sorry that we have to <u>take money away</u> from
24   students to hire a demographer to create maps based on the 2010 census data, and then we'll have
     to turn around and hire a demographer again after the 2020 census..." Trustee 2: "we're going to
25   <u>do this twice</u> kills me inside while we're cutting staff that we need. ... It's not going to be pretty
     and we have to do it so we don't <u>waste</u> more money" Trustee 3: "I do resent the <u>kinds of money</u>
26   that we're going to have to spend, that's not on children."

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
     ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 27

an appointment to inspect the recording the following morning. Access was denied by telephone.[14] A call to SJUSD attorney on March 12, 2020 was not returned.

**Binding Litigation Commitment**

85.       At 11:27AM on March 17, 2020, Counsel for Plaintiffs received a cryptic voice mail message from SJUSD attorney Michelle Cannon, asking to "talk about postponing until 2022," but promising "we are still going to make it happen." Despite the professed desire to discuss, she did not return four phone calls. Subsequent statements to Governor Newsom were literally false; there was no "refusal" to postpone until the next election cycle from a "demanding attorney" because there was no "request" to do so. On the contrary, there were reaffirmations that the District was proceeding. Plaintiffs are aware of no further attempts to return calls respond to the request to "talk about" this subject.

86.       On March 19, 2020 (Thursday, 4:07PM), Ms. Cannon wrote the following:

> Mr. Rafferty, the District fully intends to comply with the law and make the transition to
> by trustee area elections this year unless we have agreement to wait and make the
> transition in 2022. Clearly we do not have such an agreement so the District will proceed
> as planned. ... There is no reason for this process to be adversary and we don't anticipate
> that it will be. As you heard at the Board meeting the Board and the superintendent are
> all committed to making this happen and moving forward.

This Court closed for ten days on March 19, 2020. The inability to seek judicial intervention heightens the public interest in ensuring that written commitments made regarding statutory safe harbors are enforceable.

87.       Ms. Cannon did not purport to guarantee that the Board would ultimately approve

---

[14] *See* SJUSD Administrative Regulation 1340; Government Code, Section 6250,

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 28

a substantive resolution adopting trustee areas. The commitment to "mov[e] forward" and the stated "inten[t] to make the transition… this year" absent an agreement is procedural; includes an enforceable commitment to seek agreement before discontinuing scheduled hearings. The false claim that SJUSD was "moving forward" to adopt trustee areas, when it was actually petitioning the Governor to suspend judicial enforcement of the CVRA, denied plaintiffs the full and equal benefits of state law, including the right to sue in this Court, in violation of 42 U.S.C. §1981(a). Plaintiffs relied to their detriment in refraining from challenging the safe harbor and in investing in continued participation in the safe harbor process, despite having exhausted the fee cap that applies if the entity passes a compliant ordinance within 90 days of the resolution of intent.

88.         On April 27, 2020, Ms. Cannon asserted that her commitment was not enforceable because "detrimental reliance may not be claimed as a matter of law." She provided no citation. Equitable estoppel in fact will run against the Government where justice and right so require, including assurances designed to induce persons not to seek judicial intervention.[13] The undertaking is a unilateral contract, on which Plaintiffs and their Counsel did rely to their detriment. They continued to spend time and expenses in support of the hearing process, which SJUSD neither completed nor sought any agreement to delay, as it promised to do.

89.         Government Code, Section 814, et seq., does not limit SJUSD's liability "based on contract or the right to obtain relief other than money or damages."

**Campaign for an Emergency Order to Suspend the CVRA Based on Misinformation**

90.         Ms. Cannon did not return another phone call on March 20, 2020. On March 23, 2020, Counsel for Plaintiffs wrote to confirm the commitment was still in effect, and she replied

---

[13] *See* Farrell v. Placer County (1944) 23 Cal. 2d 624, 627-28, Shoban v. Board of Trustees (1969) 276 Cal. App. 2d 534, 543. and cases cited therein.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 29

1  that the hearings would continue by teleconference. In fact, her law firm was already soliciting

2  the California School Board Association (CSBA) and other agencies to write the Governor

3  seeking the suspend access to the courts for CVRA plaintiffs.

4

5  91.          Claiming to represent both SJUSD and Folsom Cordova USD, Ms. Cannon's law

6  firm misled the CSBA, CASBO, and the Association of California School Administrators,

7  inducing them to sign a letter that misled the Governor in several respects:

8

| As stated in letter | Actual facts |
|---|---|
| The letter repeatedly stated that compliance in 2020 was impossible.[16] | Napa Valley USD, City of Napa, Gilroy USD, and even Folsom Cordova USD all completed the process. |
| "SJUSD reached out to the demanding attorney to request postponing the transition until the next election cycle." | This is the opposite of the truth. SJUSD repeatedly affirmed that it was complying in 2020, before and after sending the letter. See para. 86, *supra* |
| "Folsom Cordova USD also requested an agreement from the same attorney [for 2022 implementation] and that request was similarly rejected." | Three days before the letter was sent, counsel wrote FCUSD: "My clients will not entirely rule out a court-approved remedy that includes an at-large election in 2020." However, FCUSD trustees said it would "verge on dereliction of duty" not to proceed. |
| "Registrar[s] around the state have indicated that they will need more than the [statutory] lead time to adjust all maps as required for the elections." | Sacramento Registrar Bailey-Kanelos denies ever having questioned her office's ability to implement maps submitted by July 1, 2020. |

20  92.          These statewide organizations have great credibility with Governor Newsom, but

21  all appear to have been misled by SJUSD's attorneys. Public records indicate that the drafts

22  circulated to these organizations were virtually unchanged when submitted to the Governor.

23  SJUSD and FCUSD produced no public records indicating that they sought or received

24

25  [16] The letter falsely stated: "Public agencies cannot complete the transition process to by-trustee area elections in time for the 2020 election.... Public agencies will be unable to meet [the

26  registrars'] July 1, deadline... Public agencies will be forced to adopt trustee area maps that will never be used... These maps will never be used."

27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 30

1  suggested language from the organizations that co-signed the letter, or that they verified any of
2  the disputed factual claims.

3

4  93.       Registrar Bailey-Kanelos implemented the timely map submitted by Folsom
5  Cordova USD, and never indicated that she would not implement boundary changes submitted
6  by July 1, 2020. Registrar John Tuteur implemented CVRA remedial maps in Napa County and
7  never indicated that he would not implement boundary changes submitted by July 1, 2020.
8  Registrar Dean C. Logan of Los Angeles County implemented trustee area elections for Carson
9  on the November 2020 ballot, even though the city council did not approve a map to remedy the
10  CVRA until August 14, 2020.

11

12  94.       Upon information and belief, no registrar in the State of California indicated that
13  they needed more than the statutory lead time to implement boundary changes in time for the
14  2020 election.

15

16  95.       On or about March 27, 2020, SJUSD's attorneys sent Governor Newsom a letter
17  containing the misrepresentations identified in paragraph 91. It appeared to be endorsed by the
18  apparent endorsement of Folsom Cordova USD, CSBA and several additional statewide
19  organizations. SJUSD attorneys did not cite any provision of the Emergency Services Act,
20  Government Code, Section 8565, *et seq.*, or any other legal authority.

21

22  **Inapplicability of Emergency Order**

23

24  96.       They requested that the Governor "suspend timeframes" in Elections Code,
25  Section 10010(e) in two ways: (1) until such time as neither state nor local public health officials
26  recommend or impose social distancing measures, and (2) for a year if "state and local social

27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 31

1  distancing measures extend past April 1, 2020 ... to allow for the release of the 2020 census

2  data." While the Governor rejected element (2), he substantially relied on the other language

3  proposed by SJUSD.

4

5  97.        Proposal (2) demonstrates that SJUSD's proposals were based on political self-

6  preservation and the protection of incumbency, without regard to the professed concern for the

7  public health. SJUSD had only 60 days left on its safe harbor but sought an automatic two-year

8  extension even if there were 90 days with no social distancing measures before the registrar's

9  deadline.

10

11  98.        Any ambiguity in the effect of terms such "suspend timeframes" or "recommend

12  social distancing measures" should be construed against SJUSD, as the party that drafted them,

13  especially since the Governor did not have the time or opportunity to seek input from the public

14  or Legislature. Suspension of the timeframes in Section 10010(e)(2) and 10010(e)(3)(B)

15  eliminates the safe harbor period rather than prolonging it. "Social distancing measures" cannot

16  reasonably be construed to apply to recommendations that are unrelated to the conduct of

17  hearings, especially since some recommendations (plexiglass barriers in certain environments)

18  may be semi-permanent. The letter's reference to May 31, 2020 as the possible date for "lift[ing]

19  the social distancing measures" suggested that SJUSD was only proposing to suspend hearing to

20  the extent that some "social distancing measures" actually interfered with their conduct. The

21  letter did not disclose that SJUSD had already planned to conduct a CVRA hearing by

22  teleconference four days later.

23

24  99.        In reliance on the misrepresentations contained in paragraph 91, the claim that

25  social distance rendering hearings "impossible," and the ambiguous language supplied by

26  SJUSD attorneys, Governor Newsom issued Executive Order N-48-20 on April 9, 2020. It

27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 32

1 | provides in part:

2

3 | WHEREAS holding these hearings in the near future—at a time when public health
requires that Californians stay home except for essential needs—would threaten public
4 | health and safety, and would force Californians to choose between fully participating in
their democratic process and safeguarding their own health and safety, as well as the
5 | health and safety of their communities; and WHEREAS under the provisions of
Government Code section 8571, I find that strict compliance with various statutes
6 | specified in this order would prevent, hinder, or delay appropriate actions to prevent and
mitigate the effects of the COVID-19 pandemic..., [
7 | The timeframes set forth in Elections Code section 10010, subdivisions (a) and (e), are
8 | suspended as to any political subdivision of the State. The purpose of this suspension is to
protect public health and safety during the period when the State Public Health Officer
9 | and other public health officials have determined that it is necessary to engage in physical
distancing to minimize the spread of COVID-19. This suspension shall be in effect until
10 | further notice.
11 | This paragraph pauses the timeframes set forth in Elections Code section 10010,
subdivisions (a) and (e), but does not restart them: this paragraph should be construed to
12 | toll those timeframes, such that days elapsed during the suspension set forth in this
13 | paragraph are not counted, but any days that elapsed prior to that suspension are still
counted. ...
14 | This Order is not intended to, and does not, create any rights or benefits, substantive or
procedural, enforceable at law or in equity, against the State of California, its agencies,
15 | departments, entities, officers, employees, or any other person.

16

17 | 100.          Because its stated purpose is limited to the protection of public health and safety,

18 | N-48-20 does not implicate hearings by teleconference, which was the format SJUSD had

19 | selected for its hearings. One occurred before N-48-20 even issued on March 31, 2020; the

20 | remaining hearings were scheduled to be held during regular Board meetings on April 14, April

21 | 28, May 12, and May 26, 2020. Each of these meetings did occur by teleconference with live

22 | public comments, but SJUSD failed to conduct the hearings as previously scheduled.

23

24 | 101.          Article I, Section 3(b)(2) of the California Constitution provides that any court

25 | rule or other authority that defendants may cite as a basis to restrict access to the courts must be

26 | narrowly construed and, if adopted after June 3, 2014, is invalid unless adopted with findings

27

28 | COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 33

1   demonstrating the interest protected by the limitation and the need for protecting that interest. N-
2   48-20 should be construed (1) to allow any safe harbor applicable to SJUSD to expire on June 8,
3   2020, (2) to be inapplicable to SJUSD or any local entity that has teleconferencing available or in
4   actual use for hearings, (3) to permit recovery of the fee award provided by Section 10010(f)
5   without regard to the $30,000 (inflation-adjusted) cap, which is not severable from the provisions
6   limiting the duration of the hearing period to 90 days, and (4) to toll any time limitation on any
7   collateral action or claim that might be brought by CVRA petitioners from its effective date,
8   March 20, 2020 until there is a judicial interpretation as to its scope or validity, or until the
9   Governor, rescinds any further effect of the order, whichever first occurs.-

11   102.        Elections Code, Section 14031 declares that the CVRA implements guarantees
12   contained in Article I, Section 7 (due process and equal protection) and Article II, Section 2
13   (right to vote) of the California Constitution.  N-48-20 "suspends deadlines" that constitute a safe
14   harbor to facilitate alternatives to litigation that enforces the CVRA.  Even if the pandemic
15   precludes or impairs that alternative process, such a condition should not restrict access to the
16   courts for the enforcement of Sections 14025 to 14031, to which N-48-20 does not even refer.

18   103.        On April 9, 2020, when the Governor issued N-48-20, some school districts still
19   conducted in-person meetings.  Santa Clarita met in person regarding the CVRA.  N-48-20 did
20   not prohibit these in person hearings, let alone public hearings by teleconference.  The findings
21   and purpose indicate that N-48-20 is completely irrelevant to public hearings by teleconference.
22   Teleconference hearings do not require witnesses to leave their homes, nor do they result in any
23   adverse impact on the health and safety within a community.  Enforcement of the CVRA has no
24   consequential effect on homelessness or any other condition that would adversely affect public
25   health during the pandemic.

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
    ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 34

104.       City of Napa and at least three other unified school districts (Folsom-Cordova, Napa Valley, and Morgan Hill) successfully conducted the CVRA process by teleconference. SJUSD conducted hearings on other matters on June 9, 2020, June 23, 2020, September 8, 2020, and September 22, 2020.

105.       *N-48-20 is inconsistent with the Legislature's determination that school board hearings can and must conduct hearings during the pandemic.* Subsequent to N-48-20, SB 98 added Education Code, Section 43509, requiring each school district to hold a series of hearings on distance learning by September 30, 2020.

106.       *In contrast to N-64-20, N-48-20 was not adopted at the request of legislators pending consideration of legislation ratifying the action, nor does it assert that any action is being taken after consultation or "in partnership with the Legislature."* As such, its terms and implementation cannot be altered by subsequent legislation, except to the extent that the Legislature repeals the Emergency Services Act. Subsequent Executive Orders make substantial *revisions to the Elections Code only on a provisional basis, disclaiming any "limit on the enactment of legislation on that subject."* *e.g.*, N-64-20.[17] Subsequent orders preserve the separation of legislative powers protected by Article IV of the California Constitution in a way that N-48-20 does not.[18]

107.       N-48-20 does not refer to any of the delegations of emergency legislative power set forth in Article IV (*e.g.*, Sections 8 and 10) or in the Elections Code (*e.g.*, Section 3018(b) or 3021.5). The Legislature enacted Section 19104, which directs the Secretary of State to prepare

___

[17] *See* Newsom v. Superior Court of Sutter County, C092070, 3rd App. Div., July 10, 2020, slip op. at 8 (certified for publication):
[18] Article IX, Section 14 further reserves the governance of school districts to the Legislature.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 35

a report on readiness to hold elections during a disaster. This report did not discuss suspension of judicial enforcement of the CVRA as among the provisions that the Governor "may wish to waive or suspend" during a disaster. N-48-20 does not facilitate or authorize any action by the Judicial Council under Government Code, Section 68115, *et seq.*, that might restrict jurisdiction or venue over actions to the enforce the CVRA.

## Abrogation of Litigation Commitment

108.        The retroactivity of N-48-20 from April 9, 2020, when it was issued, back to March 20, 2020, has several consequences that cannot be justified by the stated purpose and findings. SJUSD held hearing during these three weeks, but now claimed (by virtue of its three weeks of retroactivity) that N-48-20 immediately extended the safe harbor from June 8, 2020 to June 28, 2020. In its view, they became immune from enforcement in 2020 three days later, on April 12, 2020.

109.        SJUSD held the first hearing on March 31, 2020 and had agendized a second hearing for April 14, 2020. Approximately 60 persons attended the April 14, 2020 teleconference.  Almost 90 minutes into the meeting, Superintendent Kern announced that he was "pulling" the hearing from the agenda.  No vote of the trustees was taken, which is inconsistent with Board Bylaw 9323 (specifying ROBERT'S RULES as parliamentary authority). SJUSD Attorney asserted that N-48-20 stopped the "by trustee timeframe," but the Board calendar continued to schedule hearings and to plan for final action on May 26, 2020.

110.        To clarify SJUSD's intentions, on April 16, 2020, counsel for Plaintiffs wrote SJUSD Attorneys:

   If, for whatever reason, the District believes that it is now appropriate to discuss an

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 36

agreement to authorize an at-large election in November 2020 and/or "wait and make the transition in 2022," please advise me as soon as possible.

SJUSD committed to a timely response the following day. At this point, Plaintiffs had relied on voluntary compliance and had not threatened litigation.

111.        Nine days later, on April 26, 2020, there had been no response. Plaintiffs demanded (pursuant to Government Code, Section 54960.1(b)) that SJUSD declare Resolution 2982 invalid, which would eliminate any bar to judicial enforcement of the CVRA. The Brown Act required the Board to do so because a quorum of trustees had engaged in at least two closed meetings without public notice, at which they collectively acquired and exchanged facts about the CVRA.[19] The failure to disclose the CVRA petition to the public, or to permit petitioners and others to comment prior to these undisclosed meetings, allowed the trustees to coordinate the misstatements and accusations that they made during the March 10, 2020 meeting, which adopted Resolution 2982. Since it was now beyond 45 days, this should have eliminated all doubt that SJUSD did not have a safe harbor and could not bar access to the Courts. However, due to the claim of retroactivity in N-48-20, the Brown Act remedy had the opposite effect. SJUSD was deemed to be still within the 45 days, so it could reenact a resolution of intent and claim that 2020 compliance was no longer timely. SJUSD did not, so the defect identified in paragraph 23 remained.

112.        Plaintiffs incurred attorneys' fees and expenses during the period of retroactivity. N-48-20 cannot extinguish a statutory fee entitlement, and certainly cannot do so retroactively.[20]

---

[19] The cure-and-correct letter identified violations of Sections 54953, 54954.2 and 54954.5, as well as Education Code, Section 35145(b). Every other jurisdiction that has addressed the issue (e.g., FCUSD, Ontario, Santa Clarita, City of Napa) recognizes that petitions seeking voluntary compliance are not threats of litigation and therefore must be proactively disclosed before they are discussed in closed session.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 37

## PART III: ADDITIONAL ALLEGATIONS RELATING TO THE FEDERAL VOTING RIGHTS ACT

### Possible Creation of a Trustee Area to Increase Latino Influence

113.        Plaintiffs do not contend that Latinos alone can form the majority of eligible voters in any trustee area and is not attempting to engineer an area in which Latinos would be guaranteed the ability to elect a candidate unilaterally.[21]  Plaintiffs allege that the Latino share of eligible voters in a trustee area could be as high as 20%, which (especially in coalition with other minority voters) would increase Latino influence over elections and governance in SJUSD. Under Ninth Circuit precedent, the totality of circumstances described in paragraphs 114 to 132, particularly the recent discriminatory actions described in paragraphs 134 to 177 may justify the creation of an "influence" trustee area.[22]

### Additional Probative Factors

114.        Federal courts determining liability under 52 U.S.C. §10301(b) (Section 2) consider the "totality of the circumstances," including the seven factors listed in Senate Report

---

[20] Edelman v. Jordan (1974) 415 U.S. 651.
[21] Gingles involved the alleged dilution of Black voters by the redistricting of a state legislature under a system, since abandoned, that combined single-member and multiple-member districts. In this context, Gingles Factor 1 provides that "multimember form of the district cannot be responsible for minority voters' inability to elect its candidates" unless "the minority group is able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50 & nn.16,17.
[22] Gingles does not address, or provide standards to evaluate, a "claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to influence elections." 478 U.S. at 48 & n.12. Garza v. County of Los Angeles (9th Cir. 1990) 918 F.2d 763, 770 & n.2. describes this aspect of Gingles as a "problematic legacy" that "has spawned confusion in the lower courts."

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 38

No. 97-417 (1982), which also discussed two additional factor referred to as 8 and 9. Other than Senate Factor 2, which relate to racially polarized voting, none of the Senate factors is "essential" to Section 2 liability, although Senate Factor 7, the extent to which Latinos have been elected to public office, is important. Gingles, 478 U.S. at 50 & n.15. Racially polarized voting also establishes "cohesiveness" for purposes of Gingles Factor 2. Elections Code, Section 14028(e) expressly provides that the remaining Senate factors are "probative, but not necessary to establish liability" under the CVRA.

115.        The Ninth Circuit has approved the taking of judicial notice of the pervasive discrimination against Latinos statewide, including discrimination by the State of California, which has touched the ability of California Latinos to participate in the electoral process. This is sufficient to establish Senate Factor 1. Gomez v. City of Watsonville (1987) 363 F.2d 1407, 1418.

116.        The *Sacramento Bee* recently published a series of articles about the most segregated schools in America, citing SJUSD's "choice to leave some schools behind." It described Encina High's "steady decline," notwithstanding the "nurturing environment and supportive teaching staff, struggling to serve a student body of refugees and children living in poverty."[23] When the Board eliminated almost every limitation on school choice in 2006, Thomaysa Glover (one of the few Black trustees in SJUSD's history) warned that it could lead to the decline of schools such as Encina. That is exactly what has occurred.

117.        Historically, Latinos in SJUSD have been subjected to official voting-related

---

[23] *Sacramento Bee*, November 17, 2019, Author: Sawsan Morrar and Phillip Reese,p. 1A; "California's schools are among the most segregated in U.S. What can be done about it?" *Sacramento Bee*, November 25, 2019; "Editorial - Sacramento needs to integrate its schools," *Sacramento Bee*, December 1, 2019.

---

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 39

discrimination that includes voting practices or procedures that enhance the opportunity for discrimination against Latino and Asian voters. As a partial remedy for past discrimination, the Justice Department has designated Sacramento County for coverage under Section 203 of the Voting Rights Act, 52 U.S.C. §10503(b), requiring ballot materials in Spanish and Mandarin. (Senate Factor 1 – historic discrimination)

118.        Latino polarized voting is present in more than three elections of trustees and in many other relevant elections. (Senate Factor 2, Gingles Factor 2 – racially polarized voting).

119.        In the Ninth Circuit, apathy, low turnout and drop-off among Latinos eligible to vote do not negate a finding of political cohesiveness. Gomez v. City of Watsonville (1988) 363 F.2d 1407.

120.        The non-Latino bloc vote that normally will defeat the combined strength of Latino support plus non-Latino "crossover" votes, as alleged in paragraph 63, rises to the level of legally significant non-Latino bloc voting. (Gingles Factor 3)   This showing that non-Latino voters are usually, not just occasionally, able to defeat the Latino candidate of choice demonstrates structural dilution of the Latino vote. Gingles, 478 U.S. at 51.

121.        Latinos in SJUSD bear the effects of longstanding societal, economic, and educational discrimination, effects that are apparent in the areas of education, employment, housing, and health. In July 2020, for example, the *Sacramento Bee* accused the county of creating COVID test deserts in minority communities.[24] Such discriminatory effects hinder Latino voters' ability to participate effectively in the political process. (Senate Factor 5 –

---

[24] https://www.sacbee.com/opinion/editorials/article244094082.html

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 40

ongoing effects of discrimination on education, health, employment)

122.       Minority neighborhoods in Arden-Arcade score higher than other areas of SJUSD on practically every demographic variable that the Department of Finance uses to identify populations that are hard-to-count in the census, including vacant units, poverty, renters, crowding, unemployment, public assistance, persons who have moved within the last year, limited English proficiency, low broadband penetration, high foreign-born, and large numbers of children.[25] These are the very factors that have made these neighborhoods less visible to SJUSD policy makers and has heightened their need for representation on the SJUSD Board. (Senate Factor 5)

123.       At the first and only hearing on March 31, 2020, Petitioners presented maps of these demographic variables that supported an earlier observation made by trustee Villescaz that there was great income inequality within SJUSD.  Large concentrations of low-income residents lived in neighborhoods near Encina High School in Arden-Arcade, not far from some of the wealthiest areas along the American River.  The high-income areas had disproportionate numbers of senior citizens.  Their voter turnout is high, but levels of support for Measure N and Proposition 51 were relatively low.

124.       Past discrimination has created a sense of futility and ineffectiveness that depresses levels of candidacy, registration, and turnout among the protected class, including drop-off and undervote in school trustee elections. (Senate Factor 5)

125.       Few members of the minority group have been elected to the Board.  (Senate

---

[25] https://census.ca.gov/wp-content/uploads/sites/4/2019/06/Arden-Arcade-CDP.pdf#page=2

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 41

Factor 7).  The plurality of justices in <u>Gingles,</u> 478 U.S. at 51, limits the group of candidates who are analyzed as minority to those who are also preferred by voters of the minority to which they belong.  On this basis, there has only been one Latino candidate of choice election.  Her election is a "special circumstance" because she was not opposed, and therefore her appointment in lieu of election is not evidence against racially polarized voting.

126.     Non-Latino voters in the city at-large typically vote sufficiently as a bloc to elect candidates other than the Latino voters' candidates of choice.  This satisfies <u>Gingles</u> Factor 3.

127.     To the extent that plaintiffs have located campaign websites for trustees elected from 2004 to the present, they have not yet located references to the needs of Arden-Arcade and other high-minority communities or even to inequities or discrepancies in the allocation of resources among SJUSD neighborhoods.

128.     There is, and has historically been, a lack of responsiveness on the part of at-large trustees to the particularized needs of the Latino residents of SJUSD. (Senate Factor 8 - lack of responsiveness). *See* paragraph 56, *supra.*

129.     Trustees made a series of false and misleading statements at the March 10, 2020 Board meeting to attack petitioners' motives and to call into question the need to comply with the CVRA.  These statements demonstrate "tenuous policy justifications" for purposes of Senate Factor 9 and "a lack of responsiveness" for Senate Factor 8, which are among the circumstances considered in establishing discriminatory effect.  These statements are also probative evidence of intentional discrimination.

130.     Arguments to hold the November 2020 election at-large because compliance with

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 42

the CVRA "took money away from students" were "tenuous" as policy justifications, establishing Senate Factor 9. Due to the size of the District, this initial election would reduce balloting costs by about $100,000, more than enough to offset the transition costs. A series of coordinated statements were made by trustees who wanted to run for reelection at-large (and did), demonstrating that the false claim was intended to deprive the voting rights of the protected group.[26]

131.         Coordinated statements that the process was "very rushed"[27] were also tenuous and provide additional evidence of discriminatory intent. The legislative history of A.B. 350 (2016) indicates that 4-½ month period is longer than most jurisdictions took to draw maps before there was a safe harbor. The public is not capable of sustaining focus when the process is prolonged and repeated.

132.         Claims by the Superintendent and trustees that the District had "changed so much" is ten years is also tenuous. Except for the total population data used to determine the size of each area, the census data are irrelevant. Relative to most jurisdictions in California, the size and location of protected groups has not changed substantially in SJUSD. The CVRA requires the use of ACS data, which are updated annually. For this reason, the statement that the process must be done "twice" is not accurate. School redistricting requires only a single hearing.

133.         The Superintendent also referred to groups "that did not even exist ten years ago," suggesting that waiting for the 2020 enumeration was necessary to consider them as

---

[26] Attorney: we're doing a ton of work, spending a lot of time and money now, but you're going to have to do this again in 2022."
[27] Trustee 1: "If we don't meet the timeline of this very rushed process, it could be hundreds of thousands of dollars or more. Trustee 2: "I am sorry that the process is so rushed" Trustee 3: "Now we're going to go through a very rushed process"

---

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 43

communities of interest. To the extent that he was talking about communities of immigrants, refugees, specific nationalities, or primary languages, almost all relevant and accurate data are from the ACS, so this justification is also tenuous.

**Evidence of Intentional Discrimination**

134.        In the Ninth Circuit, maintaining an electoral system known to dilute Latino voting strength "as the avenue by which to achieve political self-preservation" or "an intent to perpetuate incumbency" constitutes intentional discrimination in violation of Article I, Section 7(a) and (b) of the California Constitution, Section 2, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It is unnecessary to establish animus toward Latinos as a group, any other "invidious motive" or "ill-feeling toward minorities." It is sufficient "intentionally to take actions calculated" to be discriminatory in effect or to "intend to create [a] very discriminatory result that occurred." Garza v. County of Los Angeles (1990) 918 F.2d 763, 771 & n.1.

135.        The trustees chose not to comply in 2020 as an avenue to political self-preservation and perpetuation of their incumbency. All three incumbents whose terms ended in 2020 subsequently ran for reelection at-large. In addition to enjoying the general protection that at-large provides incumbents, their residences were concentrated in a way that made it unlikely that each would have run from a separate area had trustee areas been implemented. All incumbents benefited because they retained control of redistricting, excluding any representation from high-minority areas. This provided long-term protection for their incumbency. SJUSD and its Board intended that use of the at-large system in 2020 would immediately preserve the incumbency of three trustees' members. This would allow the same five members currently serving to draw district lines in 2021 that would be in effect until 2030 and promote preserving

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 44

the incumbency of all current members who sought reelection in the future.

136.        Racially discriminatory intent is also demonstrated when disparate impact is combined with the historical background of the challenged decision, departure from normal procedures, and contemporaneous statements of the decisionmakers.[28]

137.        Contemporary statements by decision-makers are highly relevant evidence.[29] False statements "support an inference of discrimination even without further evidence of defendant's true motive."[30] Here, the trustees made clear that they opposed implementation in 2020. They supported their opposition by statements they knew to be false regarding the alleged cost impacts.

138.        The fact that these statements were coordinated in advance eliminates the normal complexity of determining the collective intent of individual legislators. The violations of the Brown Act, as described in paragraphs 80 and 111, is a "event leading up to the challenged decision" and "departure from normal procedures," and further evidence of discriminatory intent. There was no rational reason to make statements undercutting the action being taken unless they were essential to rationalize the subsequent violation of the purported goal for the unanimous "resolution of intent."

139.        The failure to refer to 2020 compliance in the text of the resolution, the subsequent failure to comply in 2020, and the attempt to invoke the safe harbor are "departures

_____

[28] Village of Arlington Heights v. Metropolitan Housing Development Corp. (1977) 429 U.S. 252, 267-269.
[29] Arlington Heights, 429 U.S. at 268.
[30] e.g., Haire v. Board of Supervisors of Louisiana State Univ. (5th Cir. 2013), 719 F.3d 356, 365 n.10.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 45

1  from normal procedures" and evidence of discriminatory intent.

2

3  140.        SJUSD is unusually large as an electoral constituency, making it difficult for

4  natural leaders from minority communities to obtain the funding and visibility necessary to

5  campaign throughout the District. Plurality voting, without a single transferable ballot, promotes

6  slating, which often benefits incumbents. (Senate Factor 3 – practice that enhances dilution).

7

8  141.        SJUSD has no trustee area residency requirement, which hinders the political

9  access of Latinos because all the candidates can come from outside Latino neighborhoods.

10  Upon information and belief, all the incumbents live outside Latino neighborhoods. Based on

11  current voter registration, it does not appear that any trustee has lived west of Watt Avenue since

12  Richard Launey left the Board in 2012. This further supports a finding that Senate Factor 3 has

13  been established.

14

15  **Incumbents' Resistance to Increasing the Number of Trustees**

16

17  142.        The original petition (at 11) raised the possibility of enlarging of the Board from

18  five to seven. As a result of the State Board waiver, this can only be done without a special

19  election at the time of compliance with the CVRA.

20

21  143.        At the March 10, 2020 meeting, Counsel for Petitioners suggested that G-6 (the

22  resolution ordering the November 2020 election) be modified to permit an increase to seven

23  trustees, if the trustees approved a map with seven areas. He observed that San Juan USD was

24  the 10th largest unified school district in California, and that only two larger districts had only

25  five trustees (and both were divided into trustee areas).

26

27            ...

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 46

144.        Prior to the only hearing, on March 31, 2020, Counsel for Plaintiff wrote President Villescaz a letter regarding the proposed increase to seven trustees. It included a map that showed how seven areas would more effectively empower chronically unrepresented communities. This also showed that each incumbent could reside in a separate trustee area if, and likely only if, there were seven trustees.

145.        The minutes of the March 31, 2020 hearing record that YNIGUEZ and at least two other witnesses testified in support of seven trustees.

146.        It is typical for legislative bodies to direct their demographer to create a scenario for a larger body at the request of constituents, or at least to post a map prepared by proponents. SJUSD did neither.

147.        During the April 14, 2020 meeting, SJUSD attorney Michelle Cannon misrepresented that enlarging the Board required going through a "very similar process" for an additional waiver from the State Board that was "separate." (video, 2:01) She made this statement without a good faith basis. She knew that the State Board granted a "general waiver" from the election requirement, the plain language of which extends to any form of reorganization identified in Education Code, Sections 5019(a), 5019(b) and 5030(b), including a change in the number of trustees. At 2:01:14, Ms. Cannon acknowledged that "sometimes these changes are done together and in tandem." The State Board had never granted two separate waivers to make the "tandem change," which illustrates that Ms. Cannon knew her prior statement had no reasonable basis. She then stated that it would be "really rushed to get it done by the November election." (2:01:48) Since she knew that a state waiver could not be considered until after the July 1, 2020 registrar deadline, this inconsistency further illustrates the intentional falsity of her statements.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 47

148.         Each trustee was familiar with the process of seeking waivers from the State Board and knew that Ms. Cannon's statements were made without a good faith basis. Nonetheless, several trustees cited the allegedly belated suggestion that a remedy expand the Board as a basis for deferring the entire matter of trustee area elections until the 2022.

149.         One trustee claimed that the Board was unanimous in support of moving forward with trustee area elections, but that it was the issue of moving to seven trustees now precluded resolving the issue before the election. The increase to seven trustees "may have great merit," but required "the kind of robust discussion" that caused "8,000 people" to participate in hearings on early start-times. (2:07) He went on to say that the Board had been "unfairly accused" simply because it "wanted more discussion" on the issue of expansion. They needed "the voice of lots of more, not just 50 or 100" on the issue of moving from five to seven. "If not, I believe we could very quickly finish this process." (2:08:45)

150.         This admission that the transition process could complete before the election deadline created a crisis for President Villescaz, who immediately interjected with an attempt to blame petitioners for "this bifurcation." According to the minutes of the April 14, 2020, the last statement by President Villescaz was: "The idea of moving to a seven-member board did not come up until well after the process had started," even though it was stated in the notice and was the subject of the first public comment made at the first meeting.[31] Perhaps inadvertently, she admitted that the Board had put its plan "into action" in February 2020 (even though there were no legally noticed meetings on the subject until March 10, 2020).

---

[31] "It didn't come up to our March meeting when we already had an agendized item and we had already been underway to put all of that into action prior to that stay-at-home orders for the month of February in response to the demand letter that we received at the beginning of that month. ... To suggest that the timeline is in sync and that we are the ones somehow creating this bifurcation in the question is just wrong and the timeline does not fit that."

---

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 48

## FIRST CAUSE OF ACTION:
## VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT
## BY KINCAID, YNIGUEZ, CANTON, AND MEMBERS OF BENITO JUAREZ AND NEN

151.    Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

152.    Proof of intentional discrimination is not required to establish a violation of the CVRA.

153.    Paragraphs 58 to 78 demonstrate the existence of racial polarized voting. When combined with the imposition of the at-large method of elections, racially polarized voting is sufficient to establish a violation of the CVRA. Section 14028(a).

154.    Latino polarized voting in elections for trustees is sufficient to demonstrate a violation of the CVRA, alone or in combination with other elections. Because of the paucity of Latino candidates over a period of time, one or a few elections is sufficient to establish liability. Paragraphs 61 to 74.

155.    Latino polarized voting by voters in SJUSD precincts in a number of statewide ballot measures is sufficient to demonstrate a violation of the CVRA, alone or in combination with other elections. Paragraph 78.

156.    Latino polarized voting by voters in SJUSD precincts in county, state, and federal office is sufficient to demonstrate a violation of the CVRA, alone or in combination with other elections.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 49

157.        In SJUSD, at-large election is combined with electoral practices that enhance the dilutive effects of at-large elections, including the exceptional size of the electoral division, extended and staggered terms of office.

158.        Elections Code, Section 14028 provides thar racially polarized voting is the only essential element that plaintiffs must show to prove that an at-large system violates the CVRA. "The dilution or abridgment described in Section 14027 is established by showing racially polarized voting." Sanchez v. City of Modesto (2006 5ᵗʰ Dist.) 145 Cal. App. 4ᵗʰ 660, 670.

159.        The suppression of grassroots candidates, the deterrence of organized mobilization of Latino neighborhoods due to the absence of competitive elections, the chronic absence of trustees who live in these neighborhoods, and the long-term negative impact on Latino voter participation constitutes additional abridgments of Latino voting rights, in further violation of Section 14027. Paragraphs 50 to 56 detail these abridgments of the ability to Latinos to influence elections and elected officials in governance.

160.        The fact that no Latino candidate who was preferred by Latino voters have ever been elected in contests for SJUSD trustee since at least 1994 is one circumstance that can be considered in evaluating a violation of the CVRA.

161.        Paragraphs 121 to 132 document factors that are probative, but not necessary to establish a violation of the CVRA. These include the history of discrimination against Latinos, the use of electoral devices or other voting practices or procedures that may enhance the dilutive effects of at-large elections, denial of access to those processes determining which groups of candidates will receive financial or other support in a given election, the extent to which members of a protected class bear the effects of past discrimination in areas such as education,

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 50

- 177 -

1  employment, and health, which hinder their ability to participate effectively in the political
2  process, and the use of overt or subtle racial appeals in political campaigns are probative.

3

4  162.        Elections Code, Section 14027 also prohibits the imposition of at-large elections
5  to fill vacancies, whether called by the Board or upon verification that a petition has terminated a
6  provisional appointment by the Board.  Education Code, Section 5091(a) & (c)(2).  To prepare
7  for the possibility of a vacancy, the Board will need a map of trustee areas in order to call a
8  compliant election that may occur as early as March 2, 2021, which is the next established
9  election date after November 3, 2020.  The map also needs to be available prior to any
10 provisional appointment, as it determines which voters are eligible to sign a petition to terminate.
11 Education Code, Section 5091(c)(2).  The election following termination of a provisional
12 appointment does not usually need to be held on an established election date. *id.*

13

14 163.        The CVRA provides "great liberality" in designing a remedy.  The Court's
15 authority is at least as extensive as that available to remedy a violation based on the effects test
16 of Section 2 of the Voting Rights Act and can include pre-election orders.[32]
17

18                          **SECOND CAUSE OF ACTION**
19 **VIOLATIONS OF 52 U.S.C. §10301(b); 42 U.S.C. §1981;**
   **ARTICLE 1, SECTION 7 OF THE CALIFORNIA CONSTITUTION;**
20 **SECTION 2, FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**
                          **BY ALL PLAINTIFFS**
21
   164.        Plaintiffs re-allege and incorporate by reference the allegations set forth in all
22 prior paragraphs of this Complaint.
23

24
   165.        Latinos can create a compact influence district in coalition with Black and other
25

26 [32] Sanchez, 145 Cal. App. 4th at 690; Jauregui v. City of Palmdale (2014 2d App. Div.) 226
   Cal.App.4th 781, 807.
27

28 COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
   ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 51

1   minority voters, including the western portion of Arden-Arcade and some adjoining areas of
2   North Highlands and Foothill Farms. Paragraph 114. In connection with the essential element of
3   racially polarized voting (Gingles 2 and Senate Factor 2), and the important fact that few Latinos
4   have been elected as Latino candidates of choice (Senate Factor 7), the totality of the
5   circumstances (Paragraphs 114 to 132) justifies creating trustee areas, including such a remedial
6   area. Because Latino voting is polarized, this area will improve representation for Latinos
7   throughout SJUSD. *See* Paragraph 59 & n.4

8

9   166.        Paragraphs 121 to 132 document factors that are supportive of, but not necessary
10  to establish, a violation of Section 2 based on discriminatory effect. Gingles, 478 U.S. at 48 &
11  n.15. Even when plaintiffs do not demonstrate a trustee area in which a single protected group is
12  a majority, in the Ninth Circuit, a court can prohibit the imposition of at-large elections based
13  solely on their discriminatory effect, after considering the totality of circumstances. In this case,
14  the Court may specify the creation of an area that will increase Latino influence, even if Latinos
15  cannot unilaterally elect their candidates of choice. Garza, 918 F.2d at 779.

16

17  167.        SJUSD intentionally delayed implementing trustee area elections because it knew
18  that areas could not be created such that trustees whose terms ended in 2020 could each live in a
19  different area scheduled to elect in 2020. Indeed, a map from Plaintiffs circulated to all trustees
20  showed that it was unlikely that the current trustees would live in different trustee areas unless
21  the Board was expanded to seven.

22

23  168.        SJUSD knew that the Legislature intended that high-minority trustee areas be
24  scheduled for election in presidential years when minority turnout is higher than in gubernatorial
25  years. *See* Paragraph 15, *supra*. They also knew that these minority area trustees, if elected in
26  2020, would participate in redistricting.

27

28  COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
    ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 52

169.     Paragraphs 134 to 139 state additional evidence of intent based on the history of the challenged decision, events leading up to the decision, and contemporaneous statements, including tenuous justifications and deliberately inaccurate statements. Evidence of contemporary intent to discriminate can also be considered as probative of Senate Factors 1, 2, 3 and 5 and a totality of circumstances that establishes a discriminatory effect sufficient to violate of Section 2.

170.     SJUSD attorney Michelle Cannon represented that an increase in the number of trustees would be difficult to achieve before the November 2020 elections because it required an additional waiver even after those elections. She knew that the State Board of Education had waived the voter approval requirements stated in relevant parts of Education Code, Section 5019, 5020, 5021, and 5030 until March 2022 with regard to all organizational changes identified in Section 5019(a) and 5020(a).

171.     Each trustee knew that this statement was false and intended Ms. Cannon to mislead the voters by rationalizing the delay, which was motivated by their desire to allow three incumbents to be re-elected at-large in 2020. It also enabled them to argue that the costs and delay of voter approval (or an additional waiver) precluded expanding the Board at any later date.

172.     The trustees originally purported to conduct the at-large election to save costs, aggressively accusing petitioners of taking money out of classrooms. *See* footnote 8 *supra*. They knew that the districtwide election cost substantially more than balloting by three of the five trustee areas, even after the costs of transition. A false justification is compelling evidence of discriminatory intent that would ordinarily dispense with inquiry into motive.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 53

173.       Similarly, at the meeting where the Board "suspended" hearings, trustees blamed proponents for adding the proposal to enlarge the Board belatedly. Representations about the "timeline" were coordinated and false, which provides additional support for an inference of discriminatory intent, with no further inquiry into motive.

174.       In this case, however, motive enhances the finding of discriminatory intent. The motives of political self-preservation or the protection of incumbency combined with deliberate actions that impair the equal influence of Latino voters constitute intentional discrimination in violation of Section 2, 52 U.S.C. §10301(b), as well as the Fourteenth and Fifteenth Amendments to the United States Constitution. Garza, 918 F.2d at 779.

175.       The purposeful delay of trustee elections past the regular 2020 election and until the redistricting process is a violation that is independent of and additional to the underlying claim of vote dilution under Section 2 and justifies a comprehensive remedy to eliminate all results of the discriminatory acts.

176.       The deception of plaintiffs to believe that SJUSD was continuing to implement trustee areas when it was actually petitioning the Governor to issue an executive order judicial enforcement of the CVRA deprived plaintiffs and all members of all racial and language groups protected by Elections Code, Section 14027, et seq., of the full and equal benefit of legal proceedings as is enjoyed by white citizens. In violation of 42 U.S.C. §1981, SJUSD and its agents specifically intended to deprive plaintiffs and all Latino citizens in the State of their right to participate in the hearings mandated by Elections Code, Section 10010(a), and of their right to sue in this Court (and superior courts for other counties throughout the State).

177.       Paragraph 91 identifies a series of false and misleading representations by SJUSD

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 54

and its attorneys made first to CSBA, CASBA, and ASCA. After SJUSD misleadingly obtained the endorsement of these groups, SJUSD made these false and misleading statements to Governor Newsom. Each of these false and misleading statements intended to impair rights of plaintiffs that the preceding paragraph identifies, in further violation of 42 U.S.C. §1981.

178.        Once this form of discriminatory intent is shown, only "some showing of injury" relating to equal political participation is necessary to justify a "meaningful remedy." The burden is "less rigorous" than in cases based solely on discriminatory effects. In cases that establish purposeful violation, it is "wholly contrary" to the intent of Section 2 and the principles of equal protection to withhold relief based on the inability to form a majority Latino district. Garza, 918 F.2d at 771.

179.        The remedy for intentional action should not be narrowly tailored, but should eliminate the discriminatory effects "root and branch," in order to place Latino voters in the position they would have occupied but for the unlawful failure to comply in the 2020 election."

180.        Given the totality of the circumstances, the at-large method of election as imposed in the selection of SJUSD trustees has discriminatory effects that violate 52 U.S.C. §10301(b).

181.        The decision of the SJUSD trustees to order the 2020 trustee election to be conducted at-large intentionally violated Article 1, Section 7(a) & (b) of the California Constitution and Section 2, Fourteenth Amendment to the U.S. Constitution.   ~

182.        The remedy should include a process that requires the trustees to fill any vacancy

---

[33] Green v. New Kent County School Board (1968) 391 U.S. 430, 438; United States v. Virginia (1996) 518 U.S. 515, 547.

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 55

1   through special election by voters in a remedial trustee area located in the western edge of

2   SJUSD, based on data from the 2010 enumeration and the 2014-2018 ACS. This will ensure that

3   minority voters from these traditionally unrepresented neighborhoods have a seat at the table

4   during redistricting, which would have occurred but for the intentional decision not to implement

5   trustee area elections in 2020.

6

7   183.        In addition or in the alternative, the Court should designate an independent

8   redistricting commission to assure that all areas of SJUSD are represented in the redistricting

9   process.

10

11                               **PRAYER FOR RELIEF**

12

13   WHEREFORE, Plaintiffs respectfully pray that this Court enter Judgment granting Plaintiffs:

14

15   1.          A declaratory judgment that at-large election of the SJUSD violates the rights of

16   Plaintiffs as secured by the California Voting Rights Act, Elections Code, Section 14027 *et seq.*,

17   52 U.S.C. §10302(b), Article I, Section 7(a) & (b) of the California Constitution, and the

18   Fourteenth and Fifteenth Amendments of the United States Constitution;

19

20   2.          Preliminary and permanent injunctive relief preventing the SJUSD and its

21   officers, agents, and employees, successors in office and all other persons in active concert and

22   participation with them, including Sacramento County Registrar of Voters Bailey-Kanelos, from

23   conducting special or regular future elections for SJUSD under the unlawful at-large method of

24   election;

25

26   3.          An Order of this Court adopting a map creating two trustee areas, each having a

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
    ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 56

1    population equal to one-seventh of the total population of SJUSD, as validated by the

2    Department of Finance in accordance with Education Code, Section 5019.5, and directing that a

3    special election be held to elect trustees after the adoption of the Order; or in the alternative,

4    prohibiting provisional appointments to any vacancy prior to November 2022 and specifying the

5    order in which these areas would elect a trustee for the remainder of the term of any vacated

6    trustee position;

7

8    4.        An order establishing an independent citizens' redistricting commission appointed

9    by a designee of this Court, which will prepare a map to redistrict the SJUSD;

10

11   5.        An order continuing the jurisdiction of this Court for purposes of 52 U.S.C.

12   §10302(c);

13

14   6.        Additional injunctive relief mandating that SJUSD remedy the effects of past

15   discrimination by supporting efforts to increase minority voter registration and political

16   participation;

17

18   7.        The costs of this suit, including reasonable attorneys' fees and expert witness fees,

19   pursuant to Elections Code, Section 14030 and Code of Civil Procedure, Section 1021.5; and

20

21   //

22

23   //

24

25   //

26

27

28   COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
     ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 57

1  | 8.  Such other and further relief as the Court may deem just and proper.

2

3  | Respectfully submitted,

4

5  | *Scott Rafferty*

6

7

8  | Scott J. Rafferty

9  | Dated this Fifth day of October 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  | COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 58

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION OF COMPLAINT

State of California

County of Sacramento

To wit:

JUAN YNIGUEZ, a Plaintiff named in the foregoing Complaint, KINCAID et al. v. SJUSD, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, he believes them to be true. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information provided by his attorney, which he believes to be true.

JUAN YNIGUEZ, Plaintif

Affirmed this 2*ᵗʰ day of October 2020

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 57

## VERIFICATION OF COMPLAINT

State of California

County of Sacramento

To wit:

MAGALI KINCAID, a Plaintiff named in the foregoing Complaint, <u>KINCAID et al. v. SJUSD</u>, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, she believes them to be true. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information provided by her attorney, which she believes to be true.

*Magali Kincaid*

MAGALI KINCAID, Plaintiff

Affirmed this 4th day of October 2020

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 60

- 187 -

## VERIFICATION OF COMPLAINT

State of California

County of Sacramento

**To wit:**

DAMARIS CANTON, a Plaintiff named in the foregoing Complaint, <u>KINCAID et al.</u> <u>v. SJUSD</u>, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, she believes them to be true. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information provided by her attorney, which she believes to be true.

## /s/ Damaris Canton

DAMARIS CANTON, Plaintiff


Affirmed this 5th day of October 2020

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 61

## VERIFICATION OF COMPLAINT

State of California

County of Sacramento

To wit:

CAROLINA FLORES, a Plaintiff named in the foregoing Complaint, <u>KINCAID et al.</u> <u>v. SJUSD</u>, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, she believes them to be true. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information provided by her attorney, which she believes to be true.

*Carolina Flores*

CAROLINA FLORES, Plaintiff

Affirmed this 4ᵗʰ day of October 2020

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 62

**VERIFICATION OF COMPLAINT**

State of California

County of Sacramento

To wit:

SCOTT RAFFERTY, counsel to Plaintiffs named in the foregoing Complaint, KINCAID et al. v. SJUSD, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, I believe them to be true. The calculations performed in support of the Complaint were performed under my direction using official data of which this Court may eventually be moved to take judicial notice pursuant to Evidence Code, Section 452(c), including publications of the United States Census Bureau, the California Legislature (Statewide Database), the California Census Office, and the Department of Finance. Each allegation of racially polarized voting is supported by preliminary work product and will be proved by expert testimony at trial, if contested. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information developed under my direction, as to which the plaintiffs have relied on my representations. My signature on the complaint further certifies that the factual claims and contentions have evidentiary support. Code of Civil Procedure, Section 128.7(b).

*Scott Rafferty*

SCOTT J. RAFFERTY, Counsel to Plaintiffs

Affirmed under penalty of perjury this 4ᵗʰ day of October 2020

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 63

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT AND IN THE
ALTERNATIVE, FOR VIOLATION OF THE VOTING RIGHTS ACT OF 1965 - 64



RECEIVED
IN DROP BOX

2020 OCT -5 PM 2: 54

DOWNTOWN COURTHOUSE
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

# EXHIBIT 3

ORIGINAL

1 | **SPINELLI, DONALD & NOTT**
A Professional Corporation
2 | Domenic D. Spinelli (SBN: 131192)
Natasha N. Langenfeld (SBN: 250944)
3 | Fay K. Saechao (SBN: 320597)
601 University Avenue, Suite 225
4 | Sacramento, CA 95825
Telephone: (916) 448-7888
5 | Facsimile: (916) 448-6888

6 | Attorneys for Defendant
SAN JUAN UNIFIED SCHOOL DISTRICT
7

RECEIVED
CIVIL AND MOTION DROP BOX

2020 NOV 18  PM 3: 41

GOSCC COURTHOUSE
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY

**FILED/ENDORSED**

**NOV 1 8 2020**

By: _____ E. Medina _____
Deputy Clerk

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF SACRAMENTO

10

11 | MAGALI KINCAID, BENITO JUAREZ
NEIGHBORHOOD ASSOCIATION,
12 | NEIGHBORHOOD ELECTIONS NOW,
JUAN YNIGUEZ, CAROLINA FLORES,
13 | DAMARIS CANTON,

14 | Plaintiffs,

15 | vs.

16 | SAN JUAN UNIFIED SCHOOL DISTRICT,

17 | Defendant.

18

19

20

21

Case No.: 34-2020-00286475-CU-CR-GDS

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF SAN
JUAN UNIFIED SCHOOL DISTRICT'S
DEMURRER TO PLAINTIFFS'
COMPLAINT**

Date:  March 17, 2021
Time:  1:30 p.m.
Dept.: 53
Judge: Hon. David I. Brown

Reservation No.:      2540569

Complaint Filed: 10/5/2020
Trial Date: Not Set

**[FEES EXEMPT PURSUANT TO
GOVERNMENT CODE SECTION 6103]**

22

23

24

25

26

27

28

SPINELLI, DONALD
& NOTT

0

POINTS & AUTHORITIES IN SUPPORT OF DEMURRER TO PLAINTIFFS' COMPLAINT

# I.    INTRODUCTION

Plaintiffs' Complaint is premature, subject to demurrer, and the action must be dismissed. There is no effective relief for the Court to grant because The San Juan Unified School District Board has agreed to trustee area elections. Elections Code Section 10010 provides a safe harbor if a political subdivision passes a resolution, and a prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 90 days of the resolutions passage. That safe harbor has been extended by the Governor's Emergency Orders as discussed below, and Plaintiffs' action is improper.

# II.    STATEMENT OF FACTS

The San Juan Unified School District Board passed Resolution Nos. 2982 & 2983, which responded to Plaintiffs' February 9, 2020 Petition to comply with the California Voting Rights Act by moving to trustee area voting. Resolution 2982 recognized that Board members are elected in even-numbered years and serve staggered, four-year terms, with the next election scheduled for November 2020 for three Board members and the remaining two Board Members scheduled for election in November 2022. *See Request for Judicial Notice Filed Herewith*. Resolution 2982 recognized that transitioning from the District's current at-large election to a trustee area election would minimize the potential for litigation against the District under the California Voting Rights Act (CVRA), embodied in Elections Code § 14025 et seq. *Id*. The district entered the Safe harbor provisions of Evidence Code Section 10010, precluding any lawsuit against them. On April 9, 2020 the Governor issued Executive Order N-48-20 which tolled the safe harbor provisions of Elections Code Section 10010 while social distancing measures remain in place.

Regardless of the district's resolution and the Governor's orders, plaintiff filed this action seeking declaratory relief that defendant violated the CVRA by holding an at-large election, and injunctive relief prohibiting any further at-large elections. Plaintiffs' request for injunctive relief is moot because there are no further at-large elections scheduled by the Board – the next election is scheduled to be a trustee area election. Defendant has already had one requisite public meeting required to move to trustee area elections. Resolution 2991 was adopted by the Board on April 28, 2020 pursuant to Executive Order N-48-20 issued on April 9, 2020. *See Request for Judicial Notice*

SPINELLI, DONALD
& NOTT

1
POINTS & AUTHORITIES IN SUPPORT OF DEMURRER TO PLAINTIFFS' COMPLAINT

*Filed Herewith.* Executive Order N-48-20 provides, in pertinent part:

> "The timeframes set forth in Elections Code section 10010, subdivisions (a) and (e), are suspended as to any political division of the State. The purpose of this suspension is to protect public health and safety during the period of time when the State Public Health Officer and other public health officials have determined that it is necessary to engage in physical distancing to minimize the spread of COVID-19. This suspension shall be in effect until further notice.   This paragraph pauses the timeframes set forth in Elections code section 10010, subdivisions (a) and (e), but does not restart them: this paragraph should be construed to toll those timeframes, such that days elapsed during the suspension set forth in this paragraph are not counted, but any days that elapsed prior to that suspension are still counted.  This paragraph shall not preclude a prospective plaintiff from obtaining reimbursement from a political subdivision under subdivision (f)[1] of Elections Code section 10010, in the manner set forth in that subdivision.[2]"  See Request for Judicial Notice filed herewith.

This order paused the transition to trustee area elections because the Executive Order tolled the safe harbor provisions. *Id.*

Per Resolution 2983, a public hearing[3] was held to gather public input regarding potential trustee-area boundaries. *See Request for Judicial Notice Filed Herewith.* Defendant held a special meeting at the Board of Education on March 31, 2020, telephonically, to gather public input

---

[1] As discussed in Assembly Bill 2123, Elections Code Section 10010(f) caps reimbursement to thirty thousand dollars ($30,000) when prospective plaintiffs demonstrate they are entitled to reimbursement under the act.  See Request for Judicial Notice filed herewith.

[2] In explaining Executive Order N-34-20, Governor Newsom wrote:

WHEREAS various political subdivisions of the State have been in the process of changing from an at-large method of election to district-based elections, requiring a series of public hearings, which are intended to be conducted before the expiration of a safe-harbor provision under Elections Code section 10010; and

WHEREAS on March 20, 2020 I issued Executive Order N-34-20, which suspended the tim3eframes for conducting these public hearings; and

WHEREAS uncertainty regarding Elections Code 10010 could nevertheless induce political subdivisions to hold these public hearings in the near future – at a time when public heath requires that Californians stay home except for essential needs, and otherwise engage in physical distancing, to minimize the spread of COVID-19; and

WHEREAS holding these hearings in the near future-at a time when public health requires Californians to stay home except for essential needs- would threaten public health and safety, and would force Californians to choose between fully participating in their democratic process and safeguarding their own health and safety, as well as the health and safety of their communities. See Request for Judicial Notice filed herewith.

[3] Government Code Section 34877.5 (b) requires a legislative body changing from an at-large method of election to a district-based election, as those terms are defined in Section 14026 of the Elections Code, to hold public hearings pursuant to Section 10010 of the Elections Code.  If the legislative body is otherwise adjusting district boundaries, the legislative body shall hold public hearings on the proposed district boundaries pursuant to Section 21607 or 21627 of the Elections Code.

1   regarding potential trustee area boundaries. *See Resolution No. 2991 - Request for Judicial Notice.*

2   Little public input was received by the Board at the March 31, 2020 meeting despite public outreach

3   and notice, most likely because of the COVID-19 Pandemic. *See Resolution No. 2991 - Request for*

4   *Judicial Notice.* While still committed to the process of transition from at-large to by-trustee area

5   elections, the Board thereafter continued this process to allow public participation.  Governor

6   Newsom's Executive Order expressly extends the safe harbor provision to move to trustee-area

7   elections - given that it requires individuals to choose between safety and the democratic process.

8   Because Defendants have agreed to transition to trustee-area elections, Plaintiffs' Complaint is

9   subject to demurrer and dismissal. At all times counsel for the District was transparent about this

10  process, informing that the Governor's orders could affect timelines.  See Board of Education

11  Minutes – 3/31/20 approved 4/14/20.

12          Plaintiffs' Complaint admits that one Latino candidate of choice currently sits on the board

13  – President Paula Villasquez. Plaintiffs' Complaint at ¶ 125: 20-22; ¶ 68.  Plaintiffs' Complaint also

14  admits that SJUSD has another Latino trustee – Saul Hernandez. Id at ¶ 65.  Two (2) out of five (5)

15  trustees is a forty percent (40%) Latino representation. This is far more than the fourteen and one-

16  half percent (14.5%) of the Latino population in the district or the twelve and one-half percent

17  (12.5%) of eligible Latino voters. (Plaintiffs' Complaint, ¶ 68.)  Plaintiffs' Complaint admits that

18  Thomaysa Glover was one of the "few" black trustees in SJUSD's history in 2006. *Id* at ¶ 116:14.

19  However Plaintiff laments an absence of experienced Latino elected officials. Id at ¶ 53.  Plaintiffs'

20  Complaint acknowledges SJUSD is large and difficult to campaign. *Id* at ¶140. On March 31, in a

21  letter addressed to SJUSD President Paula Villescaz, Plaintiffs' counsel admits the critical events of

22  COVID, but insists these public hearings move forward.  (See Declaration of Domenic D Spinelli.)

23          SJUSD will move to trustee area elections as provided by the Resolution but has paused the

24  process until public participation can be handled safely during the pandemic pursuant to the

25  Governor's Executive Order.  *See 4/28/20 minutes approved 5/12/20 - Request for Judicial Notice.*

26  Defendants demurrer should be granted as set forth below.

27                          **III.   LEGAL STANDARD**

28          The party against whom a complaint has been filed may object, by demurrer, on the ground

1   that the pleading does not state facts sufficient to constitute a cause of action, or upon a complete

2   defense.  Code of Civil Procedure § 430.41, subd. (e).  The reviewing court accepts as true all facts

3   properly pleaded in the complaint in order to determine whether the demurrer should be overruled.

4   *Guardian N. Bay, Inc. v. Superior Court* (2001) 94 Cal.App.4[th] 963, 971. Although courts "assume

5   the truth of all facts properly pleaded," they do not assume the truth of "contentions, deductions or

6   conclusions of facts or law."  *Casino v. Bank of Am.* (2014) 224 Cal.App.4[th] 1462, 1468.  Defendant

7   demurs to both Plaintiffs' first cause of action under the CVRA and Plaintiffs' second cause of

8   action under the Federal Voting Rights Act.

9                          **IV.    ARGUMENT**

10     **A. THE CVRA HAS A SAFE HARBOR PROVISION**

11       A claim under the CVRA depends, in part, on a showing of "racially polarized voting."

12   Elec. Code § 14028.  That term is defined by reference to federal case law.  *Id.* § 14026, subd. (e),

13   which requires three fact-intensive showings as to observed voting behavior: a) the protected class

14   at issue votes as a bloc, b) the white majority does the same, and c) white bloc voting usually

15   defeats minority block voting. *See Thornburg v. Gingles* (1989) 478 U.S. 30, 49-51.

16       The CVRA also requires plaintiffs demonstrate both injury- that SJUSD's at-large election

17   system has "impaired the ability of a protected class to elect candidates of its choice" and causation

18   – that this "impairment happened "as a result of the dilution ... of the rights of voters who are

19   members of a protected class. Elections Code § 14027.

20       Assembly Bill 2123 amended Elections Code 10010 in 2018. *See Request for Judicial

21   Notice Filed Herewith.* This bill requires the District to hold  public hearings, to conduct outreach

22   to the public, and to explain the districting process.  This bill also provided a safe harbor that if a

23   political subdivision passes a resolution, a prospective plaintiff shall not commence an action to

24   enforce Sections 14027 and 14028 within 90 days of the resolutions passage. *Id.*  Finally, this

25   assembly bill capped the amount of reimbursement required by the CVRA, evidencing AB's 2123

26   intent to address the exorbitant costs associated with defending against such lawsuits. *Id.*

27     **B. THERE HAS BEEN NO CVRA VIOLATION**

28       Plaintiff incorrectly asserts that the District's at large method of election is a de facto

1 violation of CVRA, which is unsupported. After a hearing on March 10 where comments were
2 made in support of preventing racially polarized voting, and concerns were noted about the rushed
3 process, the board adopted Resolution 2982 in response to Plaintiffs' February 9, 2020 Petition. *See*
4 *Request for Judicial Notice Filed Herewith – minutes from 3/10.* However, the District pressed
5 pause on this process after having the public hearing and noting the low level of public participation
6 in the process - likely due to COVID. *See Request for Judicial Notice Filed Herewith.* The
7 Governor's orders specify that the safe harbor provisions of Evidence Code Section 10010 are
8 extended. *See Request for Judicial Notice Filed Herewith.* Therefore, plaintiff cannot bring this
9 lawsuit because Defendants are within the safe harbor provisions intended by Assembly Bill 2123.
10 *See Request for Judicial Notice Filed Herewith.*

11       Plaintiffs' own complaint emphasize the lack of historic discrimination in election of
12 SJUSD board members. Plaintiffs' Complaint is based the Voting Rights Act of 1965, 52 U.S.C. §
13 1973, which provides that "[n]o voting qualification or prerequisite to voting or standard, practice,
14 or procedure shall be imposed or abridgement of the right of any citizen of the United States to vote
15 on account of race or color." 52 U.S.C. § 1973(a). Plaintiff makes unsupported conclusions such as
16 plaintiff does not need to establish discrimination under the electoral process because "the Ninth
17 Circuit has approved the taking of judicial notice of the pervasive discrimination against Latinos
18 statewide" citing *Gomez v. City of Watsonville* (1987) 363 F.2d 1407, 1418. Plaintiffs' Complaint ¶
19 115. However, *Gomez* no such blanket holding, and found that discrimination need not be
20 established because it was otherwise apparent that a CVRA violation occurred. *Id* at 1419.

21       The CVRA process must be completed before there can be any lawsuit alleging a violation
22 in this case.

23       **C.  GOVERNER NEWSOM'S ORDER EXTENDED THE SAFE HARBOR**
         **PROVISION IN ELECTIONS CODE §10010**
24

25       A comprehensive statutory scheme exists authorizing both the State of California and
26 California counties to impose measures to protect the public from infectious diseases and other
27 health threats during declared emergencies. The illness caused by current health threat,
28 coronavirus disease 2019 (COVID-19), has killed more than ten thousand people in California and

SPINELLI, DONALD
& NOTT

1  sickened many more. *South Bay United Pentecostal Church v. Newsom* (S.D. Cal., Oct. 15, 2020,

2  No. 20-CV-00865-BAS-AHG) 2020 WL 6081733. There is no known cure, widely available

3  effective treatment, or approved vaccine for the disease. *Id*. And because people infected with the

4  virus may be asymptomatic, they may unintentionally infect others around them. *Id*. Therefore,

5  physical distancing that limits physical contact is essential to slow the spread of the virus. *Id*. The

6  California Emergency Services Act[4] (ESA) provides the Governor the power to declare a state of

7  emergency.[5] During a state of emergency, the Governor has broad authority to issue orders and

8  regulations to carry out ESA, and these orders and regulations have the force of the law. Although

9  Plaintiffs must believe that the orders do not apply to them and are ignoring the "safe harbor"

10  provisions of the CVRA, but they have not attempted to challenge the Governor's Orders in court.

11          **1. THE GOVERNER'S ORDERS ARE APPROPRIATE AND LEGAL**

12          Plaintiffs essentially ask this Court to contradict California's determination that the

13  provisions of Executive Order N-34-20 are necessary responses to the COVID-19 pandemic. As a

14  matter of California law, the California Legislature has authorized the Governor to wield wide-

15  ranging authority—including quasi-legislative authority—during emergencies like the COVID-19

16  pandemic. California's Emergency Services Act, Cal. Gov't Code § 8550 et seq., "confers upon the

17  Governor broad powers to deal with such emergencies." *Cal. Corr. Peace Officers Ass'n v.*

18  *Schwarzenegger*, 163 Cal. App. 4th 802, 811 (2008). In particular, under the Emergency Services

19  Act, the Governor may issue orders with "the force and effect of law," Cal. Gov't Code § 8657(a);

20  may suspend "any regulatory statute" or any "statute prescribing the procedure for conduct of state

21  business," *id*. § 8571; and may even "exercise ... all police power vested in the state"—using the

22  State's police power to "promulgate, issue, and enforce such orders and regulations as he deems

23  necessary," *id*. § 8627. Through this broad grant of authority, the Emergency Services Act

24  centralizes the State's powers in the hands of the Governor— reflecting California's determination

25  that "[a] public emergency is not a time for uncoordinated, haphazard, or antagonistic action."

26

27  [4] Government Code §§8550-8669.7

28  [5] Government Code §§8625 & 8558

SPINELLL DONALD
& NOTT

POINTS & AUTHORITIES IN SUPPORT OF DEMURRER TO PLAINTIFFS' COMPLAINT

1 | *Macias v. California*, 10 Cal. 4th 844, 858 (1995)

2       Executive Order N-34-20 fits comfortably within this broad grant of authority. Most

3 | notably, the Order may be understood as a suspension of the safe harbor provisions provided in

4 | Elections Code Section 10010. So understood, the Order falls squarely within Government Code

5 | section 8571: the provisions of the Elections Code are both regulatory statutes and statutes

6 | prescribing procedures for the conduct of state business. California courts have repeatedly described

7 | provisions of the Elections Code as "regulatory." *See, e.g., League of Women Voters of Cal. v.*

8 | *McPherson*, 145 Cal. App. 4th 1469, 1483 n.12 (2006) (describing the purpose of amendments to

9 | the Elections Code as "clarify[ing] the regulatory election process"); *Vikco Ins. Servs., Inc. v. Ohio*

10 | *Indem. Co.*, 70 Cal. App. 4th 55, 63 (1999) (listing the Elections Code among examples of

11 | "regulatory statute[s]" that, as a matter of California law, do not necessarily give rise to a private

12 | right of action for damages). In this light, the provisions of the Elections Code may be understood

13 | as both regulatory statutes and statutes prescribing procedures for the conduct of state business, and

14 | therefore subject to suspension under Government Code section 8571.

15       The Governor's authority in this area is further buttressed by additional provisions of the

16 | Emergency Services Act, which empower the Governor to wield the police power of the State to

17 | issue orders with the force of law. *See* Cal. Gov't Code §§ 8567, 8627. As a matter of California

18 | law, "[t]he police power is the power of sovereignty or power to govern—the inherent reserved

19 | power of the state to subject individual rights to reasonable regulation for the general welfare."

20 | *Massingill v. Dep't of Food & Agric.*, 102 Cal.App.4th 498, 504 (2002) (internal quotations

21 | omitted). In other words, the "police power" is "plenary authority to govern" within the relevant

22 | jurisdiction's geographic limits. *Candid Enterprises, Inc. v. Grossmont Union High Sch. Dist.*, 39

23 | Cal. 3d 878, 885 (1985). In this light, as a matter of state law, the Emergency Services Act has long

24 | been understood to confer upon the Governor the power to issue orders with the force of law, even

25 | in the absence of additional statutory authority. *See, e.g.*, 60 Cal. Op. Att'y Gen. 99 (1977)

26 | (concluding that, under the Emergency Services Act, the Governor had the authority to order

27 | mandatory water rationing, even in the absence of specific statutory authority). Interestingly,

28 | plaintiffs have not filed a legal challenge to the Governor's emergency orders.

SPINELLI, DONALD
& NOTT

1    Indeed, California's Emergency Services Act has been understood to empower the Governor
2  to suspend provisions of the State's Elections Code and modify the State's elections procedures—
3  and the California Legislature has acquiesced in that understanding. In 2017, Governor Brown
4  issued Executive Order B-43-17, which (in Paragraph 6) empowered the County of Sonoma to
5  conduct a special election "wholly by mail," and suspended contrary provisions of the Elections
6  Code. *See Request for Judicial Notice.*

7    Moreover, the Legislature has not restricted this longstanding use of the Emergency
8  Services Act to suspend provisions of the State's Elections Code and modify the State's elections
9  procedures. The Legislature has accepted this use of the Emergency Services Act—which, as a
10  matter of state law, is a strong indication that this use of the Emergency Services Act is correct. *See*
11  *Save Our Heritage Org. v. City of San Diego*, 28 Cal.App.5th 656, 668 (2018) ("The Legislature is
12  presumed to be aware of a long-standing administrative practice. If the Legislature, as here, makes
13  no substantial modifications to the statute, there is a strong indication that the administrative
14  practice is consistent with the legislative intent." (alterations and internal quotation marks omitted)).

15    The context in which this litigation has arisen—an unprecedented public health
16  emergency—further counsels against concluding, in federal court, that the chief executive of a state
17  has exceeded his powers as a matter of state law. "Our Constitution principally entrusts 'the safety
18  and health of the people' to the politically accountable officials of the States 'to guard and protect.'"
19  *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May
20  29, 2020) (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)).
21  "When those officials 'undertake to act in areas fraught with medical and scientific
22  uncertainties,'"—as the Governor and other California officials have here—"their latitude 'must be
23  especially broad," and should not lightly "be subject to second-guessing" by the federal judiciary.
24  *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). Or, by any judiciary.

25    **2. N-48-20 IS NOT INCONSISTENT WITH SENATE BILL 98**

26    Senate Bill 98 was passed under the authority of Education Code Section 8209 and is also
27  an emergency measure. *See Request for Judicial Notice*. This bill changed funding for childcare
28  based on low child attendance due to COVID and related public health directives. Plaintiffs'

1    contention that this bill provides that school boards must conduct hearings during the pandemic is
2    unsupported. *See Request for Judicial Notice.* This bill does not address anything to do with the
3    CVRA and was passed as an emergency measure for schools, funding, and children attendance
4    related to the pandemic.

5
                **D. THE RIGHTS OF LATINO VOTERS ARE REPRESENTED BY THE BOARD
6                  AND THE SECOND CAUSE OF ACTION CANNOT SURVIVE**

7         As discussed above, Plaintiffs' Complaint admits that a Latino candidate of choice – the
8    current President – sits on the SJUSD board. Forty percent (40%) of the board is Latino where only
9    fourteen and one-half percent (14.5%) of the district's population is Latino and only twelve and
10   one-half percent (12.5%) of eligible voters are Latino (Plaintiffs' Complaint ¶ 48.) Even looking at
11   just one (1) board member, the president as the Latino candidate of choice, that represents twenty
12   percent (20%) of the board; with Mr. Hernandez, that is 40% of the current board. There is no
13   history of racially polarized voting for purposes of 52 U.S.C. Section 10301 (b). There has been no
14   history of racially polarized voting in San Juan Unified School District as alleged in plaintiffs' own
15   complaint. Plaintiffs' Complaint admits that the federal counts and factual allegations related
16   thereto are not essential and should not be litigated, and that plaintiffs prefer to resolve the
17   complaint based on the CVRA. See Complaint ¶ 4.

18         Plaintiffs rely on *Garza v. County of Los Angeles*, 918 F2d 763, 774-76 (9th Cir. 1990),
19   however that authority is inapposite. Los Angeles established an entire redistricting commission
20   based on findings related to a history of racially polarized voting. See Elections Code Section
21   21530& Senate Bills 958 and 1108, attached to the Request for Judicial Notice filed herewith. Not
22   only has plaintiff failed to state a cause of action under the Federal Voting Rights Act, Plaintiffs'
23   request for an order continuing jurisdiction of this court pursuant to 52 USC § 10302 should be
24   denied. Not only does this court not have original jurisdiction under this federal statute, this is not
25   an action brought by the Attorney General nor has there been any finding of a violation of either the
26   fourteenth or fifteenth amendments.

27   //

28   //

SPINELLI, DONALD
& NOTT

**E. THERE IS NO ILL INTENT BY THE BOARD IN CONTINUING THIS PROCESS**

Plaintiffs' counsel makes self-serving statements that the board chose not to comply as an avenue to political self-preservation and to perpetuate their incumbency. Plaintiffs' Complaint at ¶ 135. This is simply not established by the record. Instead, as clearly demonstrated in the board's actions, the board has agreed to transition to trustee area elections. This is undisputed and the process must be allowed to finish pending the ability to hold the remainder of the public hearings under the pandemic.

## V.    CONCLUSION

Based upon the foregoing facts and authorities, defendant respectfully requests the court sustain defendant's demur to Plaintiffs' Complaint. There is no effective relief for the Court to grant because The San Juan Unified School District Board has agreed to trustee area elections. Elections Code Section 10010 provides a safe harbor that if a political subdivision passes a resolution, a prospective plaintiff shall not commence an action to enforce Sections 14027 and 14028 within 90 days of the resolutions passage. That safe harbor has been extended by the Governor as discussed below, and Plaintiffs' action is improper. Plaintiffs' request to mandate the Board adopt two more members is also improper as discussed in defendant's concurrent Motion to Strike.

DATED: November 18, 2020

SPINELLI, DONALD & NOTT

By:

DOMENIC D. SPINELLI
NATASHA N. LANGENFELD
FAY K. SAECHAO
Attorneys for Defendant
SAN JUAN UNIFIED SCHOOL DISTRICT

SPINELLI, DONALD & NOTT

# EXHIBIT 4

FOLSOM CITY CLERK'S DEPT
20 JAN '21 A-9:28

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

CITY OF FOLSOM

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Hari Shetty, Kavita Sood, Neighborhood Elections Now

| FOR COURT USE ONLY |
| *(SOLO PARA USO DE LA CORTE)* |
| **FILED/ENDORSED** |
| JAN 05 2021 |
| By: _K. Johnson_ |
| Deputy Clerk |

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | **CASE NUMBER:** *(Número del Caso):* |
| *(El nombre y dirección de la corte es):* | 34-2020-00291638 |

Schaber Courthouse, Superior Ct of Sacramento Cty 720 9th St, Sacramento CA 95814

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Scott Rafferty, 1913 Whitecliff Ct, Walnut Creek CA 94596, 202-380-5525

| DATE: | | Clerk, by | | , Deputy |
| *(Fecha)* | JAN 0 5 2021 | *(Secretario)* | K. JOHNSON | *(Adjunta)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:
3. [x] on behalf of *(specify):* City of Folsom

   under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
   [x] other *(specify):* 416.50

4. [ ] by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
| Judicial Council of California | | www.courts.ca.gov |
| SUM-100 [Rev. July 1, 2009] | | |

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this Form ]   [ Save this Form ]   [ Clear this Form ]

- 206 -

1  Scott Rafferty (SBD 224389)
   1913 Whitecliff Court
2  Walnut Creek CA 94596
   202-380-5525
3  Attorney for PLAINTIFFS



FILED/ENDORSED

DEC 3 1 2020

By: _K. Johnson_
    Deputy Clerk

4

5

6                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                         FOR THE COUNTY OF SACRAMENTO

8

9

10

11  HARI SHETTY, KAVITA SOOD, AND          )   Case No.:  34E2020-0029 1639
                                           )
12  NEIGHBORHOOD ELECTIONS NOW             )   COMPLAINT FOR VIOLATION OF THE
                                           )   CALIFORNIA VOTING ACT
13                    PLAINTIFFS,           )
                                           )
14                                         )
        vs.                                )
15                                         )
                                           )
16  CITY OF FOLSOM, et al.,                )
                                           )
17                    Defendants           )
                                           )
18                                         )
                                           )
19  _____   )

20  COMES NOW PLAINTIFFS HARI SHETTY, KAVITA SOOD, and NEIGHBORHOOD

21  ELECTIONS NOW (collectively, "PLAINTIFFS"), and allege as follows:

22                         NATURE OF THE ACTION

23      1.      This action is brought by PLAINTIFFS for injunctive relief against the CITY OF

24  FOLSOM for its violation of the California Voting Rights Act, Elections Code, Section 14025, et

25  seq.  The imposition of at-large method of election by the CITY OF FOLSOM has resulted in the

26  dilution of votes by Asian and Latino electors, suppressed the ability of these communities to choose

    and recruit candidates for public office, and denied them equal and effective political participation in
27
    elections.  The CITY OF FOLSOM's at-large method of election for electing members to its City
28
                                          - 1 -

              COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1   Council prevents Asian and Latino residents from electing candidates of their choice or from
2   exercising influence in City Council elections that is equal to the rest of the electorate.

3       2.      On February 10, 2020, before any public health restriction, the Folsom Democratic
4   Club submitted a petition asking the City Council to comply with the California Voting Rights Act
5   and citing additional benefits of district elections. Approximately 350 signatories included residents
6   from every part of the CITY OF FOLSOM and from every political party. The addresses at which
    they are registered to vote are shown in Figure 1. The City Manager responded by letter dismissing
7   the proposal to comply with the California Voting Rights Act. The City Manager did not deny that
8   CITY OF FOLSOM's at-large election violated the California Voting Rights Act but stated that
9   district elections would cause "factions and frictions." The City Council took no other action.

10      3.      CITY OF FOLSOM's at-large method of election does violate the California Voting
11  Rights Act. PLAINTIFFS bring this action to enjoin the CITY OF FOLSOM's continued abridgment
12  of Asian and Latino voting rights. PLAINTIFFS seek a declaration from this Court that the at-large
13  method of election currently used by the CITY OF FOLSOM violates the California Voting Rights
14  Act. PLAINTIFFS seek a decree enjoining the CITY OF FOLSOM from further imposing or
15  applying its current at-large method of election. PLAINTIFFS seek additional injunctive relief
16  requiring the CITY OF FOLSOM to implement district-based elections, ranked choice voting, and
17  other appropriate relief tailored to remedy CITY OF FOLSOM's violation of the California Voting
    Rights Act.

18      4.      The California Voting Rights Act is a no-fault statute. It does not require a showing of
19  discriminatory intent. At this time, PLAINTIFFS do not assert violations of Section 2 of the Voting
20  Rights Act of 1965, 52 U.S.C. §10301(c) or of Section 1 of the Civil Rights Act of 1871, 42 U.S.C.
21  §1983, which might require a showing that past or present members of the City Council have chosen
22  to maintain at-large elections as the avenue to preserve or perpetuate their own incumbencies. Garza
    v. County of Los Angeles (9th Cir. 1990) 918 F.2d 763, 771. Allegations of intentional discrimina-
23  tion can be divisive. While PLAINTIFFS reserve all rights to amend this complaint, avoiding the
24  need to determine intent is a benefit of resolving the case under the California Voting Rights Act.

25      5.      Since 2000, California Governors of both political parties have supported minority
26  voting rights. On December 18, 2020, former Republican Governor Arnold Schwarzenegger called
27

28
                                    - 2 -
            COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1  for new voting rights legislation to prevent COVID from being used as "an excuse for voter

2  suppression."[1]

3        6.     Despite Governor Schwarzenegger's guidance, CITY OF FOLSOM, through its

4  attorney, has indicated that it will not timely and voluntarily comply with the CVRA because

5  "Executive Orders" prohibit public hearings required to permit the City Council to enact an

   ordinance, which is not the case. The attorney goes on to state:

6
        The Governor's Executive Orders carry the force of law under GC sections 8567, 8571 and
7       8627.5, and refusing to comply with such Orders is punishable as a misdemeanor under GC
        8665. Hence if your clients insist that we violate and refuse to comply with the Governor's
8       Orders, which we cannot lawfully do, I'm afraid we simply won't be able to have an
        agreement.
9

10       7.     No other political subdivision has argued that a municipality or its officials can be

11  held criminally liable for conducting public hearings, especially if the municipality avails itself of the

12  ability to conduct these hearings by teleconference. The statement demonstrates purpose and intent

    to discriminate.
13
         8.     Several jurisdictions[2] have completed hearings in order voluntarily to comply with the
14
    CVRA, sometimes relying on EO N-29-20, which facilitates holding such hearings by teleconfer-
15
    ences. By contrast, the City Council for CITY OF FOLSOM has continued to accept public
16  testimony live in its chambers on every other subjects. To claim that the City can lawfully conduct

17  all other forms of business, but that COVID somehow renders compliance with the CVRA a criminal

18  offense, would be redolent of the egregious abuses and pretexts by officials in the Deep South that

19  led Congress to enact of the Voting Rights Act of 1965.

         9.     Elections Code, Section 10010(e), requires any prospective plaintiff to send a petition
20
    (or notice of possible violation) by certified mail. Since the evidence is based on the 2018 election, it
21
    was appropriate to send this notice in advance of the 2020 election.[3]  However, since it was too late
22
    to require compliance for the 2020 election, PLAINTIFFS chose to delay sending the formal notice
23  of possible violation until October 28, 2020. PLAINTIFFS expected the CITY OF FOLSOM to

24  accept district elections and to execute the "written agreement" set forth in Elections Code, Section

25  10010(e) to allow additional time for public input. PLAINTIFFS hoped that this collaborative

26  [1] cnn.com/videos/tv/2020/12/19/schwartzenegger-on-the-future-of-the-gop.cnn
    [2] e.g., City of Napa, Napa Valley Unified School District, and Folsom's own school district, Folsom-
27  Cordova USD.
    [3] The 2018 election is more probative. See Elections Code, Section 14028(a).
28
                                        - 3 -

              COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1  approach might defer this action (and preclude any court action by other affected voters) long enough
2  to allow Folsom's initial district maps to use data from the 2020 census. The Census Bureau usually
3  delivers California data in advance of the statutory deadline (March 31, 2021), which has not been
   extended. However, many observers expect a delay of the redistricting file until July 2021.
4
5      10.    In other jurisdictions, prospective plaintiffs have not attempted to negotiate a statutory
   agreement and have demanded that districts be drawn using 2010 census data (for use only in the
6  event of a special election) and be redistricted in 2021. Jurisdictions have complied, as required by
7  law.[4]

8      11.    During the 45-day safe-harbor period that ended on December 14, 2020, PLAINTIFFS
9  attempted to reach an agreement that would delay hearings long enough to avoid the preparation of
10 maps using 2010 census data.

11     12.    CITY OF FOLSOM further declined unconditionally to agree that districts would be
12 mapped in time for the 2022 election.

13     13.    CITY OF FOLSOM failed to pass any "resolution of intent," or to schedule hearings
   to create district maps at any time, prior to the statutory deadline of December 14, 2020.
14
       14.    Absent judicial approval, the refusal of CITY OF FOLSOM to satisfy the statutory
15 conditions for an extension precludes any agreement to delay hearings until after the 2021
16 redistricting file becomes available. By filing this lawsuit, PLAINTIFFS have provided an
17 opportunity to save public funds and to avoid two sets of hearings, which will likely discourage
18 effective public participation.

19     15.    CITY OF FOLSOM has delivered to PLAINTIFFS a purported "resolution of intent"
20 for possible consideration at a regular meeting on January 12, 2021. This resolution has not been
   posted or agendized, so PLAINTIFFS cannot determine if the City Council has any actual intention
21 of considering it. In any event, the untimely resolution does not include a "requirement that the
22 district boundaries be established no later than the six months before the [city's] next regular election
23 to select [Council] members," i.e., before May 8, 2022. If passed, the belated resolution would only
24 promise to implement maps "beginning in November 2022 or the next earliest municipal election if
25 the Sacramento County Voter Registration and Elections Department is unable to implement the new
26 'district-based' election areas for the November 2022 election."

27 [4] e.g., Central Costa Contra Sanitary Commission received the notice on July 13, 2020 and adopted maps
   on November 16. 2020.
28
                                        - 4 -
           COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

16. After November 2022, the next regular elections occur on November 3, 2024 and November 4, 2026.

17. The only conceivable basis for a registrar to decline to implement a district map for November 2022 would be a failure by CITY OF FOLSOM to submit the map as a boundary change no later than 125 days before the election (July 6, 2022). Elections Code, Section 12262. Because CITY OF FOLSOM has not negotiated an extension, it must create districts using 2010 census data and then redistrict before April 17, 2022. Section 21622(c). In CITY OF FOLSOM were creating maps for the first time, no extension could extend beyond May 8, 2022, because Section 10010 requires the new neighborhood candidates to know the boundaries six months in advance to prepare their campaigns in the new districts for the November 8, 2022 election. If the CITY OF FOLSOM drew district maps by its relevant deadline, the maps would be available to the registrar in time for implementation in 2022.

18. The proposed draft resolution does not schedule hearings to be completed within the additional 90 days permitted by statute, i.e., by March 14, 2021. The resolution does not reflect or incorporate any written agreement with PLAINTIFFS "to provide to provide additional time to conduct public outreach, encourage public participation, and receive public input." Section 10010(e)(1)(C)(i) precludes any extension beyond March 14, 2021 without such a written agreement.

19. Elections Code, Section 10010(e), precludes further precludes any agreement to extend the safe harbor that does not include the statutory requirement to establish the boundaries by May 8, 2022, even if PLAINTIFFS were willing to waive their constitutional right to participate and be represented in the hearing process, which they are not. Without such an agreement, any other elector belonging to a protected class could file a court action and prejudice the ability of PLAINTIFFS to recover fees for work product already created.

## PARTIES

20. PLAINTIFF HARI SHETTY is a registered voter who resides in the CITY OF FOLSOM. He is of Asian-American heritage and therefore a member of a "protected class" within the meaning of Elections Code, Section 14026(d) and of a "language minority group" within the meaning of 52 U.S.C. §10310(d)(3).

21. PLAINTIFF KAVITA SOOD is also a registered voter who resides in CITY OF FOLSOM. She is also a member of a protected class, as a person of Asian American heritage.

- 5 -
COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

- 211 -

22.     NEIGHBORHOOD ELECTIONS NOW is an unincorporated association the membership of which includes members of language minorities who are registered to vote within CITY OF FOLSOM.

23.     Defendant CITY OF FOLSOM is a charter city subject to Article XI, Section 5 of the California Constitution and Government Code, Section 34000, *et seq.*, as well as a political subdivision within the meaning of Elections Code, Section 14026(c).  CITY OF FOLSOM is governed by a five-member City Council elected at-large, pursuant to Government Code, Sections 34000 and 36501(a).  At all times relevant to this Complaint, CITY OF FOLSOM and its City Council are and have been subject to the California Voting Rights Act, Elections Code, Section 14026(c); as well as to the provisions regarding elections set forth in Government Code, Sections 34050, 34871, *et seq.*, and Elections Code, Section 10240.  The City Council judges the qualifications of its members, pursuant to Government Code, Section 36812.

## JURISDICTION AND VENUE

24.     All parties hereto are within the unlimited jurisdiction of this Court. Elections Code, Section 14032 provides for enforcement of the California Voting Rights Act by civil action with venue in the Superior Court for the county in which the political subdivision is located.

25.     Elections Code, Section 10010 allows PLAINTIFFS to commence this action to enforce Section 14026, *et seq.*, 45 days after a political subdivision receives a notice of possible violation.  PLAINTIFFS sent such a notice by certified mail on October 28, 2020, which CITY OF FOLSOM received on October 30, 2020. If, during this 45-day period, CITY OF FOLSOM had passed a resolution of intent scheduling map hearings, Section 10010 would have required PLAINTIFFS (and other affected voters) to delay filing an action for 90 additional days, during which time CITY OF FOLSOM could conduct public hearings.  Since CITY OF FOLSOM did not pass the resolution during the required period, this enforcement action became timely on December 14, 2018.

26.     CITY OF FOLSOM, through its attorney, has threatened to invoke Executive Order N-48-20 as an indefinite bar to judicial enforcement of the California Voting Rights Act.  The exclusive purpose of EO N-48-20 is to avoid "forc[ing] Californians to choose between fully participating in their democratic process and safeguarding their own health and safety, as well as the health and safety of their own communities."  As such it applies where members of the public would be "forced" to leave their homes because the jurisdiction is unable to conduct hearings by

- 6 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1  teleconference or to receive written testimony. The proposed construction of EO N-48-20 is not

2  authorized by statute or constitutional as applied to CITY OF FOLSOM.

3      27.    State Constitution, Article I, Section 3(b)(2) requires that any apparent restriction on

4  the People's access to state courts be construed in order "to further the People's right of access." Any

   apparent restriction must also be construed to avoid state and federal constitutional issues. The

5  purpose of Section 10010 is to provide an alternative to judicial enforcement if a jurisdiction

6  voluntarily complies with the California Voting Rights Act within 135 days. By failing to pass a

7  resolution of intent on or before November 14, 2020, CITY OF FOLSOM indicated that it had no

8  intention of availing itself of the statute.

9      28.    The City Council is one of the few legislative bodies in Northern California to receive

10  members of the public in its chambers for purposes of providing testimony and addressing the City

11  Council, even when Sacramento County was in the "purple tier." During the 45-day "safe harbor"

12  period, the City Council met in five special and regular meetings (on November 10, December 7, and

13  December 8, 2020) and conducted a public hearing. In each case, witnesses and other members of

14  the public were invited to "continue to participate in the meeting in person." In addition, the agendas

15  committed to read public testimony and written comments that were submitted before the meeting

    and to allow the public to present testimony and comments via telephone during each meeting.

16      29.    Therefore, if any Executive Order were to be construed to grant immunity from

17  judicial actions to enforce minority voting rights for an indefinite period based on any alleged danger

18  to the public health that would occur if the political subdivision to receive public testimony or to

19  perform legislative acts that might lead to voluntary compliance, it would be unconstitutional as

20  applied to CITY OF FOLSOM.

21      (a) In the event that CITY OF FOLSOM invokes Executive Order N-48-20 as a basis to bar

    jurisdiction over this action, as its attorney has threatened to do, this construction of the Order would

22  not be authorized by Government Code, Section 8571. The suspension of Section 10010 would allow

23  PLAINTIFFS to seek judicial intervention without notice. As interpreted by CITY OF FOLSOM, the

24  effect of the so-called "suspension" is not only to rewrite the terms of the statute, but indirectly to

25  reverse AB 2123 (2018), which prohibits extending the safe harbor more than 90 days and adds

26  additional conditions on any extension.

27      (b) The proposed construction of EO N-48-20 would render it unconstitutional for multiple

28  reasons.

- 7 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

(i)  Right to Access State Courts. The order does not expressly indicate any intent to
divest the state courts of jurisdiction over minority voter dilution. The order does not include
findings that would be necessary to satisfy California Constitution, Article I, Section 3(b)(2), if it
were construed to provide an indefinite restriction on the right to access state courts. Any
construction that overrides legislation explicitly granting state court jurisdiction over claims of
minority vote dilution denies access to the state courts in violation of Article I, Section 3(a).

(ii)  Separation of Legislative Power. The proposed construction affirmatively revises
statutory rights, duties, and immunities, in violation of California Constitution, Article IV, Sections 1
and 10(a). In contrast to subsequent executive orders, EO N-48-20 does not allow for any
modification or rejection by the Legislature.

(iii)  Privileges and Immunities. Only the Legislature can revoke the PLAINTIFFS'
privilege to access state courts or alter the limited immunity of 135 days granted to jurisdictions from
enforcement of the California Voting Rights Act. California Constitution, Article I, Section 7(b).

(iv)  Separation of the Judicial Power. To the extent that EO-N-48-20 resolves
"uncertainty" regarding the application of Section 10010, the Order intrudes on the judicial powers of
the State in violation of California Constitution, Article VI, Section 1.

(v)  Discrimination Against Protected Class. The effect of the Order, so construed, would
be to deny voters the means to vindicate their constitutional rights based on their race, color, or
membership in a protected language minority, in violation of California Constitution, Article I,
Section 7; the Voting Rights Act of 1965, 52 U.S.C. §10301(b); the Civil Rights Act of 1871, 42
U.S.C. §1983; and the Fourteenth and Fifteenth Amendments to the United States Constitution.

(vi)  Taking of Property Without Due Process of Law. The construction impairs the right
of PLAINTIFFS to obtain reimbursement no later than April 28, 2021 for work product already
performed, consistent with Elections Code, Section 10010(f) and 14030, Code of Civil Procedure,
Section 121.5, and Serrano v. Priest (1977) 20 Cal.3d 25, 48-49, in violation of California
Constitution, Article I, Section 7, and the Fourteenth Amendment to the United States Constitution.

(vii)  Violation of equal protection. For the City Council to refuse to conduct a hearing on
district elections on the basis that it would expose the municipal corporation to criminal liability,
while inviting witnesses on all other subjects to testify in person (notwithstanding the stay-at-home
order) or to offer telephonic testimony lacks any rational basis, in violation of California
Constitution, Article 1, Section 7, and the Fourteenth Amendment to the United States Constitution.

- 8 -
COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

30.     AB 2123 contains additional conditions, including the statutory written agreement with prospective plaintiffs, that must be met before the statutory bar on judicial enforcement of the CVRA can be extended for any period. The written agreement must include a requirement that the district boundaries be established no later by May 8, 2022. It must provide for additional public input. CITY OF FOLSOM, through its attorneys, did not accept these essential conditions.

## FACTS

31.     The CITY OF FOLSOM contains approximately 78,447 persons, of which approximately 18% are Asian, 13% Latino, and 3% Black, according to 2018 census data.

32.     Racially polarized voting occurs when members of a protected class as defined by the California Voting Rights Act, Elections Code, Section 14025(d), vote for candidates and electoral choices that are different from the rest of the electorate. The existence of racially polarized voting is sufficient to establish dilution of protected-class voters in violation of Section 14027.

33.     The size of large electoral districts, including cities the size of CITY OF FOLSOM that elect at-large, increases the cost and complexity of campaigning, which suppresses candidates from minority neighborhoods who could compete in district elections. The absence of local campaigns reduces voter participation in minority neighborhoods, further diluting the influence of voters in the Asian and Latino protected classes.

34.     The suppression of minority candidates has reduced minority voter participation. Only 38% of Latino citizens of voting age and only 38% of Asian citizens of voting age voted in the 2018 elections, compared to 64% of voters who are neither Latino nor Asian.

35.     Prior to the February 2020 petition, the most influential slating organization, the Chamber of Commerce, had never endorsed a Latino or Asian candidate.

36.     Prior to 2018, one Asian and no Latino had run for City Council in the history of CITY OF FOLSOM. The Asian candidate was not elected.

37.     The barrier to neighborhood-based campaigns created by at-large elections has advantaged incumbents, entrenching them in office through periods of demographic change. Prior to the 2020 elections, a majority of the City Council members had served at least three terms. Each was white and Anglo, and their average age was 69 years.

38.     Since 1980, CITY OF FOLSOM's population has grown eightfold. Over the same period, Asians have increased from ½% to 20% of total population. But overall growth increased the barrier to competition in City Council elections, further diluting the influence of new Asian and

- 9 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1  Latino populations. In the 20th century, approximately 16 of 38 City Council members served only

2  one term. During the 21st century, only one incumbent has ever been defeated (and only after being

3  arrested for impersonating a police officer). None of these incumbents was Asian or Latino.

4       39.    Evidence of racially polarized voting can rely on a single election "where a minority

5  group has begun to sponsor candidates just recently." Thornburg v. Gingles (1989) 470 U.S. 30, 58 &

   fn.25.

6       40.    The 2018 City Council election demonstrated polarization between Asian and non-

7  Asian voters.

8       41.    The 2018 City Council election demonstrated polarization between a coalition of

9  Asian and Latino voters and the rest of the electorate.

10       42.    In the 2018 election, YK Chalamcherla, the only Asian candidate since 2010, received

11  approximately 68% of the Asian vote and only 5% of the non-Asian vote, according to an estimate

12  generated by ecological regression. These estimates do not overlap at the 80% confidence level.

    The regression is shown in Figure 2.

13       43.    Additional contests for City Council and other offices, and votes for propositions and

14  other ballot measures, provide evidence of racially polarized voting.

15       44.    The obstacles posed by the CITY OF FOLSOM's at-large method of election, together

16  with racially polarized voting, impair the ability of people of certain races, color or language minority

17  groups, such as Asian and Latino voters, to elect candidates of their choice or to influence the

18  outcome of elections conducted in the CITY OF FOLSOM.

19       45.    District-based elections will provide an opportunity for the members of the protected

20  classes as defined by the California Voting Rights Act to elect candidates of their choice or to

21  influence the outcome of the CITY OF FOLSOM City Council elections.

## FIRST CAUSE OF ACTION
22  ### (Violation of California Voting Rights Act)

23       46.    As a charter city within the State of California, Defendant CITY OF FOLSOM is a

24  political subdivision as defined in Elections Code, Section 14026(c) and is subject to the CVRA.

25       47.    Defendant CITY OF FOLSOM employs an at-large method of election, where voters

26  of its entire jurisdiction elect members to its City Council.

27       48.    Racially polarized voting has occurred in recent elections for members of the City

28  Council for the CITY OF FOLSOM and in elections incorporating other electoral choices by voters

- 10 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1  of the CITY OF FOLSOM, California. As a result, the CITY OF FOLSOM's at-large method of

2  election is imposed in a manner that impairs the ability of protected classes as defined by the

3  California Voting Rights Act to elect candidates of their choice or influence the outcome of elections.

4      49.    Single-member districts provide an opportunity for the members of a protected class

(as defined by the California Voting Rights Act) to elect candidates of their choice or to influence the

5  outcome of the CITY OF FOLSOM City Council elections.

6      50.    An actual controversy has arisen and exists between the parties relating to the legal

7  rights and duties of PLAINTIFFS and CITY OF FOLSOM, for which PLAINTIFFS desires a

8  declaration of rights.

9      51.    CITY OF FOLSOM's wrongful conduct has caused and, unless enjoined by this Court,

10  will continue to cause, immediate and irreparable injury to PLAINTIFFS and all residents of the

11  CITY OF FOLSOM.

12      52.    PLAINTIFFS and the residents of the CITY OF FOLSOM have no adequate remedy

at law for the injuries they currently suffer and will otherwise continue to suffer.

13

14      53.    Civil Code, Section 3423(g) and Code of Civil Procedure, Section 526(b)(4) do not

preclude this Court from issuing injunctive relief to prevent violations of the CVRA or as needed to

15  fashion appropriate remedies. Jauregui v. City of Palmdale (2014) 226 Cal. App. 4th 781, 808.

16

17                             **PRAYER FOR RELIEF**

18      WHEREFORE, PLAINTIFFS pray for judgment against Defendant:

19      1.    For a decree declaring that the CITY OF FOLSOM's current at-large method of

20  election for the City Council violates the California Voting Rights Act;

21      2.    For preliminary and permanent injunctive relief enjoining the CITY OF FOLSOM

from imposing or applying its current at-large method of election in any regular or special election;

22      4.    For injunctive relief mandating the CITY OF FOLSOM to implement district-based

23  elections, as defined by the California Voting Rights Act, to remedy the CITY OF FOLSOM's

24  violation of the California Voting Rights Act;

25      5.    For an order approving a map of districts that will equalize influence of voters who

26  belong to protected classes;

27      6.    For an award of PLAINTIFFS attorneys' fees, costs, litigation expenses and pre-

28  judgment interest pursuant to the Elections Code, 14030 and other applicable law; and

- 11 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

7.    For such further relief as the Court deems just and proper.

DATED: December 31, 2020

*Scott Rafferty*

SCOTT J. RAFFERTY
Counsel for PLAINTIFFS

- 12 -
COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

Figure 1. Distribution of Voters Signing February 2020 Petition Compared to Distribution of Current and Former Incumbents and Unsuccessful Candidates



Figure 2. Ecological Regression Estimate of Asian/non-Asian Vote for YK Chalamcherla in 2018



|  | lower 80% | upper 80% |
|---|---|---|
| Asian % | 4.6% | 5.6% |
| non-Asian % | 62.3% | 75.4% |

| R-squared | 0.889 |
|---|---|
| 1/P-value 1 in | 1,703,638,756,676 |

- 13 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

## VERIFICATION OF COMPLAINT

State of California

County of Sacramento

To wit:

HARI SHETTY, a PLAINTIFF named in the foregoing Complaint, SHETTY et al. v. CITY OF FOLSOM, affirms under penalty of perjury that the facts and allegations contained therein are true, except so far as they are therein stated to be on information or belief, and that, so far as they are therein stated to be on information or belief, he believes them to be true. Much of the Complaint consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and similar factual matters, which are based on information provided by his attorney, which he believes to be true. I have reviewed and understand the statistical analysis.

Affirmed this 31st day of December 2020

- 14 -
COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1

## VERIFICATION OF COMPLAINT

2  State of California

3  County of Sacramento

4  To wit:

5          KAVITA SOOD, a PLAINTIFF named in the foregoing Complaint, SHETTY et al. v. CITY

6  OF FOLSOM, affirms under penalty of perjury that the facts and allegations contained therein are

   true, except so far as they are therein stated to be on information or belief, and that, so far as they are
7
   therein stated to be on information or belief, she believes them to be true. Much of the Complaint
8
   consists of allegations regarding the legal elements of jurisdiction, legal, academic and historical
9  citations, the results of statistical analyses, and similar factual matters, which are based on

10  information provided by her attorney, which she believes to be true.

11

12

13  Affirmed this 31st day of December 2020

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT

1          VERIFICATION OF COMPLAINT

2    State of California

3    County of Sacramento

4    To wit:

5          On behalf of NEIGHBORHOOD ELECTIONS NOW, a PLAINTIFF named in the foregoing

6    Complaint, SHETTY et al. v. CITY OF FOLSOM, Muriel Brounstein affirms under penalty of

     perjury that the facts and allegations contained therein are true, except so far as they are therein stated

7    to be on information or belief, and that, so far as they are therein stated to be on information or belief,

8    she believes them to be true. Much of the Complaint consists of allegations regarding the legal

9    elements of jurisdiction, legal, academic and historical citations, the results of statistical analyses, and

10   similar factual matters, which are based on information provided by her attorney, which she believes

11   to be true.

12   *Muriel Brounstein*

13
     Affirmed this 31 day of December 2020
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        - 16 -
              COMPLAINT FOR VIOLATION OF THE CALIFORNIA VOTING RIGHTS ACT



**SUPERIOR COURT OF CALIFORNIA**
**County of Sacramento**
720 Ninth Street, Room 102
Sacramento, CA 95814-1311

For Court Use Only

PETITIONER/PLAINTIFF: Hari Shetty, Kavita Sood, et al.

RESPONDENT/DEFENDANT: City of Folsom, et al.

| ORDER RE: DELAY IN SCHEDULING INITIAL CASE MANAGEMENT CONFERENCE | CASE NUMBER: 34≡2020-0029 1639 |
|---|---|

The Court finds good cause to delay the scheduling of the initial Case Management Conference for this case given the COVID-19 pandemic and its impact on court-wide operations. Among the affected operations is the Court's Case Management Program (CMP). The Court's CMP calendars have been and remain suspended until further notice. After the CMP Departments resume operations, the Court will schedule the initial Case Management Conference in this case and issue a Notice of Case Management Conference and Order to Appear.

The deadline for filing and service of the Case Management Conference Statements will be based upon the date for the initial Case Management Conference once it has been scheduled.

Parties shall continue to accomplish service of all parties named in the action.

Parties shall continue to ensure that all defendants and cross-defendants have answered, been dismissed, or had their defaults entered.

Plaintiff shall serve a copy of this order on any party to the complaint. The cross-complainant shall have the same obligation with respect to the cross-complaint

RICHARD K. SUEYOSHI

Dated: 12/31/2020

_____
Richard K. Sueyoshi, Judge of the Superior Court

Page 1 of 1

Order re: Delay in Scheduling Initial Case Management Conference

- 223 -



**SUPERIOR COURT OF CALIFORNIA**
**County of Sacramento**
**720 Ninth Street**
**Sacramento, CA 95814-1380**
**(916) 874-5522—Website www.saccourt.ca.gov**

### Program Case Notice
#### Unlimited Civil Case

The Case Management Program (CMP) requires the following timelines to be met in all cases except those that are excluded by California Rule of Court 3.712(b), (c) and (d) and Local Rule 2.46(B), (E) and (F).

| Action | Requirement |
|---|---|
| **Service of Summons** | Summons, complaint and program case notice must be served on all named defendants and proofs of service on those defendants must be filed with the court within **60 days** from the filing of the complaint. |
| | When the complaint is amended to add a new defendant, the added defendant must be served and proofs of service must be filed within **30 days** after the filing of the amended complaint. |
| | A cross-complaint adding a new party must be served and proofs of service must be filed with the court **30 days** from the filing of the cross-complaint. |
| **Statement of Damages** | If a statement of damages pursuant to Section 425.11 of the Code of Civil Procedure or a statement of punitive damages is required, it must be served with the summons and complaint. |
| **Responsive Pleadings** | If a responsive pleading is not served within the time limits and no extension of time has been granted, the plaintiff within **10 days** after the time for service has elapsed must file a request for entry of default. |
| | Parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint. |
| | No extensions of time to respond beyond **105 days** from the filing of the complaint may be given. |
| **Judgment by Default** | When default is entered, the party who requested the entry of default must apply for a default judgment against the defaulting party within **45 days** after entry of default, unless the court has granted an extension of time. |
| **Case Management Statement** | The court will provide a notice of case management conference on the filing parties at the time that the case is filed with the court. A case management statement shall be filed at least **15 calendar days** prior to the date set for the case management conference. |
| **Mediation Statement** | The Mediation Statement shall be filed concurrently with the Case Management Statement, unless the parties have filed a Stipulation for Alternative Dispute Resolution form with the ADR Administrator at any time up to 15 calendar days prior to the Case Management Conference, as required by Local Rule 2.51(E). |
| **Meet and Confer** | Parties must meet and confer, in person or by telephone as required in California Rules of Court 3.724 at least **30 calendar days** before the case management conference date. |
| **Case Management Conference** | A case management conference is generally held within **180 days** of the filing of the complaint. |

Failure to comply with the program rules may result in the imposition of sanctions or an order to show cause. Please refer to Local Rules Chapter Two – Part 4 for more information.

### NOTE: THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT.

Program Case Notice (Unlimited Civil Case)

CV\E-143U (Rev 02.16.16)
Local Form Adopted for Mandatory Use

Page 1 of 1



**SUPERIOR COURT OF CALIFORNIA**
COUNTY OF SACRAMENTO
SACRAMENTO, CALIFORNIA, 95814
916-874-5522
WWW.SACCOURT.CA.GOV

## ALTERNATIVE DISPUTE RESOLUTION
## INFORMATION PACKAGE

Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the Superior Court of California, County of Sacramento (Sacramento County Superior Court), strongly encourages parties in civil cases to explore and pursue the use of Alternative Dispute Resolution.

**What is Alternative Dispute Resolution?**

Alternative Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits. Types of ADR processes include:

- Arbitration
- Mediation
- Settlement Conferences

- Private judging
- Neutral evaluation

- Mini-trials
- Negotiation and *hybrids* of these processes

All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes. At the present time, the Sacramento County Superior Court offers Mediation and Arbitration.

**What are the advantages of using ADR?**

ADR can have a number of advantages over traditional court litigation.

- **ADR can save time.** Even in a complex case, a dispute can be resolved through ADR in a matter of months or weeks, while a lawsuit can take years.

- **ADR can save money.** By producing earlier settlements, ADR can save parties and courts money that might otherwise be spent on litigation costs (attorneys fees and court expenses.)

- **ADR provides more participation.** Parties have more opportunity with ADR to express their own interests and concerns, while litigation focuses exclusively on the parties' legal rights and responsibilities.

- **ADR provides more control and flexibility.** Parties can choose the ADR process most appropriate for their particular situation and that will best serve their particular needs.

- **ADR can reduce stress and provide greater satisfaction**. ADR encourages cooperation and communication, while discouraging the adversarial atmosphere found in litigation. Surveys of disputants who have gone through ADR have found that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

**Arbitration and Mediation**

Although there are many different types of ADR processes, the types most commonly used to resolve disputes in California state courts are Arbitration and Mediation. The Sacramento County Superior Court currently offers pre-screened panelists with experience and training in each of the following areas.

**Arbitration.** An Arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an Arbitration award. Arbitration awards may be entered as judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes. Arbitration can be binding if the parties so agree in writing. If there is no such agreement, either party can reject the Arbitration award and request a trial.



**Mediation.** Mediation is a voluntary, informal, confidential process in which the Mediator, a neutral third party, facilitates settlement negotiations. The Mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.

Litigants are encouraged to use an ADR process as early in the case as circumstances permit. All appropriate cases will be reviewed for referral to ADR at the Case Management Conference(CMC).

### ADR Procedures for the Sacramento County Superior Court

Upon filing a complaint or cross-complaint, the plaintiff/cross-complainant must acquire this information package from the Court's Website, http://www.saccourt.ca.gov, or the Superior Court Clerk. Plaintiff is required to include the ADR Information Package when he or she serves the Complaint on the Defendant.

The court's ADR Panel List is available on-line at http://www.saccourt.ca.gov or may be obtained at the Civil Filing Counter at the Gordon D. Schaber Sacramento County Courthouse, 720 Ninth Street, Room 101, Sacramento, CA 95814.

**Mediation.**

All parties to the dispute may voluntarily agree to submit the case to a neutral Mediator, either through a court-appointment or through a private arrangement. The parties may choose either of the following Mediation choices:

**Private Mediation.** Parties to a civil action agree to mediate their dispute with a Mediator of their choice without court assistance. The cost of Mediation must be borne by the parties equally unless the parties agree otherwise. Parties will be charged an amount as set by the Mediator (refer to the ADR Panel List for current rates).

**Court Mediation.** Upon stipulation of the parties, a Mediator and alternate Mediator will be selected from the court-approved list of neutrals (ADR Panel List). The court will confirm the selected Mediator and notice parties by mail.

The Mediator is then responsible for contacting the parties to confirm a date, time, and place for Mediation. Mediators on the court's approved ADR Panel List have agreed to provide up to three (3) hours of pro-bono Mediation. In the event the Mediation extends beyond 3 hours and parties determine it would be beneficial to continue the Mediation process, the parties will independently be responsible for compensating the Mediator in an amount as set by the Mediator.

### UNLIMITED CIVIL CASES

- A *Stipulation and Order to Mediation – Unlimited Civil Cases*. Form CV\E-MED-179 *(see attached)* may be filed with the court at any time up to 15 calendar days prior to the Case Management Conference.

- If the parties do not stipulate to Mediation prior to their CMC, they may indicate their willingness to stipulate to Mediation at the CMC. In that event, parties must submit a *Stipulation and Order to Mediation – Unlimited Civil Cases* within 14 calendar days after their CMC.

- A *Mediation Statement* must be filed with the *Case Management Statement.*

### LIMITED CIVIL CASES

- Parties may select and conduct voluntary Private Mediation without notification to the Court.

- Parties may stipulate to court mediation by filing a Stipulation and Order to Arbitration/Mediation - Limited Civil Cases form (CV\E-203) at any time after the filing of the Limited Civil Case Status Memorandum form (CV\E-202). This form is located on the court's website at http://www.saccourt.ca.gov. A Stipulation and Order to Arbitration/Mediation – Limited Civil Cases MUST be filed concurrently or subsequent to a Limited Civil Case Status Memorandum.

---



**Arbitration**
*UNLIMITED CIVIL CASES*

- Plaintiff may elect, the parties may stipulate, or the judge may Order the case to Arbitration. Parties will be asked to select an Arbitrator and three alternate Arbitrators from the court's ADR Panel List. The court will send a Notice of Appointment and an appropriate Order to Arbitration to all parties.

- Arbitrations are conducted pursuant to California Rules of Court, rules 3.810 through 3.830, and Local Rules Chapter 2, Part 5. Unless otherwise stipulated, an Award of Arbitrator is not binding upon the parties provided that they file a timely Request for Trial De Novo pursuant to California Rules of Court, rule 3.826. Upon the filing of a timely Request for Trial De Novo, the case will proceed to a Trial-Setting Conference. If no timely Request for Trial De Novo is filed, judgment based upon the Award of Arbitrator will be entered pursuant to California Rules of Court, rule 3.827.

LIMITED CIVIL CASES
Arbitration may occur in a limited civil case under the following circumstances:

- When all parties stipulate to arbitration pursuant to Code of Civil Procedure section 1141.12. A stipulation for arbitration shall be filed using the Court's local form, Stipulation and Order to Arbitration/Mediation – Limited Civil Cases form (CV\E-203). A Stipulation and Order to Arbitration/Mediation – Limited Civil Cases MUST be filed concurrently or subsequent to a Limited Civil Case Status Memorandum form (CV\E-202).

- When plaintiff elects to refer the case to judicial arbitration. A written election by the plaintiff to submit an action or proceeding to arbitration shall be filed using the Court's local form, Limited Civil Case Status Memorandum form (CV\E-202).

**Additional Information**
For additional information regarding the Court's ADR program, please go to the Court's website http://www.saccourt.ca.gov.

# EXHIBIT 5

1 | STEVEN WANG, State Bar No. 191168
City Attorney
2 | SARI MYERS DIERKING, State Bar No. 226805
Assistant City Attorney
3 | City of Folsom
50 Natoma Street
4 | Folsom, CA 95630
Telephone: (916) 461-6025
5 | Facsimile: (916) 351-0536

6 | Attorneys for Defendant
CITY OF FOLSOM

7

8

FILED/ENDORSED

FEB 16 2021

By: _____A. Macias_____
Deputy Clerk

(*Filing Fee Exempt: Gov. Code § 6103*)

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | COUNTY OF SACRAMENTO

11

12

13 | HARI SHETTY, KAVITA SOOD, and
NEIGHBORHOOD ELECTIONS NOW,

14 | Plaintiffs,

15 | vs.

16 | CITY OF FOLSOM, *et al.*,

17 | Defendants.

18

19

20

21

22

23

24

25

26

27

28

Case No. 34-2020-00291639

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF CITY OF
FOLSOM'S DEMURRER TO PLAINTIFFS'
COMPLAINT**

Date:  June 10, 2021
Time:  1:30 p.m.
Dept.:  53
Judge:  Hon. David I. Brown

Reservation No.: 2550176

Complaint Filed: January 5, 2021

---

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF CITY OF FOLSOM'S DEMURRER TO PLAINTIFFS' COMPLAINT

1
2

**TABLE OF CONTENTS**

3

I. INTRODUCTION...................................................................................................1

4

II. FACTS AND PROCEDURAL HISTORY..............................................................1

5

III. LEGAL STANDARD...........................................................................................2

6

IV. ARGUMENT.......................................................................................................3

7
8

A. The Governor has Authority to Declare a State of Emergency and Issue Executive Orders to Protect the Health and Safety of the People of California..................................................3

9

B. Executive Order N-48-20 is Proper and Has the Force of Law............................................4

10

1. The March 4, 2020 Proclamation of State of Emergency was proper ..............................4

11
12

2. Executive Order N-48-20 was properly issued, remains in effect, and compliance is mandatory..............................................................................................................................5

13

C. Executive Order N-48-20 Suspends the Timelines at Issue ....................................................6

14

D. Executive Order N-48-20 Requires Dismissal ......................................................................8

15

V. CONCLUSION ....................................................................................................14

16
17
18
19
20
21
22
23
24
25
26
27
28

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Adelman v. Associated International Insurance Co.,* 90 Cal.App.4th 352 (2001).....................3, 10

4

*California Correctional Peace Officers Association v. Schwarzenegger,* 163 Cal.App.4th 802 (2008).............................................................................................................................................10

5

*Jacobson v. Massachusetts,* 197 U.S. 11 (1905) ...........................................................................15

6

*Macias v. State of California,* 10 Cal. 4th 844 (1995)...................................................10, 12, 13, 15

7

*Marshall v. United States,* 414 U.S. 417 (1974).............................................................................15

*Martin v. Municipal Court,* 148 Cal.App.3d 693 (1983)..........................................................passim

8

*McKenney v. Purepac Pharmaceutical Co.,* 167 Cal.App.4th 72 (2008)........................................3

9

*South Bay United Pentecostal Church v. Newsom,* 590 U.S. __, Case No. 19A1044 (2020)........14

10

*South Bay United Pentecostal Church v. Newsom,* 592 U.S. __, Case No. 20A136 (20-746) (2021)..............................................................................................................10, 11, 12, 14

11

*Vacco v. Quill,* 521 U.S. 793 (1997)...............................................................................................11

12

**Statutes**

13

14

Code of Civil Procedure § 422.10. ...................................................................................................2

Code of Civil Procedure § 430.10 ....................................................................................................2

15

Code of Civil Procedure § 430.30 ....................................................................................................2

16

Code of Civil Procedure § 430.41 ....................................................................................................2

17

Code of Civil Procedure § 430.50 ....................................................................................................2

18

Code of Civil Procedure § 430.60 ....................................................................................................3

19

Elections Code § 10010 ............................................................................................................passim

20

Government Code § 8550.................................................................................................................3

Government Code § 8558........................................................................................................3, 4, 5

21

Government Code § 8565.................................................................................................................3

22

Government Code § 8567............................................................................................................3, 4

23

Government Code § 8571.......................................................................................................passim

24

Government Code § 8625........................................................................................................3, 4, 5

25

Government Code § 8627.........................................................................................................3, 13

26

Government Code § 8629............................................................................................................4, 6

Government Code § 8665............................................................................................................4, 6

27

28

ii

1

**Other**

2   Executive Order N-29-20.............................................................................................................12

3   Executive Order N-34-20........................................................................................................passim

4   Executive Order N-48-20........................................................................................................passim

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

1

## I. INTRODUCTION

2       Plaintiffs' complaint fails to state facts sufficient to constitute a cause of action and

3 accordingly the City of Folsom's demurrer should be sustained.  Plaintiffs allege that the City of

4 Folsom failed to take action related to changing the method by which it elects City

5 Councilmembers within the timeframes specified in the Elections Code.  However, those very

6 timeframes were specifically suspended by the Governor as a part of the State of California's

7 effort to prevent and mitigate the effects of the COVID-19 pandemic.  The Governor's Executive

8 Order tolling the relevant timeframes was in effect prior to Plaintiffs' attorney sending a demand

9 letter, prior to the filing of this lawsuit, and it remains in effect today.  Due to the fact that the

10 Governor's Executive Order suspended the time a public agency has to respond to a demand letter

11 under the CVRA, and the Elections Code provides that no lawsuit may be filed until a certain

12 amount of time has passed without such a response, the complaint fails to state a cause of action

13 upon which relief may be granted.  Accordingly, the demurrer should be sustained without leave

14 to amend, and the complaint should be dismissed.

15

## II. FACTS AND PROCEDURAL HISTORY

16       On March 4, 2020, Governor Newsom declared a State of Emergency based on the

17 COVID-19 pandemic.  (Request for Judicial Notice in Support of City of Folsom's Demurrer to

18 Plaintiffs' Complaint[1] ("RJN") Exhibit 1.)  On March 20, 2020, the Governor signed Executive

19 Order N-34-20.  (Exhibit 2.)  Paragraph 1 of that executive order suspended the timeframes set

20 forth in Elections Code section 10010 for conducting hearings required when switching from an

21 at-large method of election to district-based elections.  (Exhibit 2, ¶ 1.)  To clarify the scope of

22 Executive Order N-34-20 without changing its effective date, on April 9, 2020, the Governor

23 signed Executive Order N-48-20, which controls here.  (Exhibit 3.)  Paragraph 2 of Executive

24 Order N-48-20 states, in pertinent part:

25       The timeframes set forth in Elections Code section 10010, subdivisions (a) and (e), are

26       suspended as to any political subdivision of the State.  The purpose of this suspension is to

27       protect public health and safety during the period when the State Public Health Officer

28 [1] All exhibits referenced hereafter are exhibits to the RJN, unless specifically stated otherwise.

1

- 233 -

1   and other public health officials have determined that it is necessary to engage in physical

2   distancing to minimize the spread of COVID-19. This suspension shall be in effect until

3   further notice.

4   This paragraph pauses the timeframes set forth in Elections Code section 10010,

5   subdivisions (a) and (e), but does not restart them: this paragraph should be construed to

6   toll those timeframes, such that days elapsed during the suspension set forth in this

7   paragraph are not counted, but any days that elapsed prior to that suspension are still

8   counted. (Exhibit 3, ¶ 2.)

9       On October 28, 2020, Plaintiffs sent the City Clerk a letter stating that the City of Folsom

10   may be in violation of the Elections Code[2]. (Plaintiffs' Complaint ("Complaint"), ¶ 25.) Despite

11   Executive Order N-48-20's suspension of the timeframes set forth in Elections Code section

12   10010 subdivision (e), Plaintiffs filed suit on January 5, 2021, alleging a failure to take action

13   within the 45-day timeframe that typically applies in CVRA cases. (Complaint, ¶ 25.) However,

14   at all relevant times, that 45-day timeframe was tolled by Executive Order N-48-20. (Exhibit 3.)

15       The City of Folsom wrote to Plaintiffs' counsel in an attempt to meet and confer before

16   filing this demurrer, in compliance with Code of Civil Procedure section 430.41. (Declaration of

17   Steven Wang in Support of City of Folsom's Demurrer to Complaint ("Wang Dec") at ¶ ¶ 2, 4.)

18   The parties were not able to reach agreement, so the filing of this demurrer was necessary. (Wang

19   Dec at ¶¶ 5-7.)

20   ### III.    LEGAL STANDARD

21       A demurrer is a permissible pleading in civil actions. (Code of Civil Procedure (CCP) §

22   422.10.) A defendant may object to a complaint filed against him via demurrer so long as the

23   grounds for the objection appear on the face of the complaint or are judicially noticeable. (CCP §

24   430.30(a).) A demurrer can be brought on any of several permissible grounds, including that the

25   complaint does not state facts sufficient to constitute a cause of action. (CCP § 430.10(e).)

26       A demurrer may be taken to the entire complaint or to any of the causes of action

27   contained therein. (CCP § 430.50.) The demurrer shall specifically state each of the grounds for

28   [2] The City of Folsom denies any such violation.

2

1    objection upon which it is based.  (CCP § 430.60.)

2         Demurrers for failure to state a cause of action are commonly referred to as general

3    demurrers.  (*McKenney v. Purepac Pharmaceutical Co.* (2008) 167 Cal.App.4th 72, 77.)  When

4    evaluating such a demurrer, the Court must assume the truth of the material facts properly pled in

5    the complaint.  (*Adelman v. Associated International Insurance Co.* (2001) 90 Cal.App.4th 352,

6    359.)  However, the Court does not consider any contentions, deductions, or conclusions of fact

7    or law.  (*Ibid.*)

8                            **IV.    ARGUMENT**

9    **A. The Governor has Authority to Declare a State of Emergency and Issue Executive**

10        **Orders to Protect the Health and Safety of the People of California**

11        The California Emergency Services Act, Government Code section 8550, et seq.,

12   gives the Governor broad power and authority with respect to states of emergency.  As explained

13   by the Legislature, "[t]he state has long recognized its responsibility to mitigate the effects of

14   natural, manmade, or war-caused emergencies that result in conditions of disaster or in extreme

15   peril to life … and generally to protect the health and safety and preserve the lives and property of

16   the people of the state."  (Government Code § 8550.)

17        To that end, the Legislature empowered the Governor to proclaim a state of

18   emergency in circumstances that include an epidemic.  (Government Code §§ 8625, 8558(b).)

19   During a state of emergency, the Governor has complete authority over all agencies of the state

20   government and the right to exercise all police power vested in the state by the Constitution and

21   laws of the State of California in order to effectuate the purposes of the California Emergency

22   Services Act.  (Government Code §§ 8627, 8565.)

23        In exercising that broad authority, the Governor shall promulgate, issue, and enforce

24   such orders as he deems necessary.  (Government Code §§ 8627, 8567(a).)  During the state of

25   emergency, the Governor's orders have the force and effect of law.  (Government Code §

26   8567(a).)

27        The Legislature also specifically authorized the Governor to suspend any statute

28   during a state of emergency where he determines that strict compliance would in any way

                                    3

1   prevent, hinder, or delay the mitigation of the effects of the emergency.  (Government Code §
2   8571.)

3          When the state of emergency has passed, the Governor must proclaim its termination
4   at the earliest possible date that conditions warrant.  (Government Code § 8629.)  The
5   extraordinary powers granted to the Governor with respect to a state of emergency terminate
6   when the state of emergency itself has been terminated by proclamation of the Governor or by
7   concurrent resolution of the Legislature declaring it at an end.  (Government Code § 8629.)  Until
8   that time, the Governor's orders remain in effect and retain the force of law.  (Government Code
9   § 8567(a).)

10          Any person who refuses or willfully neglects to obey any lawful order promulgated or
11   issued pursuant to the California Emergency Services Act is guilty of a misdemeanor.
12   (Government Code § 8665.)  This penalty has been upheld by the Courts.  (*Martin v. Municipal*
13   *Court* (1983) 148 Cal.App.3d 693.)

14   **B.  Executive Order N-48-20 is Proper and Has the Force of Law**

15       *1. The March 4, 2020 Proclamation of State of Emergency was proper*

16          Governor Newsom declared a state of emergency with respect to the COVID-19
17   pandemic on March 4, 2020, after finding that the conditions of Government Code section
18   8558(b) relating to the declaration of a state of emergency had been met and that local authority
19   was inadequate to cope with the emergency.  (Exhibit 1.)

20          When analyzing claims that a previous Governor's declaration of a state of emergency
21   was defective and improper, the Court of Appeal explained that specific findings are not required,
22   but the Governor must state the circumstances of the emergency found to exist and that the
23   emergency is found to be beyond local control measures.  (*Martin, supra,* 148 Cal.App.3d at p.
24   698, citing Government Code §§ 8625, 8558.)

25          Here, the Governor's March 4, 2020 Proclamation of State of Emergency did both.
26   Specifically, the Proclamation stated, in pertinent part:

27          "[A]s of March 4, 2020, across the globe, there are more than 94,000 confirmed cases
28          of COVID-19, tragically resulting in more than 3,000 deaths worldwide;" and

<div align="center">4</div>

1    "[A]s of March 4, 2020, there are 129 confirmed cases of COVID-19 in the United

2    States, including 53 in California, and more than 9,400 Californians across 49 counties

3    are in home monitoring based on possible travel-based exposure to the virus, and

4    officials expect the number of cases in California, the United States, and worldwide to

5    increase;" and

6    "[I]f COVID-19 spreads in California at a rate comparable to the rate of spread in

7    other countries, the number of persons requiring medical care may exceed locally

8    available resources, and controlling outbreaks minimizes the risk to the public,

9    maintains the health and safety of the people of California, and limits the spread of

10   infection in our communities and within the healthcare delivery system;" and

11   "[L]ocal authority is inadequate to cope with the threat posed by COVID-19."

12   (Exhibit 1, pp. 1-2.)

13   The Governor's Proclamation of State of Emergency identified the circumstances of

14   the emergency found to exist and found that the emergency was beyond local control measures.

15   (Exhibit 1, pp. 1-2.)  Accordingly, the Governor's action complied with Government Code

16   sections 8625 and 8558 and was also consistent with the Court of Appeal's direction in *Martin,*

17   *supra.*  Therefore, the March 4, 2020 Proclamation of State of Emergency was proper.

18   *2. Executive Order N-48-20 was properly issued, remains in effect, and compliance is*

19   *mandatory*

20   As a part of the California Emergency Services Act, the Legislature granted the

21   Governor the power to suspend any statute upon a determination that strict compliance would in

22   any way delay, hinder, or prevent mitigation of the effects of a declared state of emergency.

23   (Government Code § 8571.)

24   Executive Order N-34-20 suspends the timeframes in Elections Code section 10010.

25   (Exhibit 2, ¶ 1.)  Executive Order N-48-20, which controls here, clarifies the scope of Executive

26   Order N-34-20 and further specifies the timeframes that are suspended until further notice.

27   (Exhibit 3, ¶ 2.)  Executive Order N-48-20 explains that the Governor suspended the statutory

28   timeframes at issue because he determined that strict compliance would prevent, hinder, or delay

5


efforts to mitigate the effects of the COVID-19 pandemic. (Exhibit 3, p. 2.) Executive Order N-48-20 states, in pertinent part:

> [U]nder the provisions of Government Code section 8571, [the Governor] find[s] that strict compliance with various statutes specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic. (Exhibit 3, p. 2.)

Both Executive Order N-34-20 and Executive Order N-48-20 suspend the timeframes in relevant provisions of the Elections Code because the Governor determined that strict compliance with those timeframes would prevent, hinder, or delay the mitigation of the effects of the state of emergency caused by the COVID-19 pandemic. (Exhibit 3, p. 2; Exhibit 2, p. 2.) This action is specifically authorized by Government Code section 8571. Therefore, Executive Order N-48-20 was properly issued.

Executive Order N-48-20 states that it shall be in effect "until further notice". (Exhibit 3, ¶ 2.) As of the writing of this demurrer, there has been no notice that Executive Order N-48-20 is no longer in effect. (Declaration of Sari Myers Dierking in Support of City of Folsom's Demurrer to Complaint ("Dierking Dec"), ¶ 6; RJN, ¶ 4(b).) Without such notice, the process outlined in Government Code section 8629 applies. As of the writing of this demurrer, the State of Emergency originally proclaimed on March 4, 2020 remains in effect. (Dierking Dec, ¶ 5; RJN, ¶ 4(a).) No proclamation terminating the State of Emergency has been issued by the Governor and no resolution of the Legislature has declared it at an end. (*See* Government Code § 8629; Dierking Dec, ¶ 5; RJN ¶ 4(a).) Accordingly, by its own terms and pursuant to Government Code section 8629, Executive Order N-48-20 remains in effect.

The failure to obey an executive order issued pursuant to the California Emergency Services Act is a misdemeanor. (Government Code § 8665.) This penalty has been upheld by the courts. (*Martin, supra* 148 Cal.App.3d 693.) Accordingly, compliance with Executive Order N-48-20 is mandatory.

C. **Executive Order N-48-20 Suspends the Timelines at Issue**

Plaintiffs' Complaint alleges that Elections Code section 10010 allows them to file

1  suit 45 days after giving notice of a possible violation.  (Complaint, ¶ 25.)  Plaintiffs allege they

2  sent such a notice to the City of Folsom, which was received on October 30, 2020, making the

3  Complaint timely as of December 14, 2020. (Complaint, ¶ 25.)

4         While Plaintiffs' allegations might state a claim under normal circumstances, they fail

5  to do so here because Executive Order N-48-20 suspended the 45-day timeframe, rendering the

6  Complaint fatally premature.

7         The plain language of the statute, read together with the executive order, supports the

8  City's position.  Specifically, Elections Code section 10010 subdivision (e)(2) prohibits filing a

9  complaint until 45 days after notice of a possible violation.  (Elections Code § 10010(e)(2);

10  Complaint, ¶ 25.) Elections Code section 10010(e) states, in pertinent part:

11         (1) Before commencing an action to enforce Sections 14027 and 14028, a prospective

12              plaintiff shall send by certified mail a written notice to the clerk of the political

13              subdivision against which the action would be brought asserting that the political

14              subdivision's method of conducting elections may violate the California Voting

15              Rights Act of 2001.

16         (2) A prospective plaintiff shall not commence an action to enforce Sections 14027

17              and 14028 within 45 days of the political subdivision's receipt of the written notice

18              described in paragraph (1).  (Elections Code § 10010(e).)

19         Executive Order N-48-20 specifically suspends and tolls the post-notice 45-day

20  timeframe that must pass before a CVRA complaint may be filed pursuant to Elections Code

21  section 10010 subdivision (e)(2).  (Exhibit 3, ¶ 2.)  Paragraph 2 of Executive Order N-48-20

22  states, in pertinent part:

23         The timeframes set forth in Elections Code section 10010, subdivisions (a) and (e), are

24         suspended as to any political subdivision of the State.  The purpose of this suspension

25         is to protect public health and safety during the period when the State Public Health

26         Officer and other public health officials have determined that it is necessary to engage

27         in physical distancing to minimize the spread of COVID-19.  This suspension shall be

28         in effect until further notice.

<div align="center">7</div>

1    This paragraph pauses the timeframes set forth in Elections Code section 10010,

2    subdivisions (a) and (e), but does not restart them: this paragraph should be construed

3    to toll those timeframes, such that days elapsed during the suspension set forth in this

4    paragraph are not counted, but any days that elapsed prior to that suspension are still

5    counted. (Exhibit 3, ¶ 2.)

6    Plaintiffs' Complaint relies upon Elections Code section 10010(e) as the basis for

7    showing that the action was timely filed. (Complaint, ¶ 25.) However, Executive Order N-48-20

8    specifically suspends that statute and tolls its 45-day timeframe. (Exhibit 3, ¶ 2.) While

9    Executive Order N-48-20 remains in place, the 45-day time period that must pass before a CVRA

10   complaint may be legally filed remains tolled. (Exhibit 3, ¶ 2.) Accordingly, Plaintiffs have not

11   met a necessary prerequisite to the filing of this CVRA lawsuit.

12   D. **Executive Order N-48-20 Requires Dismissal**

13   Elections Code section 10010(e)(2) specifically prohibits a prospective plaintiff from

14   filing a CVRA lawsuit within 45 days of the public agency receiving a written notice under

15   section 10010(e)(1). (Elections Code § 10010(e)(2).) That 45-day timeframe was lawfully

16   suspended by the Governor's Executive Order N-48-20. (Exhibit 3, ¶ 2.) In fact, since the

17   executive order was in place before Plaintiffs served the written notice described above, the 45-

18   day timeframe has not even started. (Exhibit 3, ¶ 2: "This paragraph pauses the timeframes set

19   forth in Elections Code section 10010, subdivisions (a) and (e), but does not restart them: this

20   paragraph should be construed to toll those timeframes, such that days elapsed during the

21   suspension set forth in this paragraph are not counted, but any days that elapsed prior to that

22   suspension are still counted.")

23   Simply put, Executive Order N-48-20 tolled the 45-day timeframe at issue. (Exhibit 3,

24   ¶ 2.) Because the 45-day timeframe has not yet passed, no complaint may be filed. (Elections

25   Code § 10010(e)(2).) As such, Plaintiffs' Complaint fails to state a cause of action on which

26   relief may be granted.

27   Plaintiffs allege that Executive Order N-48-20 does not control, arguing that tolling

28   the 45-day timeframe is not authorized by Government Code section 8571 and doing so is

8

1   unconstitutional for various reasons. While the Court must assume the truth of the material facts

2   properly pled in Plaintiffs' Complaint, contentions, deductions, or conclusions like these are not

3   entitled to the same weight. (*Adelman, supra,* 90 Cal.App.4[th] at p. 359.)

4           Relatively few published opinions from California Courts have considered challenges

5   to the viability of executive orders issued during a state of emergency. But in those cases,

6   arguments similar to those raised by Plaintiffs have been rejected. (*Martin, supra,* 148

7   Cal.App.3d 693; *Macias v. State of California* (1995) 10 Cal. 4th 844; *California Correctional*

8   *Peace Officers Association v. Schwarzenegger* (2008) 163 Cal.App.4[th] 802.)

9           In response to the City of Folsom's attempt to meet and confer regarding its objections

10  to the Complaint, Plaintiffs' counsel pointed to the United States Supreme Court's February 5,

11  2021 decision in *South Bay United Pentecostal Church v. Newsom,* 592 U.S. ___ (2021), Case

12  No. 20A136 (20-746). The Supreme Court's short, 19-line decision in that case granted a

13  temporary injunction against California's total ban on indoor worship services, but upheld the

14  State's percentage capacity limitations and prohibition on singing and chanting in association

15  with such services. (*Id.* at p. 1.)

16          The holding in *South Bay United Pentecostal Church* does not control here and it has

17  little, if any, relevance to the issues to be decided in this demurrer. The facts in that case are very

18  different from those at issue here. Unlike the total ban on indoor worship services at issue in

19  *South Bay United Pentecostal Church,* there was – and is - no ban on voting in the City of

20  Folsom. While Plaintiffs dislike the at-large method by which Folsom City Councilmembers are

21  elected and serve, an election occurred shortly after Plaintiffs' October 28, 2020 demand letter[3].

22  (Exhibit 5, p. 2.) In addition, the next municipal election is not scheduled to occur until

23  November 2022, so there is no imminent threat to be addressed here, unlike the ongoing

24  prohibition on indoor worship services at issue in *South Bay United Pentecostal Church.* (*See*

25  Exhibit 6, Folsom Charter, section 2.01(B)-(D).)

26

27

28  [3] Despite Plaintiffs' claims of discriminatory voting, one Asian candidate and one Latina candidate were elected to fill the two vacant seats on the Folsom City Council in the 2020 election. (*See* Exhibit 5, p. 2.)

9

1            Similarly, the body of law related to the First Amendment's protection of the free

2 exercise of religion is vast and specific to cases involving religious issues. As stated by Justice

3 Kagan in the dissenting opinion in *South Bay United Pentecostal Church,* "States must treat like

4 cases alike but may treat unlike cases accordingly." (*South Bay United Pentecostal Church,*

5 *supra, dissent* at p. 2, quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997).) A total ban on indoor

6 religious services is categorically different from tolling the statutory timeframes that must pass

7 before prospective plaintiffs may file suit in CVRA cases. Accordingly, *South Bay United*

8 *Pentecostal Church* does not dictate the outcome in this case.

9            As explained by the California Supreme Court, "a public emergency is not a time for

10 uncoordinated, haphazard, or antagonistic action." (*Macias, supra,* 10 Cal. 4th at p. 858.) The

11 California Emergency Services Act "recognizes and responds to a fundamental role of

12 government to provide broad state services in the event of emergencies resulting from conditions

13 of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to

14 protect and preserve health, safety, life, and property." (*Id.* at p. 854, citing *Martin, supra,* 148

15 Cal.App.3d at p. 696.) The Act "makes equally evident the overriding necessity of a broadly

16 *coordinated* effort to deal with emergencies, and places the primary responsibility, and the means

17 for carrying out such efforts, with the State." (*Macias, supra,* 10 Cal.4th at p. 854.)

18            If accepted, Plaintiffs' arguments would lead to an uncoordinated, haphazard, and

19 inconsistent application of all executive orders issued pursuant to this ongoing state of

20 emergency. With conditions changing rapidly, the applicability of executive orders would be

21 unclear at any given time. The Courts would be flooded with lawsuits arguing over whether

22 executive orders apply in a myriad of specific cases.

23            As relevant here, prospective plaintiffs, public agencies, and members of the public

24 would not know in any given case whether Executive Order N-48-20 applies. Some jurisdictions

25 might choose to hold public hearings to avoid potential CVRA-related penalties while risking the

26 health and safety of their constituents and, by extension, the community at large. Other

27 jurisdictions might wait to hold the hearings, relying on the plain language of the executive order

28

<div align="center">10</div>

1    and wishing to protect the health of their residents and of the community, only to find themselves

2    facing various penalties due to their unique facts and circumstances.

3            The Governor foresaw – and specifically preempted – this kind of confusion.  Just a

4    few days after issuing Executive Order N-34-20, the Governor clarified its scope and confirmed

5    its broad, statewide application in Executive Order N-48-20.

6            Executive Order N-34-20 contained certain qualifications and limitations.

7    Specifically, Executive Order N-34-20 stated, in pertinent part:

8            The timeframes for conducting the hearings required when a political subdivision

9            changes from an at-large method of election to a district-based election, as set forth in

10           Elections Code section 10010, *are suspended for any subdivision, until such time as*

11           *neither state nor local public health officials recommend or impose social distancing*

12           *measures in the relevant subdivision.*  Following that time, the relevant subdivision

13           shall hold the required hearings in a manner that ensures the public is provided

14           advance notice and is afforded an opportunity to participate in the postponed

15           hearings…  (Exhibit 2, ¶ 1, emphasis added.)

16           Less than one month after issuing Executive Order N-34-20, the Governor realized

17   that such a location-specific order would not be in the best interests of the people of California,

18   threatening public health and safety by resulting in uncertainty regarding whether the timeframes

19   in Elections Code section 10010 would apply in any given jurisdiction at any given time.

20   (Exhibit 3, pp. 1-2 and ¶ 2.)  What if a jurisdiction were to hold one or more public hearings

21   pursuant to the CVRA only to find that conditions changed before the next scheduled hearing

22   such that social distancing was again required?[4]  Would the redistricting process proceed?  Would

23   the timelines be tolled again?  Once social distancing was no longer required, would the process

24   start over from the beginning or pick up where it left off?  Do the same rules apply to every

25   jurisdiction in a given County?  These types of questions exemplify the kind of uncoordinated,

26   haphazard action the California Supreme Court warned against in *Macias, supra.*

27

28   [4] This is not purely hypothetical, as many areas in California experienced what has been referred to as a "spike" in
     COVID-19 cases late last year that resulted in a re-institution of the regional stay at home order.  (Exhibit 7.)

11

1    As a result, the Governor issued Executive Order N-48-20 with the express purpose of

2    "clarify[ing] the scope of Paragraph 1 of Executive Order N-34-20..." such that "[t]he timeframes

3    set forth in Elections Code section 10010, subdivisions (a) and (e), *are suspended as to any*

4    *political subdivision of the State. The purpose of this suspension is to protect public health and*

5    *safety* during the period when the State Public Health Officer and other public health officials

6    have determined that it is necessary to engage in physical distancing to minimize the spread of

7    COVID-19...." (Exhibit 3, ¶ 2, emphasis added.) Accordingly, the Governor determined that

8    broad, statewide tolling of the timeframes at issue here was in the best interests of the public in

9    order to prevent the spread of COVID-19.

10    The Governor was aware that alternative means of public participation existed when

11    Executive Order N-48-20 was issued. Specifically, Executive Order N-29-20, issued on March

12    17, 2020, authorized local legislative bodies to hold public meetings via teleconferencing and to

13    make public meetings accessible telephonically or otherwise electronically to all members of the

14    public seeking to observe and address the body. (Exhibit 4, ¶ 3.) The Governor could easily have

15    limited the applicability of paragraph 2 of Executive Order N-48-20 or framed it differently based

16    on such alternative means of public participation. However, he declined to do so, determining

17    instead that broad, statewide tolling of the timeframes at issue here was in the best interests of the

18    public in order to prevent the spread of COVID-19. (Exhibit 3, ¶ 2.)

19    That determination is entitled to significant deference from the Courts. (*South Bay*

20    *United Pentecostal Church, supra,* at p. 2, Chief Justice Roberts concurring.) In fact, "[o]ur

21    Constitution principally entrusts 'the safety and the health of the people' to the politically

22    accountable officials of the States 'to guard and protect.' (*South Bay United Pentecostal Church*

23    *v. Newsom,* 590 U.S. __ (2020), Case No. 19A1044, at p. 2, Chief Justice Roberts concurring,

24    quoting *Jacobson v. Massachusetts,* 197 U.S. 11, 38 (1905).) "When those officials 'undertake to

25    act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially

26    broad'." (*Ibid.*, quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974).)

27    Accordingly, Governor Newsom's determination that the timeframes in Elections

28    Code section 10010, subdivision (e) should be tolled on a statewide basis until further notice in

12

1    order to protect the public health and safety should not be second guessed now. If it is, the kind

2    of uncoordinated, haphazard, and antagonistic action cautioned against by the California Supreme

3    Court in *Macias, supra,* will be the result. (See, *Macias, supra,* 10 Cal. 4th at p. 858.)

4             The Legislature also foresaw and preempted the kind of confusion that would result if

5    Plaintiffs' arguments are accepted. The Legislature granted the Governor the authority to

6    determine, in any given state of emergency, the proper scope and geographic applicability of any

7    executive order, including one to suspend a statute. (Government Code §§ 8627, 8571.)

8    Government Code section 8571 gives the Governor authority to suspend any statute if strict

9    compliance would prevent, hinder, or delay mitigation of the state of emergency. (Government

10    Code § 8571.) The Legislature did not impose limits on that power due to case-specific facts or

11    jurisdictional differences. On the contrary, it granted the Governor broad statewide authority and

12    the right to exercise all police power vested in the state by the Constitution and laws of the State

13    of California in order to protect the public from the effects of the state of emergency.

14    (Government Code § 8627.)

15             California is a state with 58 counties, hundreds of cities, and approximately 39 million

16    residents. In a state this big, there will always be some differences in how things are done from

17    place to place. However, the California Emergency Services Act allows the State to coordinate

18    efforts to mitigate states of emergency and it gives the Governor broad authority to issue

19    executive orders applicable statewide to do just that. By design, executive orders issued pursuant

20    to a statewide state of emergency are not enforced haphazardly, but consistently. Plaintiffs'

21    arguments should be rejected because they are contrary to the clear and unambiguous statutes in

22    the California Emergency Services Act, and the plain language of Governor Newsom's Executive

23    Order N-48-20.

24             Plaintiffs are specifically prohibited from commencing this CVRA lawsuit by the plain

25    language in Elections Code section 10010(e)(2) and Executive Order N-48-20. Since the 45-day

26    timeframe at issue has been tolled and has not yet commenced, Plaintiffs' filing of their lawsuit is

27    not legally permissible and the Complaint fails to allege a single cause of action upon which relief

28    could be granted.

<div align="center">13</div>

## V.    CONCLUSION

Executive Order N-48-20 specifically suspended the timelines in Elections Code section 10010 subdivision (e), the statute relied upon by Plaintiffs to file suit in this case.  While those timelines are tolled, prospective plaintiffs may not legally commence an action of the kind at issue here.  Accordingly, the complaint fails to state a cause of action and demurrer is proper.

Therefore, and for the foregoing reasons, the City of Folsom respectfully requests that its demurrer be sustained without leave to amend, and Plaintiffs' complaint be dismissed.

Dated: February 12, 2021

SARI MYERS DIERKING
Assistant City Attorney
Attorney for Defendant, CITY OF FOLSOM

14

# EXHIBIT 6

1

## PROOF OF SERVICE

2

I, Stacy Saldutti, declare:

3

4

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 50 Natoma Street, Folsom, CA 95630. On February 12, 2021, I served the within documents:

5   1. **NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFFS' COMPLAINT**
6   2. **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CITY OF FOLSOM'S DEMURRER TO PLAINTIFFS' COMPLAINT**
7   3. **DECLARATION OF STEVEN WANG IN SUPPORT OF CITY OF FOLSOM'S DEMURRER TO PLAINTIFFS' COMPLAINT**
8   4. **DECLARATION OF SARI MYERS DIERKING IN SUPPORT OF CITY OF FOLSOM'S DEMURRER TO PLAINTIFFS' COMPLAINT**
9   5. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CITY OF FOLSOM'S DEMURRER TO PLAINTIFFS' COMPLAINT**

10  ☐ by delivering the document listed above via electronic mail to the email address set forth below.

11

12  ☐ by transmitting via facsimile from (916) 351-0536 the above listed document(s) without error to the fax number(s) set forth below on this date before 5:00 p.m. A copy of the transmittal/confirmation sheet is attached.

13

14  ☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Folsom, California addressed as set forth below.

15  ☐ by causing personal delivery by _____ of the document(s) listed above to the person(s) at the address(es) set forth below.

16

17  ☐ by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

18

19  ☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

20  Clerk of the Court
Sacramento Superior Court
21  720 9th Street, Room 102
Sacramento, CA 95814

Scott Rafferty
1913 Whitecliff Court
Walnut Creek, CA 94596

22

23  I am readily familiar with the City of Folsom's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

24

25

26  I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this proof of service was executed on February 12, 2021, at Folsom, California.

27  Stacy Saldutti

28

# EXHIBIT 7

## Sari Dierking

| | |
|---|---|
| **From:** | Steven Wang |
| **Sent:** | Friday, February 19, 2021 10:30 AM |
| **To:** | Sari Dierking |
| **Subject:** | Fwd: Trial setting |

**From:** Scott Rafferty <rafferty@gmail.com>
**Date:** February 19, 2021 at 9:48:27 AM PST
**To:** Steven Wang <swang@folsom.ca.us>
**Subject: Trial setting**

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

It is now clear that census data will not be available until 9/30/21, which is beyond the 90-day maximum extension to which we can agree (without court approval).

We would like the court to approve an extension of hearings until after September on the following terms: (1) per 10010, city commits to map by 5/7/22; (2) city complies with Fair Maps Act.

Other attorneys have not granted this type of extension, so jurisdictions (recently, Central Contra Costa Sanitary District) drew "maps to nowhere." They had an expensive lawyer and demographer. I'm not sure how, but they spent $240k on the first round. That does not include the time I volunteered at the request of the GM to review the maps and explain the process to the directors.

If you choose to support this approach as an alternative in the event the court does not dismiss the case, it would avoid the need to set trial dates.

Otherwise, we would propose the first available trial date after April 15, 2021, which gives you ample time to retain expert witnesses.

We would ask that your ex parte notice identify these issues for resolution at the 3/17/21 hearing and conference.

Scott Rafferty
1913 Whitecliff Ct
Walnut Creek CA 94596
 mobile 202-380-5525