# EXHIBIT N

RECEIVED
LAW AND MOTION DROP BOX

1  Scott Rafferty, Esq (SBN 224398)MAR -3  PH 4: 06
2  1913 Whitecliff Court
   Walnut Creek CA 94596        COSSC COURTHOUSE
3  202-380-5525                 SUPERIOR COURT
                                OF CALIFORNIA
   rafferty@gmail.com           SACRAMENTO COUNTY
4
5  Attorney for Plaintiffs
6


FILED/ENDORSED

MAR - 3 2021

By: _____A. Macias_____
              Deputy Clerk

7            SUPERIOR COURT FOR THE STATE OF CALIFORNIA
8                      COUNTY OF SACRAMENTO
9  HARI SHETTY, KAVITA SOOD, AND          Case No.: 34-2020-00291639
10 NEIGHBORHOOD ELECTIONS NOW             PLAINTIFFS' OPPOSITION TO
                                          DEMURRER TO COMPLAINT AND
11                                        MEMORANDUM OF POINTS AND
              Plaintiffs,                 AUTHORITIES IN SUPPORT THEREOF
12                                        [Code Civ. Proc. §§ 430.40]
   vs.                                    Hearing Date: March 17, 2021
13                                        Complaint Filed: December 31, 2020
   CITY OF FOLSOM,                        Judge: Hon. Shama H. Misawali
14
              Defendant
15

16          TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

17          Plaintiffs Hari Shetty, Kavita Sood, and Neighborhood Elections Now (NEN) hereby

18  oppose their demurrer to the complaint in this case.  This opposition demonstrates that the

19  complaint is timely.  This Opposition is based upon the complete files and records in this action,

20  the following Memorandum of Points and Authorities, and upon any documentary and/or oral

21  evidence as may be presented at the time of the hearing of the Motion.

22          Respectfully submitted,

23          /s/ Scott Rafferty

            Attorney for Plaintiffs Shetty, Sood, and NEN
24

25

26

27

28  PAGE 1
    PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1

2

# TABLE OF CONTENTS

3

4

5

6

TABLE OF AUTHORITIES ................................................................................. 4

7

8

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 7

9

10

INTRODUCTION ..................................................................................................... 8

    A.    THE GOVERNOR'S EMERGENCY ORDERS ................................................. 8

    B.    PLAINTIFF'S PETITIONS FOR VOLUNTARY COMPLIANCE .................... 10

    C.    IMPACT OF COVID ON PUBLIC PARTICIPATION IN FOLSOM ...................................................................................................... 11

    D.    FOLSOM'S DECISION NOT TO COMPLY VOLUNTARILY. ........................ 11

11

12

13

14

15

16

17

18

ARGUMENT .......................................................................................................... 12

I.    N-48-20 MAY BE UNCONSTITUTIONAL ON ITS FACE. .......................................... 14

II.    N-48-20 DOES NOT APPLY TO FOLSOM. .................................................................. 15

    A.    COURTS SHOULD INTERPRET EMERGENCY ORDERS IN LIGHT OF THEIR INTENDED PURPOSE. ....................................................... 15

    B.    N-48-20 DOES NOT APPLY TO CITIES THAT ELECT NOT TO PURSUE THE ALTERNATIVE PROCESS TO LITIGATION. ....................... 15

    C.    N-48-20 DOES NOT BAR ACCESS TO THE COURTS WHEN NO BARRIER TO SAFE PUBLIC PARTICIPATION EXISTS. ...................... 16

19

20

21

22

23

24

25

26

27

28

PAGE 2
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

III.   THE STATE DISASTER ACT DOES NOT AUTHORIZE THE
       GOVERNOR TO RESTRICT THE JURISDICTION OF THIS COURT
       OVER VOTING RIGHTS. ........................................................................... 17

       A.   THE PURPOSE OF THOSE PROPOSING N-48-20 WAS
            UNRELATED TO THE PANDEMIC AND FRUSTRATES
            LEGISLATIVE POLICY. ............................................................... 17

       B.   N-48-20 CANNOT RESTRICT THE STATUTORY
            JURISDICTION OF THE COURTS. ................................................ 18

       C.   PLAINTIFFS HAVE CLAIMS WITHIN THE
            CONSTITUTIONAL JURISDICTION OF THIS COURT. ............... 18

IV.   N-48-20 RAISES SERIOUS CONSTITUTIONAL QUESTIONS. .................. 19

       A.   THE INDEFINITE BAR ON CVRA LITIGATION IS NOT
            NARROWLY TAILORED. .............................................................. 19

       B.   STATEWIDE IMMUNITY FROM THE CVRA CANNOT
            SURVIVE STRICT SCRUTINY UNDER EQUAL PROTECTION
            DOCTRINE. ................................................................................. 19

C.   N-48-20 VIOLATES THE SEPARATION OF POWERS. ............................. 21

CONCLUSION ........................................................................................... 21

1

# TABLE OF AUTHORITIES

2

## Cases

3

Anderson v. Celebrezze (1983) 460 U.S. 780 ............................................................... 15

4

Bullock v. Superior Court (2020) 51 Cal.App.5th 134...................................................... 13

5

6

Cal. Redevelopment Assn. v. Matosantos (2011) 53 Cal.4th 231 ................................................ 16

7

California Attorneys, Etc. v. Schwarzenegger (2010) 182 Cal.App.4th 1424.............................. 12

8

Candid Enterprises, Inc. v. Grossmont Union High Sch. Dist. (1985) 39 Cal.3d 878 ................ 15

9

10

Desrosiers v. Governor (2020) 486 Mass. 369 .......................................................... 17

11

Field v. Bowen (2011) 199 Cal.App.4th 346 .......................................................... 15

12

Fuentes v. Shevin (1972) 407 U.S. 67 .......................................................... 16

13

Gerawan Farming, Inc. v. Agric. Labor Relations Bd. (2016) 247 Cal.App.4th 284.................. 16

14

Hunter v. Erickson (1969) 393 U.S. 385 .......................................................... 17

15

In re Certified Questions from U.S. District Court (Mich. 2020) 2020 WL 5877599.................. 16

16

17

Jacobson v. Massachusetts (1905) 197 U.S. 11 .......................................................... 5

18

Jauregui v. City of Palmdale (2014) 226 Cal.App.4th 781 .......................................................... 10

19

Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc. (2005)

20

   133 Cal.App.4th 26.......................................................... 12

21

22

Legislature v. Eu (1991) 54 Cal.3d 492 .......................................................... 13

23

Marine Forests Soc. v. Cal. Coastal Comm'n (2005) 30 Cal.Rptr.3d 30 .................................... 18

24

Marbury v. Madison (1803) 5 U.S. 137 .......................................................... 10

25

Martinez v. California (1980) 444 U.S. 277 .......................................................... 16

26

Newsom v. Superior Court for Sutter County, .......................................................... 15

27

Newsom v. Superior Court, C092070, 3rd Dist, July 10, 2020 ...................................... 7

28

PAGE 4
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1

*Obergefell v. Hodges* (2015) 576 U.S.644 ................................................................. 10

2

*Payne v. Superior Court* (1976) 17 Cal.3d 908 ........................................................... 16

3

*People of State of Cal. v. Walters and U.S. Veterans Administration* (9th Cir. 1984)

4

5

751 F.2d 977 ............................................................................................................. 9

6

*People v. Gutierrez* (2014) 58 Cal.4th 1354 ............................................................... 14

7

*Perry v. Brown* (9th Cir. 2012) 671 F.3d 1052 ........................................................... 17

8

*San Antonio Sch. Dist. v. Rodriguez* (1973) 411 U. S. 1 ............................................ 17

9

*Trump v. Bullock*, CV 20-66-H-DLC, D. Mont., Sept. 30, 2020 ................................ 15

10

*United States v. Carolene Products Co.* (1938) 304 U.S. 144 .................................... 17

11

*United States v. City of Philadelphia* (3rd Cir. 1980) 644 F.2d 187 ........................... 9

12

*United States v. City of Rancho Palos Verdes* (9th Cir. 1988) 841 F.2d 329 .............. 9

13

*United States v. Salerno* (1987) 481 U.S. 739 ........................................................... 11

14

*Washington v. Seattle School District No.1* (1982) 457 U.S. 456 .............................. 17

15

*West Virginia St. Bd. of Educ. v. Barnette* (1943) 319 U.S. 624 ............................... 10

16

17

*Wolf v. Scarnati* (Penn. 2020) 233 A. 3d 679 ............................................................ 16

18

*Youngstown Sheet & Tube Co. v. Sawyer* (1952) 343 U.S. 579 ................................ 16

19

**Statutes**

20

21

Elections Code, §10010 ............................................................................................... 5

22

Elections Code, §12262 ............................................................................................... 9

23

Elections Code, §14027 ........................................................................................ 6, 16

24

Elections Code, §14029 ........................................................................................ 5, 10

25

26

Elections Code, §14031 .................................................................................... 5, 10, 16

27

28

PAGE 5
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

Elections Code, §21621 ........................................................................................ 8

Elections Code, §8571 ..................................................................................... 9, 15

Elections Code, §14028 ................................................................................... 6, 16

42 U.S.C. §1988 .................................................................................................. 16

42 U.S.C. §1983 .................................................................................................. 16

52 U.S.C. §10301(b) ........................................................................................... 16

Code of Civil Procedure, §526 ........................................................................... 10

Code of Civil Procedure, §664.6 .......................................................................... 7

Civil Code §3423 ................................................................................................ 10

Code of Civil Procedure,§430.40 ......................................................................... 1

Government Code §8571 ..................................................................................... 15

Government Code §8627 ..................................................................................... 15

## Other Authorities

Petition for Writ of Mandate, ............................................................................. 15

## Constitutional Provisions

14th Amendment ................................................................................................. 16

15th Amendment ................................................................................................. 16

Art. I, §3 ....................................................................................................... 10, 16

Art. I, §7 ............................................................................................................. 10

Art. II, §2 ...................................................................................................... 5, 10

Art. VI, §10 ......................................................................................................... 16

Art.[1] I, §7 ............................................................................................................ 5

PAGE 6
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

**Executive Orders**

N-29-20 .................................................................................................................................. 14

N-34-20 .................................................................................................................................. 12

N-38-30 .................................................................................................................................. 11

N-40-20 .................................................................................................................................. 18

N-45-20 .................................................................................................................................. 18

N-48-20 .............................................................................................................................. passim

N-52-20 .................................................................................................................................. 18

N-67-20 ...................................................................................................................... 11, 15, 18

N-68-20 .................................................................................................................................. 18

N-69-20 .................................................................................................................................. 18

N-83-20 .................................................................................................................................. 18

PAGE 7
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES
## INTRODUCTION

This case involves violation of the California Voting Rights Act (CVRA), Elections Code, §14027[1], *et seq.*, resulting from the application of at-large voting to elections for City Council in City of Folsom. Defendant ("Folsom") waives all objections to the sufficiency of the complaint except for a barrier on plaintiffs' right to petition this court purportedly created by N-48-20, an executive order issued by Gov. Gavin Newsom on April 9, 2020.[2] Folsom does not claim that the Governor is an indispensable party to this suit or to the resolution of its demurrer.[3]

The City Attorney has publicly acknowledged that "it will be very difficult to get this case dismissed."[4] Plaintiffs submit that there is no good faith argument that N-48-20 blocks jurisdiction over CVRA claims for an indefinite period. The Demurrer offers no precedent in California or from any other state for any gubernatorial order that limits court jurisdiction over voting rights during COVID-19 or any prior emergency. Interpreting the order to do so is inconsistent with the Governor's stated objectives, beyond the scope of any statutory delegation, violates fundamental constitutional guarantees, and abrogates the jurisdiction of this Court to protect those guarantees. The Supreme Court has held that it is "the duty of the courts to adjudge" if emergency orders bear "no real or substantial relation" to their stated objective or if they constitute a "palpable invasion of rights secured by the fundamental law." Jacobson v. Massachusetts (1905) 197 U.S. 11, 31. As construed by Folsom, N-48-20 fails both tests.

### A. THE GOVERNOR'S EMERGENCY ORDERS

§14031 explicitly states that the CVRA implements Art.[1]I, §7 (equal protection) and Art. II, §2 (right to vote), by creating a strong presumption in favor of district elections. §14029 gives the court broad remedial authority, including approving a map to equalize the electoral

---

[1] Except as otherwise indicated, section numbers refer to the Elections Code, "¶" (in boxes) to the Complaint, "Art." to the California constitution, and "Amendment" to the federal constitution.
[2] Folsom claims that N-48-20 divests this Court of jurisdiction over CVRA by indefinitely extending a 45-day safe harbor intended to permit cities to cure the violation if they commit to draw a district map, which Folsom has chosen not to do.
[3] Governor Newsom has diligently protected our state during this unprecedented pandemic. He issued N-48-20 after receiving inaccurate information from trusted members of the California Bar about the capacity of election officials and the status of discussions with prospective plaintiffs. Orders issued after N-48-20, especially those affecting elections, have carefully addressed the issues raised in this opposition.
[4] January 12, 2021 meeting transcript [36:33]. P RJN Exh. 2

PAGE 8
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

influence of the protected minorities. §10010 provides an opportunity for a governing body to draw its own map if it complies voluntarily. If Folsom had passed a non-binding "resolution of intent" to create single-member districts within 45 days of receiving a "notice of possible violation," §10010 would have given its City Council 90 more days to conduct four public hearings prior to adopt map and ordinance adopting district elections. To focus public attention, the first two hearings must occur within 30 days of each other; once draft maps are available, two more hearings must occur within 45 days of each other. During this "safe harbor" period, which can last no longer than 135 days, §10010 bars commencement of "an action to enforce §§14027 and 14028 [the CVRA]."

N-34-20 (D RJN Exh. 2), issued March 20, 2020, suspended the "timeframes for conducting *hearings*" while "social distancing measures" were in effect. On March 27, 2020, lawyers for San Juan USD and Folsom-Cordova USD privately wrote the Governor seeking to extend protection from litigation so that they could conduct at-large elections in 2020. On April 9, 2020, N-48-20 (D RJN Exh. 3), retroactively "clarified" the earlier order to suspend "the timeframes set forth in §10010(a) and (e)." Plaintiff NEN did not learn of the letter until May 11, 2020, when San Juan USD responded to a request for public records.

The letter to Governor Newsom contained several misrepresentations, most critically that COVID prevented elections officials "across the state" from implementing timely submitted maps for the November 2020 election. P RJN Exh. 1 at 4. It categorically asserted: "Unless the Executive Order is amended, Public Agencies will be forced to adopt trustee area maps that will never be used." Folsom-Cordova USD trustees repudiated the letter, stating that it "verged on dereliction of duty" not to comply in 2020. Without exception, registrars in Sacramento, Napa, Santa Clara, and Los Angeles Counties implemented CVRA maps submitted after N-48-20 in the November 2020 election. The letter also mischaracterized discussions between NEN and the two school districts. NEN initiated discussion of possible mitigations if compliance in 2020 became truly impossible; these included shortened terms and independent redistricting. While San Juan USD was secretly lobbying the Governor for immunity, they rebuffed NEN's offers to discuss delay, confirming a seemingly absolute commitment to comply in 2020.

Except for San Juan USD, no other jurisdiction has attempted to defend N-48-20 in court. Central Contra Costa Sanitary District, which received a notice of possible violation in July

PAGE 9
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

2020, adopted maps on November 16, 2020.  They will never be used and must be redistricted by March 2022.  Its attorney publicly questioned the validity of N-48-20. ¶10 & n.4.  Folsom's Assemblyman Kevin Kiley obtained an injunction barring the Governor from issuing any executive order that "changes existing statutory law or makes new statutory law or legislative policy," which the Court of Appeal has stayed.[5]  The appellate brief of the California League of Cities supports 17 of the emergency orders, even N-35-20 and N-65-20 (*extending* time to file claims against public entities), but makes no attempt to defend N-34-20 or N-48-20.  P RJN Exh. 7.

## B.  PLAINTIFF'S PETITIONS FOR VOLUNTARY COMPLIANCE

In early February 2020, approximately 350 Folsom residents, including Shetty and Sood, sent the City Council a petition to comply with the CVRA but did not use registered mail.  The City Manager responded by letter.  She did not deny that Folsom's at-large elections violated the CVRA.  Instead, she criticized the law, stating that district elections create "factions and frictions." Complaint, ¶2[1].  By the time Folsom rejected the original petition, less than 135 days remained before the registrar's deadline for map changes, so Folsom would have been able to delay the hearing process long enough to conduct the 2020 elect at large.[6]

Therefore, petitioners delayed filing the "notice of possible violation" until October 2020 and immediately proposed a 90-day extension so hearings could use the 2020 census data, then expected in February 2021.  §10010(e)(1)(C)(i) permits such an extension if a "written agreement" confirms a "requirement" to complete maps six months before the next regular election (May 7, 2022).  Folsom needed to make this commitment within 45 days, *i.e.*, by December 12, 2020. ¶¶9, 30

The City Attorney initially assured plaintiffs that the Folsom would comply in 2022 and prepared the statutory agreement.  He proposed enforcement under C.C.P. §664.6.  This approach, which was not our preference[7], accepted and required that plaintiffs file a lawsuit.  Subsequent drafts added demands that plaintiffs agree not to comment through counsel in the City's legislative hearings – and that they obtain a similar commitment from the Folsom Area

---

[5] Newsom v. Superior Court for Sutter County (2020) 51 Cal.App.5th 1093.
[6] The petition had made racial inclusion a campaign issue but forcing Folsom to draw "maps to nowhere" could hurt, rather than help, the minorities' candidates of choice.
[7] We preferred a joint application for a consent judgment or stipulation setting forth the process to comply before 2022.

PAGE 10

PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

Democratic Club, which was not a party to the notice of violation. ¶ 19 This violates the City's own Charter.[8] The City Attorney further demanded that plaintiffs and the Democratic Club waive all rights to "object" to any proposed map resulting from reflected input from other community members, even if the result violated the anti-gerrymandering criteria stated in the new Fair Maps Act (§21621(c)) or other state and federal laws. These unconstitutional conditions precluded the accommodations that plaintiffs had expected to make. ¶4

## C. IMPACT OF COVID ON PUBLIC PARTICIPATION IN FOLSOM

In vivid contrast to most California jurisdictions, Folsom has continued to conduct in-person meetings in the council chamber.[9] Folsom has always provided opportunities to address the Council remotely. Initially, it read emails submitted in advance. More recently, it has allowed speakers to call in by phone. The public is also admitted to the chamber during meetings. The Demurrer does not deny that Folsom could teleconference hearings would elicit at least as much public input as requiring attendance in person, ¶28.

This actual refusal to engage the public shows that the pandemic is a mere pretext to delay CVRA, possibly for years. The City declined plaintiffs' requests to post their petition and to agendize the resolution of intent within the 45-days allowed by §10010. Folsom finally included the petition in the agenda packet for a closed session on December 8, 2020. ¶28. The Council did not report out any action following that session.

## D. FOLSOM'S DECISION NOT TO COMPLY VOLUNTARILY.

A month later, after this lawsuit was filed, Folsom still declined to invoke the statutory framework for voluntary compliance, so there is no longer any rational basis to defer judicial enforcement. Several council members who oppose the CVRA openly acknowledged that they are "taking advantage of the Governor's order" for reasons unrelated to any public health concerns.[10] The Council considered a draft resolution expressing an "intent to commence the process ... once the U.S. 2000 census data ... is made available," and "evaluate the feasibility of

---

[8] Charter, 2.09 "Public Participation: No one shall be denied the right, personally or through counsel, to present grievances or offer suggestions for the betterment of municipal affairs at any regular meeting of the City Council, nor to speak to the subject of any special meeting."
[9] The late member Ernie Sheldon regularly participated by teleconference, and other members have done so on occasion.
[10] P RJN Exh. 2 [115:19, 121:52]
PAGE 11
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

hearings while "N-34-20 and N-48-20 remain in place." P RJN Exh. 3; ¶15 This resolution, which the Council failed to adopt, did not commit to compliance in 2022. It defiantly suggested that COVID might somehow prevent the registrar from implementing boundary changes for another two years.[11]

The City Attorney argues that N-48-20 is mandatory and that the City itself could face criminal prosecution if it conducts map hearings to implement districts.[12] ¶6 Numerous jurisdictions have conducted these hearings since N-48-20 issued.[13] This alleged fear of possible prosecution is inconsistent with language in the proposed resolution recognizing an option to proceed while N-48-20 remained in place. Folsom, San Juan USD, and Santa Clarita have treated N-48-20 as a "get out of court free card" unrelated to the pandemic. Folsom has used it as leverage in an attempt to prevent plaintiffs (and Democrats who are not parties to the litigation) from participating in the manner the Charter entitles them and even from disputing any unlawful gerrymander that might have resulted had the council-conducted hearings.

## ARGUMENT

§10010 provides a statutory process for jurisdictions to comply voluntarily with the CVRA, as an alternative to litigation. The State Disaster Act allows Governor Newsom to suspend regulatory statutes[14] where "strict compliance" would hinder mitigation of an emergency. §10010 requires 45 days' notice of intent to sue, which allows jurisdictions to comply voluntarily and rewarding them with the ability to draw their own map and cap attorneys' fees. If the jurisdiction agrees to conduct hearings, litigation is abated for 90 additional days. "Suspending" §10010 would have eliminated the process for alternative dispute resolution and removed the bar to litigation. Even if the Governor can relax strict compliance with hearing requirements, he

---

[11] Folsom provides no evidence that any registrar has ever failed to implement new areas submitted 125 days before the election. §12262. ¶17

[12] People of State of Cal. v. Walters and U.S. Veterans Administration (9th Cir. 1984) 751 F.2d 977, 978; United States v. City of Rancho Palos Verdes (9th Cir. 1988) 841 F.2d 329; United States v. City of Philadelphia (3rd Cir. 1980) 644 F.2d 187

[13] e.g., Napa, NVUSD, Folsom-Cordova USD, Morgan Hill. ¶104.

[14] Government Code, §8571: "During a state of war emergency or a state of emergency the Governor may suspend any regulatory statute, or statute prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any state agency … where the Governor determines and declares that strict compliance with any statute, order, rule, or regulation would in any way prevent, hinder, or delay the mitigation of the effects of the emergency."

PAGE 12
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1    cannot rewrite the law in a manner that destroys statutory jurisdiction and impedes the CVRA's

2    expressly stated goal of implementing constitutional guarantees.[15]   District elections are not a

3    "penalty" to be abated, but (in almost all cases) a right that the CVRA grants this court power to

4    enforce by civil action, rather than writ application.[16]   If the pandemic prevents a city from com-

5    pleting the alternative to litigation, the city and plaintiffs should be in court sooner, not later, so

6    the courts can use the CVRA's broad remedial power to determine the process for drawing a

7    map, to enjoin any impending elections, or to prescribe appropriate mitigation that might allow

     certification of a non-complying election. *Id.*

8         Folsom construes N-48-20 to rewrite §10010 even more broadly, immunizing the city

9    from CVRA liability indefinitely, even though it has no intention of even starting the process of

10   voluntary compliance.  Folsom argues that N-48-20 effectively suspends the CVRA itself, which

11   is not a regulatory statute, but legislation that expressly implements two constitutional guarantees

12   – equal protection and the right to vote. §14031.  Folsom's construction further denies plaintiffs

13   access to the courts, in violation of Art. I, §3(a) of the California Constitution.

14        It is always "the duty and province of the judicial department to say what the law is [and]

15   to apply [it] to particular cases." Marbury v. Madison (1803) 5 U.S. 137, 162.  But this is espe-

16   cially true when disputes involve racial discrimination or the right to vote.  These subjects are

17   "withdrawn from the vicissitudes of political controversy [and placed] beyond the reach of

18   majorities and officials."  Claims regarding such fundamental rights cannot be submitted to a

19   vote or suspended by a Governor, even during a state of emergency.  They are "established as

20   legal principles to be applied *by the courts.*" Obergefell v. Hodges (2015) 576 U.S.644, 677.

21   *quoting* West Virginia St. Bd. of Educ. v. Barnette (1943) 319 U.S. 624, 638.  The CVRA

     explicitly implements these guarantees, even eliminating the normal restrictions on the judicial

22   power to enjoin municipal actions. *See* footnotes 15 & 16, *supra*.

23        Folsom appears to be the only jurisdiction to argue that N-48-20 not only precludes litiga-

24   tion, but also prohibits the hearings required to draw its own district map.  Therefore, its interpre-

25   tation of N-48-20 effectively imposes unlawful at-large elections for the duration of the emer-

26   ---

     [15] The Legislature enacted the CVRA to implement the right to vote and the protection against discrimina-
     tion that are guaranteed by Art. I, §7 and Art. II, §2 of the California Constitution.  §14031.

27   [16] "§14029 is an exception to C.C.P. §526(b)(4) and Civil Code §3423(d)." Jauregui v. City of Palmdale

28   (2014) 226 Cal.App.4th 781, 791, 805. ¶53
     PAGE 13
     PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1   gency, which Folsom suggests may extend beyond the 2022 elections.

2        I.      N-48-20 MAY BE UNCONSTITUTIONAL ON ITS FACE.

3            Arguably, N-48-20 is not unconstitutional on its face if there is some conceivable set of

4   circumstances in which it would be valid. United States v. Salerno (1987) 481 U.S. 739, 745. Per-

5   haps somewhere is California, there is a jurisdiction that needs to conduct in-person hearings

6   because it has no website or cannot offer remote public input for hearings. If such an entity

7   receives a notice that it has violated the CVRA, and sincerely wants to comply voluntarily with

8   in-person hearings, it can (without a filing fee) seek relief from superior court. This scenario

9   does not provide a basis for the Governor to adjudicate mass immunity from the CVRA.

10           In applying the Salerno rule in the context of the CVRA, Sanchez v. City of Modesto

11  (2006) 51 Cal.Rptr.3d 821, 836, citing Salerno, 481 U.S. at 745, recognized its exception where

12  the "overbreadth of a law violated the First Amendment." Access to the courts is essential to

13  oldest and most fundamental First Amendment right, the right to petition. California Motor

14  Transp. Co. v. Trucking Unlimited (1972) 404 U.S. 508, 514. N-48-20 is not only overbroad,

15  but it delegates unfettered discretion to public entities to determine when, if ever, the legality of

16  their own actions can be reviewed in court. The timeliness of cases, and their management dur-

17  ing COVID, should be adjudicated by the courts, not controlled by the defendant using a guber-

18  natorial delegation that cannot be revised by the Legislature or the Judiciary.

19           N-48-20 differs from the careful regard Governor Newsom has shown for the coordinate

20  branches in all other emergency actions. N-38-30 removed statutory barriers so that the judiciary

21  could briefly suspend issuance of summons in unlawful detainer cases while localities revised

22  laws to avoid the actual danger of evicting infected persons. Every subsequent election-related

23  order, such as N-67-30, reflected coordination with the Legislature, which was invited to ratify or

24  revise through legislation.[17] But N-48-20 uses the Governor's unilateral power to make orders,

25  which the Legislature can override only be terminating the state of emergency in its entirety.

---

[17] See Newsom v. Superior Court (July 30, 2020) 51 Cal. App. 5th 1093, 1096: "The Executive Order
identifies statutory provisions that are displaced pursuant to its provisions. But it also affirms the
administration is 'working in partnership' with the Legislature and Secretary of State and '[n]othing in
this Order is intended, or shall be construed, to limit in any way the enactment of legislation concerning
the November 3, 2020 General Election.'" See N-67-20, ordering ¶7
PAGE 14
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

II.    N-48-20 DOES NOT APPLY TO FOLSOM.

Folsom asks this Court to protect the public health from the contagion that would occur if people physically attended hearings that it has no intention of holding, even though it has invited the public into its chambers and even though it offers remote input to those who actually care about physical distancing. ¶28

A. COURTS SHOULD INTERPRET EMERGENCY ORDERS IN LIGHT OF THEIR INTENDED PURPOSE.

Executive orders issued during emergencies are not polished products of a deliberative legislative process, nor do they reflect public input. A single actor, not a collective body, produces these orders, preparing them quickly due to their urgency. N-48-20 was based on limited and inaccurate information in the early stage of an emergency whose duration and severity were unknown. Subsequent election orders are more precise and include more refined legal justifications. For all these reasons, purpose and intent play larger roles in interpreting the text than is the case in conventional legislation.[18] But here, the language of N-48-20 and its stated purpose both make clear that the Governor had no intention of closing the courts to minority voters.

B. N-48-20 DOES NOT APPLY TO CITIES THAT ELECT NOT TO PURSUE THE ALTERNATIVE PROCESS TO LITIGATION.

The preamble to N-48-20 excludes the notion that it immunizes cities like Folsom that choose not even to start the process of voluntary complying with the CVRA.19 The "plain lan-

---

[18] *Compare* California Attorneys, Etc. v. Schwarzenegger (2010) 182 Cal.App.4th 1424, 1435 (interpretation should "interpretation would not achieve the announced purpose of the Governor's executive order") *with* Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc. (2005) 133 Cal.App.4th 26, 30 (restrict evidence of legislative intent to collective view of Legislature).

[19] All four relevant clauses in the preamble focus on the four hearings; the first expressly limits N-48-20 to jurisdictions that are "in the process of changing." *See* D RJN Ex.3.

WHEREAS various political subdivisions of the State have been in the process of changing from an at-large method of election to district-based elections, requiring a series of public hearings, which are intended to be conducted before the expiration of a safe-harbor provision under Elections Code §10010; and WHEREAS on March 20, 2020, I issued Executive Order N-34-20, which suspended the timeframes for conducting these public hearings; and WHEREAS uncertainty regarding Elections Code §10010 could nevertheless induce political subdivisions to hold these public hearings in the near future—at a time when public health requires that Californians stay home except for essential needs, and otherwise engage in physical distancing, to minimize the spread of COVID-19; and WHEREAS holding these hearings in the near future—at a time when public health requires that Californians stay home except for essential needs—would threaten public health and safety, and would force Californians to choose between fully participating in their democratic process and safeguarding their own health and safety, as well as the health and safety of their communities;

PAGE 15

PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

guage" of N-34-20 and N-48-20 extends the safe harbor to allow more time for "hearings" that elicit public input about possible maps. This initial resolution of intent is not such a hearing. It is a decision taken by the council to elect a statutory process as an alternative to possible litigation. On January 12, 2021, Folsom City Council unanimously <u>declined</u> to pass a draft resolution, affirmatively deciding <u>not</u> to start the process of voluntary compliance.

§10010(e)(1)(C)(i) also requires any jurisdiction that obtains any extension to its safe harbor to commit to complete its map before the next regular election. The jurisdiction must also post <u>additional</u> opportunities for public input made possible by the extension. These provisions are not "timeframes," and are not suspended under any reading of N-48-20. Folsom has still made no firm commitment to comply in 2022.

### C. N-48-20 DOES NOT BAR ACCESS TO THE COURTS WHEN NO BARRIER TO SAFE PUBLIC PARTICIPATION EXISTS.

Folsom claims N-48-20 immunizes it from the CVRA despite the fact that the City (1) conducts all other business in person and (2) avoided even disclosing plaintiffs' petition to the public for as long as possible. It would prevent the public from advising the Council on the only one subject – a challenge to its electoral legitimacy. This exploits the pandemic for the political self-preservation, which is "repugnant to the obvious purpose"[20] of N-48-20 and the State Disaster Act, which only authorizes orders that have a nexus to mitigating the emergency.[21]

Every meeting of the Folsom City Council occurs in-person, indicating that the Council itself denies any inconsistency with health orders. At the same time, Folsom provides remote access, providing an opportunity for public input. Despite all these circumstances, Folsom claims that the Governor deliberately "determined that <u>broad statewide tolling</u> of the timeframes at issue was in the best interests of the public in order to prevent the spread of COVID-19."[22] However and whenever Folsom complies with the CVRA, there was no need to "coordinate" with other bodies. In the midst of a pandemic, it is not as "easy" as Folsom asserts, for the Governor to survey and forecast how remote public access would work for the great diversity of leg-

---

[20] *See* <u>Legislature v. Eu</u> (1991) 54 Cal.3d 492, 505.

[21] <u>Bullock v. Superior Court</u> (2020) 51 Cal.App.5th 134, 140.

[22] Folsom asserts that the Governor could "easily have limited" the order to reflect the emerging availability of "alternative means of public participation" and to accommodate the great diversity of political subdivisions in California, some of which do not even have websites. Demurrer (12:14)

PAGE 16
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1    islative bodies in California.[23] Dem. 12:14 As argued above, if some entity had a particular basis

2    to delay hearings or postpone compliance, it needed only to seek relief from the court, which

3    could adjudicate appropriate relief.

4            The explicit purpose of N-48-20 was "to protect public health and safety" while "it was

5    necessary to engage in <u>physical</u> distancing." N-29-20 authorized remote public access only three

6    days before N-34-20.  N-48-20 clarified N-34-20 less than three weeks later.[24]  Since that time,

7    effective tools for remote meetings became prevalent more quickly than could have been

     imagined.

8

9        III.      THE STATE DISASTER ACT DOES NOT AUTHORIZE THE GOVERNOR TO
                   RESTRICT THE JURISDICTION OF THIS COURT OVER VOTING RIGHTS.

10           The Governor recognizes that the State Disaster Act only authorizes him to exercise

11   extraordinary powers in ways that have a "close nexus" to the stated emergency[25]  The statute

12   must also be construed, if possible, to avoid the serious constitutional questions that arise from

13   targeting protected classes and their attempts to vindicate the right to vote. *Cf.* <u>People v.</u>

14   <u>Gutierrez</u> (2014) 58 Cal.4th 1354, 1373.

15       A.   THE PURPOSE OF THOSE PROPOSING N-48-20 WAS UNRELATED TO THE
              PANDEMIC AND FRUSTRATES LEGISLATIVE POLICY.

16           In the midst of a pandemic, it is unrealistic to expect the Governor and his staff to be able

17   to scrutinize the purposes and foresee all consequences of adopting proposals submitted by mem-

18   bers of the California bar whom he had every reason to trust.  A close reading of letter from San

19   Juan USD and Folsom-Cordova USD betrays that its true purpose was unrelated to the pan-

20   demic.  The lawyers who drafted N-48-20 sought to circumvent AB 350 (2016) and AB 2123

21   (2018), which amended §10010, respectively, to implement the CVRA in time for the next

22   presidential election (when minority turnout was expected to be high) and before the 2020 census

23   ──────────

     [23] As §10010(e)(1)(C)(ii) recognizes, some political subdivisions do not even have websites.  While the

24   Legislature can address every detail, Folsom is wrong to assert that, in the midst of a pandemic, it is not
     as "easy" as Folsom asserts for the Governor to craft detailed language that forecasted the extent to which

25   methods were emerging the enable public remotely to address most (but not all) legislative bodies in
     California.

26   [24] The change from "social distancing" to "physical distancing" was consistent with advice from the
     World Health Organization that governments promote remote meeting technologies that avoid physical

27   contact.who-audio-emergencies-coronavirus-press-conference-full-20mar2020.pdf#page=6
     [25] <u>Newsom v. Superior Court</u>, C093006, Reply in Support of Writ of Mandamus, p.35 (P RNJ Exh. 6)

28   PAGE 17
     PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1  (so that the new minority officials would have a seat at the table). These intentionally

2  discriminatory purposes infect N-48-20, even assuming the Governor's staff was not aware of

3  them.

### B. N-48-20 CANNOT RESTRICT THE STATUTORY JURISDICTION OF THE COURTS.

Gov. Code §8571 authorizes the Governor to "suspend any regulatory statute or statute

prescribing the procedure for conduct of state business." Gov. Code §8627 authorizes orders

appropriate to exercise "complete authority over all agencies of the state government" and "all

police power vested in the state."[26]  In defense of N-67-20 (P RJN Exh. 4), which expanded voting

by mail statewide, Governor Newsom explained that he has the power to suspend a statute under

§8571 and then "fill the resulting legal vacuum by issuing new orders with the force and effect of

law." The Governor classified the sections of the Elections Code that N-67-20 suspended as "regula-

tory" and related to state business because they governed the "election process for state offices."[27]

By contrast, §10010 is jurisdictional, not regulatory, and does not apply to election for

any state office.[28]  If N-48-20 suspends §10010, the "safe harbor" is simply eliminated. This

restores the statutory jurisdiction that the CVRA created, which gives this court "broad remedial

power" to decide whether to require districts and how and when to draw the map. Courts are not

"agencies." Judicial adjudication is not an exercise of the "police power." Therefore, the Gover-

nor lacks "complete authority" to use "vacuum filling" power under Gov. Code §8627 to replace

a suspended jurisdictional statute with new legislation. Any contrary interpretation of the Disas-

ter Act would completely subordinate the judicial power to the Governor during any emergency.

### C. PLAINTIFFS HAVE CLAIMS WITHIN THE CONSTITUTIONAL JURISDICTION OF THIS COURT.

The Demurrer (p.14:17) seeks dismissal with prejudice, which the Court cannot grant if

any alternative cause of action provides a basis for relief. If N-48-20 bars "an action to enforce

§§14027 and 14028," it does not extinguish this Court's obligation to enforce the CVRA by

---

[26] The writ petition cites Candid Enterprises, Inc. v. Grossmont Union High Sch. Dist. (1985) 39 Cal.3d 878, 885 for the proposition his power is "as broad as the police power exercisable by the Legislature itself." Newsom v. Superior Court for Sutter County, Petition for Writ of Mandate, p. 52 (P RJN Exh. 5)
[27] "Anderson v. Celebrezze (1983) 460 U.S. 780, 788 recogniz[ed] 'the state's important regulatory interests' in elections.... Field v. Bowen (2011) 199 Cal.App.4th 346, 356 descri[bed] 'state control over the election process for state offices'" P RJN Exh. 5 at p.52.
[28] See Trump v. Bullock, CV 20–66–H–DLC, D. Mont., Sept. 30, 2020 (similar Montana statute).

PAGE 18
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1    mandamus, which is grounded in Art. VI, §10.  Neither the Governor, nor even the Legislature,

2    can extinguish the jurisdiction of the courts over claims based on the state constitution, including

3    Art. I, §3(a) and the provisions identified in §14031.  Cal. Redevelopment Assn. v. Matosantos

4    (2011) 53 Cal.4th 231, 252–253; Gerawan Farming, Inc. v. Agric. Labor Relations Bd. (2016)

5    247 Cal.App.4th 284.  Plaintiffs may also state additional claims for intentional vote dilution

6    under 52 U.S.C. §10301(b), 42 U.S.C. §§1983, 1988, and the 14th and 15th Amendments.  This

7    Court must entertain federal civil rights claims.  Martinez v. California (1980) 444 U.S. 277,

     283–85.

8

9        IV.    N-48-20 RAISES SERIOUS CONSTITUTIONAL QUESTIONS.

10           The Court should construe N-48-20 and the Disaster Act to avoid constitutional questions.

11   Wolf v. Scarnati (Penn. 2020) 233 A.3d 679, 698; In re Certified Questions from U.S. Dist. Ct. (Mich.

12   2020) 2020 WL 5877599, ¶18.  Ultimately, however, Folsom's claimed bar to jurisdiction cannot be

13   sustained without addressing its compliance with due process, equal protection, and the First Amend-

14   ment right to petition.  Normal review of emergency actions reduces the risk that disasters will

15   become pretexts to undermine rights in ways that are not really necessary to address the crisis. [29]

16       A.  THE INDEFINITE BAR ON CVRA LITIGATION IS NOT NARROWLY
             TAILORED.

17           "None of our freedoms would be secure" without the opportunity to defend them in a

18   court of law "at a meaningful time and in a meaningful manner." Payne v. Superior Court (1976)

19   17 Cal.3d 908, 910, quoting Fuentes v. Shevin (1972) 407 U.S. 67, 80. Payne and Fuentes

20   involved deprivations of a property, where procedurals conducted after the fact could award

21   damages.  The Court still required a pre-deprivation hearing on the basis that "no damage award

22   can undo" a violation of due process.  Folsom has already suggested that N-48-20 may excuse

     compliance in the next election.  If a trial is required, there may be little time to spare.

23       B.  STATEWIDE IMMUNITY FROM THE CVRA CANNOT SURVIVE STRICT
             SCRUTINY UNDER EQUAL PROTECTION DOCTRINE.

24           The existence of an emergency does not affect the strict scrutiny this Court must apply to

25   racial classifications, burdens on fundamental rights, and content-based restrictions. San Antonio

26

---

27   [29] See Youngstown Sheet & Tube Co. v. Sawyer (1952) 343 U.S. 579, 650 (Jackson, J., conc.)
     (forefathers "suspected that emergency powers would tend to kindle emergencies.")

28   PAGE 19
     PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

Sch. Dist. v. Rodriguez (1973) 411 U.S. 1,16. Actions that burden fundamental rights must still be narrowly tailored to further the state interests created by the pandemic, compelling as those interests are.  Desrosiers v. Governor (2020) 486 Mass. 369, 378.  When an insular minority attempts to vindicate a fundamental right, the analyses under the equal protection and due process clauses often converge, "each leading to a stronger understanding of the other." Obergefell, 576 U.S. at 672.

Because N-48-20 affects hearings on only one subject and does not reduce contagion, it lacks a genuine nexus required to invoke authority under the State Disaster Act.  For similar reasons, it is not a narrowly tailored limitation on due process rights and fails to provide equal protection even under a rational basis test.  Minority groups cannot "be targeted for the deprivation of an existing right without a legitimate reason." Perry v. Brown (9th Cir. 2012) 671 F.3d 1052, 1076.  Even though the N-48-20 does not explicitly identify Asian-Americans or Latinos for differential treatment, it precludes enforcement of the CVRA (and only the CVRA), which implements the equal protection clause of the California Constitution.  A rational basis is insufficient when an action "curtails the operation of political processes ordinarily to be relied upon to protect minorities." United States v. Carolene Products Co. (1938) 304 U.S. 144, 152 & n.4. N-48-20 indefinitely suspends both the CVRA and destroys incentives that the Legislature created for collaboration during voluntary compliance.

The Supreme Court has held that actions that reconfigure political and legal processes in a manner that burdens racial minorities (or eliminates prior protections) are subject to strict scrutiny.[30]  Analyzed under the political restructuring doctrine, N-48-20 alters the preexisting process for challenging electoral methods in a manner that disadvantages voters from protected classes.  Actions to eliminate legal processes that protect minority interests are so "inherently suspect" that violate equal protection even without "particularized inquiry into motivation." Washington v. Seattle Sch. Dist. #1, 457 U.S. at 485.  Emergency orders are not transparent political decisions, so there is significant risk that they incorporate influence that intends to

---

[30] In Hunter v. Erickson (1969) 393 U.S. 385, the Court struck down an initiative that prohibited implementation of any future ordinance prohibiting housing discrimination without voter approval.  Washington v. Seattle School District No.1 (1982) 457 U.S. 456, 459, the Court invalidated an initiative that effectively barred school boards from implementing desegregation plans.
PAGE 20
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

1  discriminate against the minority.

2  ### C.  N-48-20 VIOLATES THE SEPARATION OF POWERS.

3      California provides for greater interaction among the three coordinate branches of its

4  government than the federal constitution tolerates. <u>Marine Forests Soc. v. Cal. Coastal Comm'n</u>

5  (2005) 30 Cal.Rptr.3d 30, 35.  Governor Newsom has skillfully collaborated with the Judiciary.

6  Legislature and local governments, often limiting the duration of his orders just long enough to

7  permit them to promulgate emergency court rules or legislation. *e.g.*, N-35-20; N-67-20 (P RJN

8  Exh. 4).  Perhaps owing to the influence of the lawyers who advocated for it, N-48-20 is an

    anomaly.

9      N-35-20 recognized that the Judicial Council was the appropriate body to suspend issuance

10  of eviction summons, and the judiciary limited the duration of its moratorium to enable localities to

11  make policy.  By contrast, N-48-20 undertakes to resolve "uncertainty" that might "induce" cities to

12  hold hearings "in the near future when the public health requires Californians to stay at home."  This

13  displaces an adjudicatory action reflecting specific and changing circumstances, possibly including a

14  stand-still order, which the superior courts were well equipped to issue and supervise.

15      Unlike states with similar statutes, the Legislature cannot (by resolution or even by

16  legislation subject to veto) revise or overturn gubernatorial orders.  Its only option is to terminate

17  the entire emergency, which will not occur soon.  No does the Disaster Act require that orders

18  periodically expire and be renewed. Later orders compensated for the absence of this essential

19  safeguard.  When the Governor extended the time allowed for various administrative tasks, he

    did so for a limited period, which subsequent orders renewed, often repeatedly.[35] Without this

20  safeguard, N-48-20 has lingered since April 9, 2020, beyond the "near future," outlasted the stay-

21  at-home orders, and may continue "during the period [of] physical distancing," or simply "until

22  further notice."  This type of administrative supervision should only be done by a court.  The

23  Governor's staff has critical priorities that preclude monitoring the small number of affected

24  jurisdictions.  This inertia has tolerated a jurisdictional bar that was never justified anywhere -

25  yet remains statewide in scope and indefinite in duration.

26

27  ───────────────

    [35] *e.g.*, N-68-20 extended deadlines in N-45-20 for 60 days; N-83-20 ended provisions in N-71-20 but extended

28  some from N-40-20 and N-52-20, which had already been extended by N-69-20.

    PAGE 21

    PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT

**CONCLUSION**

When Folsom ignored the December 12, 2020 deadline and forfeited the right to draw its own maps, plaintiffs prepared and filed this lawsuit. It seeks no damages, names no individuals, and alleges neither intentional discrimination nor violation of federal civil rights. It was designed to give Folsom two options. ¶4 The City could either answer the complaint, possibly demanding a trial on the issue of whether Asians and Latinos vote differently from the rest of the electorate, or it could join in stipulations that might have restored the City's forfeited ability to draw its own map and to enjoy an extension until the release of census data expected in September 2021. Instead, Folsom chose to deny its own citizens the right to be heard, and thereby deny them the right to an equal vote. The collaboration allowed by AB 350 (§10010) as an alternative to litigation is a bargain – capped legal fees in return for expedited and voluntary compliance. The Court should not trust the City to draw a racially neutral map, nor should they profit from their rejection of the collaborative process.

Plaintiffs hoped that the restrained approach of the bare bones complaint would facilitate a settlement and a possible return to voluntary compliance. Instead, Folsom seeks to dismiss the lawsuit with prejudice, but the court cannot do so unless there is no basis to amend the complaint to state a claim under any theory. CrossTalk Prod. v. Jacobson (2018) 65 Cal.App.4th 635, 645. N-48-20 is not a bar to claims based on the facts stated herein under 42 U.S.C. §1983 and 52 U.S.C. §10301(b). The pandemic is neither an excuse nor a legal defense to intentional discrimination against Asian and Latino voters.

Dated this 2nd day of March 2021                Respectfully submitted,

*Scott Rafferty*

Scott J. Rafferty

PAGE 22
PLAINTIFFS' OPPOSITION TO DEMURRER TO COMPLAINT