Scott Rafferty (SBD 224389)
1913 Whitecliff Court
Walnut Creek CA 94596
202-380-5525
rafferty@gmail.com
Attorney for PLAINTIFFS

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

HARI SHETTY, KAVITA SOOD, AND
NEIGHBORHOOD ELECTIONS NOW

PLAINTIFFS,

vs.

CITY OF FOLSOM,


Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 22-cv-00534-JAM-JDP

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ...................................................................... 4

I.   IN FASHIONING A PRELIMINARY INJUNCTION, THIS COURT SHOULD EXERCISE THE
     BROAD AND MANDATORY REMEDIAL POWERS THAT THE LEGISLATURE HAS
     MANDATED. ...................................................................................... 9

   A.   THE STANDARD FOR AN EFFECTIVE CVRA REMEDY IS MORE DEMANDING
        THAN §2. ...................................................................................... 9

   B.   FAILURE TO REVIEW FOLSOM'S MAP WILL DESTROY THE LEGISLATURE'S
        INCENTIVE FOR VOLUNTARY COMPLIANCE. ...................................... 12

II.   PROCEDURAL BACKGROUND ......................................................................... 12

III.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION. ........................ 14

   A.   Plaintiffs Will Likely Prevail in Proving Folsom's Liability Under the CVRA...................... 14

     1.   Racially Polarized Voting (RPV) Is The Only Element Of Liability..................................... 15

     2.   Racially Polarized Voting Occurred in Folsom. .................................................................. 15

   B.   PLAINTIFFS AND ALL RESIDENTS OF FOLSOM WILL BE IRREPARABLY HARMED IF FOLSOM CONDUCTS AN ELECTION WITHOUT A COURT-APPROVED MAP. ............ 19

   C.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS. ...................................................... 19

     1.   Folsom Will Not Be Harmed By The Issuance Of This Temporary Restraint ..................... 19

     2.   Folsom's Hearings Limited Public Input in Violation of State Law.................................... 20

     3.   Withholding Pre-election Relief Will Likely Harm All Parties. ........................................... 21

   D.   THE PROPOSED TEMPORARY RESTRAINTS ARE IN THE PUBLIC INTEREST. ....... 22

IV.  THE DOOLEY MAP IS A MORE EFFECTIVE REMEDY THAN PREFERRED MAP 2. ........ 22

V.   THE COURT SHOULD NOT REQUIRE A BOND. .................................................... 25

VI.  THE COURT SHOULD ADVANCE TRIAL OF THE CVRA CLAIM AND ALLOW ORAL ARGUMENT. ..................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967)................................................................. 18

Connor v. Finch, 431 U.S. 407, 417 (1977)...................................................................... 21

Cook v. Luckett, 575 F. Supp. 479, 484 (S.D. Miss. 1983)................................................ 16

Covington v. North Carolina, 283 F. Supp. 3d 410, 429 (M.D.N.C.), aff'd 138 S.Ct. 2548 (2018) ..... 4

Exon v. Tieman, 279 F. Supp. 603 (D. Neb. 1967). ......................................................... 21

Garza v. County of Los Angeles, 918 F.2d 763, 772 (9th Cir. 1990) ....................... 3, 21

Gong v. Kirk, 278 F.Supp. 133, 157 (S.D. Fla. 1967) ..................................................... 21

Harper v. Virginia Bd. of Elections, 383 U.S. 663, 667 (1966)....................................... 16

Hellebust v. Brownback, 42 F.3d 1331 (10th Cir. 1994).................................................. 18

Jauregui v. City of Palmdale, 226 Cal.App.4th 781, 807 (Cal. Ct. App. 2014) .................. passim

Kirkpatrick v. Priesler, 395 U.S. 525, 535 (1968) ........................................................... 21

Large v. Fremont County, 670 F.3d 1133, 1148-49 (10th Cir. 2012).................................. 4

Secretary of State of California v. Mosbacher, 968 F.2d 974, 979 (9th Cir. 1992)............................ 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thornburg v. Gingles, 478 U.S. 30, 74 (1986)..........................................................12

Toney v. White, 488 F.2d 310, 311 (5th Cir. 1973)(en banc)................................18

United States v. City of Cambridge, 799 F.2d 137, 142 (4th Cir. 1986) .................19

Voinovich v. Quilter, 507 U.S. 146, 156 (1993)......................................................8

Watson v. Comm'rs of Harrison County, 616 F.2d 105, 107 (5th Cir. 1980).....................19

Williams v. City of Dallas, 734 F. Supp 1317, 1414 (N.D. Tex. 1990) .................19

Yumori-Kaku v. City of Santa Clara, 59 Cal. App. 5th 385, 406 (6th Dist. 2020) ............14

## Statutes

Civil Code, §3423(d)..........................................................................................18

Code of Civil Procedure, §526(b)(4) ..................................................................18

Elections Code, §10010 ...................................................................9, 10, 16, 19

Elections Code, §14028 ...........................................................................5, 12

Elections Code, §21601 ...........................................................................3, 20

Elections Code, §21601(c). ...........................................................................3

Government Code, §54953 ..........................................................................17

Government Code, §54954.2 ..........................................................................17

Government Code, §54957.5 ..........................................................................17

Scott Rafferty (SBD 224389)
1913 Whitecliff Court
Walnut Creek CA 94596
202-380-5525
rafferty@gmail.com
Attorney for PLAINTIFFS

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

|  |  |
|---|---|
| HARI SHETTY, KAVITA SOOD, AND NEIGHBORHOOD ELECTIONS NOW<br><br>PLAINTIFFS,<br><br>vs.<br>CITY OF FOLSOM,<br><br><br><br>Defendants | Case No. 2020-00291639-CU-CR<br><br><br>MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

SUMMARY OF ARGUMENT

Folsom should not elect city council members until and unless this Court approves a district map and sequence of elections that provides an adequate remedy for its violation of the California Voting Rights Act (CVRA). The order proposed by this motion gives the City an opportunity to submit an effective remedy. If it chooses not to do so, the Court should permit the November election to proceed if the city schedules the remedial district for the presidential election, so that Folsom's Asian-American voters an opportunity to influence elections that is equal to that enjoyed by the rest of Folsom's electorate. In the event the Court

finds Preferred Map 2 inappropriate for the reasons stated herein, the Dooley Map complies with state law and schedules a strong remedial district to elect in the presidential cycle, providing an opportunity for Asian voters to choose a candidate who can improve the group's voter participation – an ultimate goal of the CVRA.  With the election five months away, any administrative burden is not significant and is of Folsom's own creation.  Any perceived inconvenience does not outweigh the loss by Asian citizens of the right to an equal vote nor does it justify the installation of council members based on an inequitable election.

The critical defects of Folsom's intended plan are:

- If successful, its attempt to evade court approval (a) sets a precedent that will likely destroy the statutory scheme that sets deadlines for voluntary compliance and (b) avoids an injunction to prevent reversion to at-large elections, which the Council repeatedly proposed if the threat of liability abated.

- Requiring the remedial district to elect this year, instead of the presidential cycle when Asian turnout is higher, violates state law in order to entrench a non-Asian incumbent.  Even though 2018 had the highest minority turnout of any midterm, <u>less than 5 percent of eligible Asians in Folsom actually voted</u>.[1]  Permanently consigning this district to the gubernatorial cycle may prevent Asian voters from even being able to recruit a viable candidate, frustrating the transformative effects of district elections.

- Official projections show that attaching all of Folsom's area planned for new residential development will double the population of the remedial district by the 2024 election.  While Folsom likely overstates the pace of growth, the quantitative dilution of the high Asian district will be very substantial.  In the Ninth Circuit, courts consider projected population as part of a remedy to benefit protected-class

---

[1] 333 voted (per statewide database) out of 7305 citizens of voting age (2016-20 census tabulation, adjusted for prisoners)

voters. <u>Garza v. County of Los Angeles</u>, 918 F.2d 763, 772 (9th Cir. 1990).

- The intended map is gerrymandered to entrench the four non-Asian incumbents, by dividing neighborhoods over the objections of residents and in violation of the FAIR MAPS Act, Elections Code, §21601(c). First Amended Complaint [Doc. 2-1, Exh. AE] (hererinafter "FAC") ¶9; Davis Decl.; Garcia Decl.  Folsom also violated statutory deadlines and conducted hearings and deliberations in violation of state open meeting laws. *See* p.20, *infra*. Because of these violations of state law, the Council's proposed remedy is entitled to no deference.[2]

Until this case, no California jurisdiction had ever challenged the mandatory authority of the courts to implement appropriate remedies for a violation of the CVRA.  A governing body can design its own districts within the 135-day cure period provided by statute, subject to review only on writ of mandate.  But, as the City Attorney repeatedly explained to the Council, after this deadline, its "loses control" of the mapping process because the Court typically adopts the plaintiffs' map "without input from the City."[3]  Last month, the two other California cities that failed to comply after the pandemic entered settlements in order to regain some influence over the map and other remedies.[4]  Only Folsom thinks it can expel the jurisdiction of the courts by drawing a map designed to perpetuate the effects of the unlawful method of election.  The Mayor denied reality by stating there were concentrations of any

---

[2] <u>Large v. Fremont County</u>, 670 F.3d 1133, 1148-49 (10th Cir. 2012) (defendant's proposed §2 remedy that "*unnecessarily* conflicts with state law [is not] entitled to deference"); <u>Covington v. North Carolina</u>, 283 F. Supp. 3d 410, 429 (M.D.N.C.), *aff'd* 138 S.Ct. 2548 (2018).

[3] Rafferty Decl. ¶5 and 10, *ff.*, citing 7/27/21 tr. 2:00:00. *See also* n.15, *infra*.

[4] Folsom is one of three cities that failed to comply with the  deadline to create districts - even after a tolling order based on the pandemic expired.  The others, West Sacramento and Santa Clarita, have entered consent decrees requiring that district elections use a map and sequence developed in collaboration with the plaintiffs and approved by the Court. <u>Latino Resource & Information Network v. City of West Sacramento</u>, No. CV2021-1886, Yolo Sup. Ct., April 6, 2022 (bench ruling accepting settlement agreement); <u>Cruz et al. v. City of Santa Clarita</u>, No. 21STcv47451, Los Angeles Sup. Ct. (consent decree submitted for May 9, 2022 conference)

minority within the city[5] and avoided almost all discussion of creating a strong Asian district. The Council and City Attorney even asserted that they had a mandate "to retain the Council we have" solely by virtue of the members' prior election under the unlawful at-large system. FAC ¶5.[6] Because of this untenable logic, the proposed plan will perpetuate, and may exacerbate, the dilution of Asian votes.  It entrenches the four non-Asian council members without regard to areas of Asian voting strength, neighborhoods, or other communities of interest.  It is therefore not an appropriate remedy.

Plaintiffs demonstrate the need for immediate relief.  (1) Folsom's City Attorney has admitted on the record that plaintiffs will likely prevail in proving racially polarized voting, which is the only element needed to establish liability under the CVRA.  (2) The right to cast an equal vote is fundamental and preservative of all other rights.  State law requires the court to "implement appropriate remedies, including the imposition of district-based elections." *See* Elections Code, §14028.  It would perpetuate the violation of this most fundamental of rights to allow incumbents to avoid court review and implement an electoral method the stated purpose of which is perpetuate themselves in office *See* n.6, *supra*  (3) The election is months away, so implementing a court-approved remedy will not interfere with its administration. (4) The public interest requires protecting the integrity of the election, which means that minority votes must have equal weight.

"Preferred Map 2" maintains the exclusion of minority influence caused by at-large elections.  When it prepared the map, council members (and the City Attorney ) explicitly declared that its purpose was "to retain the council we have now." *See* n.6, *supra.* In reality, the map protects the four <u>non-Asian</u> incumbents, but drives the first Asian member from

---

[5] FAC, ¶45, citing . 9/14/21 tr. 2:04:09, 1/11/22 tr. 1:21:58, 2/8/22, tr. 3:11:28.  Concentrations of Asians by precinct range from 2% to 33%; Latinos from 6% to 18%. FAC ¶46.
[6] Member Rodriguez "insisted that 'we can make adjustments to retain the current council we have,' [in drawing districts]. 'We've already been elected.' 2/8/22 tr. 2:36:38. The Council received legal advice that it was 'required to consider citizen input," and that the "citizens' wishes include electing all five council members at various elections.' 2/8/22 tr. 3:16:48.  On the record, not a single citizen suggested that the at-large members were entitled to adjust maps for the specific purpose of 'retain[ing] the current council' after the transition."

office.  In order to ensure the reelection of the white incumbent who lives in the high-Asian district, Folsom ignores the statutory preference for scheduling minority districts to elect in presidential years.  Folsom's 18-month delay compounds the improbability that the Asian community can even recruit a viable candidate to challenge this white incumbent this year. The first Asian member ever elected (in 2020) also lives in the same district, so he will leave office when his term ends in 2024.  It will be difficult for the Asian community to recruit, let alone elect, its candidate-of-choice in subsequent midterm elections.  The map further marginalizes the Asian community by attaching the entire "Folsom Plan Area" to the remedial district.  According to official projections, which may not be credible, new construction will almost double the population of the high-Asian district <u>by the 2024 election</u>. If so, most of the City's Asian citizens (and their neighbors) would have only half the voting power of the established neighborhoods that have controlled the Council in recent decades.

As the City Attorney conceded in state court, there is time to litigate the remedial map by noticed motion without extending the normal deadline for map changes of July 6, 2022. Doc. 2-7 (Exh. AK), p.4.

This Motion is based solely on the CVRA.  Pursuant to F.R.C.P. 65(a), this Court should advance the trial of Plaintiffs' CVRA claim so that it can be consolidated with the hearing on the preliminary injunction.  A determination of the CVRA claim will likely resolve the remaining causes of action since there are appropriate remedies (such as the Dooley map) that satisfy all relevant state and federal law.    In the event the Court makes a final adjudication in favor of plaintiffs' CVRA claim, it should issue a permanent injunction against certifying the results of any at-large election and may consider remanding continuing jurisdiction to enforce the injunction to the state courts.

I. **IN FASHIONING A PRELIMINARY INJUNCTION, THIS COURT SHOULD EXERCISE THE BROAD AND MANDATORY REMEDIAL POWERS THAT THE LEGISLATURE HAS MANDATED.**

A. THE STANDARD FOR AN EFFECTIVE CVRA REMEDY IS MORE DEMANDING THAN §2.

Don Edwards, a California congressman and principal author of the 1975 and 1982 amendments to the Voting Rights Act, warned that Latino and other immigrant communities would be excluded from local politics until at-large was abolished and candidates from their own neighborhoods persuaded them to vote. Rafferty Decl. ¶17.  California embraced at-large a century ago to entrench established nativist politicians who campaigned against a "flood of [European] immigrants" and decried the "criminality of second-generation aliens."[7]  In other states, cities and districts restored district elections during the Civil Rights Movement, but at-large remained pervasive in California. Huerta Amicus at 4.  For two decades, the Legislature conducted bipartisan hearings on "District Election and Voter Participation," but a series of bills faced certain veto under two successive governors. Garcia Decl. ¶5. The absence of district elections meant that candidates, parties, and elected officials neglected minority neighborhoods, reinforcing already low voter turnout.  When the CVRA was enacted, 30% of students were Latino, but only ½ of one percent of school trustees.  *Huerta Amicus* at 2.

In contrast to Section 2, the CVRA does not create districts in which a single minority can control the election of the candidate of its choice.  As the Dolores Huerta Foundation recently advised the Supreme Court, the CVRA's goals are more ambitious and more complex.  It seeks to make elections contestable, empowering neighborhood candidates who can mobilize communities that have been marginalized for decades.  To achieve this, a map must collect communities of similar voters, rather than distribute voters from high-turnout voters so they control multiple districts.  The sequence cannot consign low-turnout districts

---

[7] Amicus curiae letter of Dolores Huerta Foundation, Pico Neighborhood Ass'n v. City of Santa Monica, No. S263972 (Cal. S.Ct.), August 31, 2020 (hereinafter "*Huerta Amicus*") at 3, 8 & n.12, citing CALIFORNIA PROGRESSIVE CAMPAIGN BOOK FOR 1914 (at 24). (attached to Garcia Decl.)

to the gubernatorial election for the convenience of an incumbent.  Preferred Map 2 uses all these devices to guarantee incumbents non-competitive elections.  That is why it defeats the law's basic objective.

Although the remedial authority of California courts enforcing the CVRA is at least as broad as that conferred by the federal Voting Rights Act, 52 U.S.C. §10301(a) (Section 2) (*See* Jauregui v. City of Palmdale, 226 Cal.App.4th 781, 807 (Cal. Ct. App. 2014)), its objectives are much more demanding.  The CVRA recognizes that at-large elections have marginalized immigrant and minority neighborhoods, suppressed their recruitment of authentic candidates of choice, and depressed their voters' participation. *Huerta Amicus* at 2. The Legislature understood that these mechanisms operate to deny minority communities equal influence.  In possible contrast to Section 2, the CVRA allows zero tolerance for gerrymandering districts to benefit incumbents at the expense of creating districts that provide the most equal opportunity for underrepresented minorities to influence Council elections.  That is why, as Folsom's City Attorney expressly warned the Council, the courts generally adopt the Plaintiffs' maps with little input from the incumbents. *See* nn.3,15. Furthermore, Courts usually impose additional remedies. *See* nn.9-12, *infra*.

When Plaintiffs began this action in 2020, less than 60% of those eligible voted in any election – and only a third of eligible Asians.[8]  A CVRA remedy is not effective unless it increases participation, especially in minority neighborhoods.  When a city fails to create districts during the cure period, the state courts almost always require additional remedies – such as expanding the size of the governing body,[9] shortening the terms of incumbents,[10]

---

[8] Rafferty to Howell, Jan. 30, 2022, attached to Rafferty Decl. 188.

[9] San Juan USD was forced to enlarge its board as an "essential element of the CVRA remedy." Comments of Michelle Cannon to Sacramento County Board of Ed., Aug. 5, 2021.

[10] In Jauregui v. City of Palmdale, 2013 WL 7018375 (Dec. 23, 2013), *aff'd as modified*, S,  "Any person not elected through an approved district-based election system may not serve as a member of the Palmdale City Council after July 9, 2014."   Although they may be cited in federal court (Cole v. Doe, 387 F. Supp. 1084, 1103 & n.7 (N.D. Cal. 2005), these unpublished decisions are not intended as persuasive authority, but only to provide context regarding the published affirmance of the trial court.

intra-census redistricting[11], or requiring an independent redistricting commission[12] – all of which would be extraordinary under federal law.

In Section 2 cases and redistricting challenges, federal courts give considerable deference to the judgment of local entities.  This reflects concerns of federalism that do not apply to the CVRA.  Voinovich v. Quilter, 507 U.S. 146, 156 (1993) (within "domain of the states" to create minority districts not required by federal law).  Because the Legislature concluded that California "face[s] a unique situation where we are all minorities,"[13] which is why it is relatively rare that a single minority can create a majority district.  The state courts enforce the Legislature's commitment "to ensure that our electoral system is fair and open." *See* n.7. "The Legislature intended to expand protections against vote dilution over those provided by the federal Voting Rights Act.    It would be inconsistent with the evident legislative intent to expand protections against vote dilution but to narrowly limit the scope of preliminary injunctive relief." Jauregui v. City of Palmdale, 226 Cal.App.4th 781, 807 (Cal. Ct. App. 2014).  At the preliminary injunction stage, the state courts "broadly construe" the CVRA and apply their remedial mandate "with great liberality." 226 Cal.App.4th at 806.  Because this Court stands in the place of the state courts, restrictions based on federalism are irrelevant.

---

[11] Robles v. City of Ontario, No. Civ-DS-2007038, San Bernadino Sup. Ct., Judgment dated June 4, 2021.

[12] Ruiz-Lozito v. West Contra Costa USD, CC 18-00570, Contra Costa Sup. Ct., Judgment dated March 16, 2019.

[13] 'Once the problem is judicially established, the bill provides courts with the authority to fashion appropriate legal remedies for the problem. In California, we face a unique situation where we are all minorities. We need statutes to ensure that our electoral system is fair and open. This measure gives us a tool to move us in that direction: it identifies the problem, gives tools to deal with the problem and provides a solution.' " (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, *op. cit.,* Apr. 9, 2002, p. 3; Assem. Com. on Judiciary, *op. cit.,* Jun. 4, 2002, p. 2. quoted in Jauregui, 226 Cal.App.4th at 807. See Rafferty Decl. at 93.

### B. FAILURE TO REVIEW FOLSOM'S MAP WILL DESTROY THE LEGISLATURE'S INCENTIVE FOR VOLUNTARY COMPLIANCE.

At the request of the Mexican-American Legal Defense Fund, the Legislature enacted A.B. 350 in 2015 with the purpose of avoiding protracted litigation and limiting the opportunity to cure so it does not allow jurisdictions to conduct prolonged or irregular public hearings. After receiving the notice of violation, a jurisdiction has 45 days to pass a resolution stating its intent to conduct hearings over the next 90 days. The tight timeframe is essential to sustain public participation and scrutiny. If a city complies during this period, plaintiffs can only enforce the CVRA by writ of mandate, which involves formidable procedural burdens – and no protection from court costs if they do not prevail.

Most jurisdictions that comply voluntarily take the need to create a remedial district seriously, but Anaheim scheduled a Latino-majority district for the 2014 gubernatorial election. Another provision of A.B. 350 (§10010(b)) required jurisdictions to "give special consideration to the purposes of the CVRA" when sequencing the initial district elections - before considering the incumbents' interests. The Legislature criticized Anaheim for putting its minority district in "a cycle in which turnout is traditionally decreased."[14]  Until Folsom, governing boards had almost invariably understood the mandate to require that remedial districts elect in the presidential cycle, even if this did not coincide with the end of the term being served by at-large members living in those districts.

## II.  PROCEDURAL BACKGROUND

On October 20, 2020, Plaintiffs notified Folsom that its at-large elections violated the CVRA. Elections Code, §10010(b) allows them 45 days to initiate a hearing process to create districts that can last an additional 90 days. (Rafferty Decl. 53)  On December 31, 2020, the Council had taken no action and Plaintiffs filed this suit, but the Court held that gubernatorial order N-48-20 tolled proceedings during the pandemic.  Doc. 1-6 (Exh. F4), pp.16-18. The Order was rescinded effective July 1, 2021. Ex. Order N-08-21 (Rafferty Decl. 176)

---

[14] A.B. 350 Assembly floor analysis, August 17, 2016, at 2.

On July 27, 2021, Folsom passed the resolution of intent. Doc. 7-2.   Initially, it committed to complete the hearings in November 12, 2021, just two weeks after the 90-day deadline.   In an apparent attempt to exhaust public attention, the Council delayed the hearings five times.   FAC, ¶¶61-63.  Folsom did not select a map until February 22, 2022.  It failed to solicit public comment when it purported to adopt Ordinance No. 1324 on March 22, 2022 and has not responded to a Brown Act demand questioning its validity. Rafferty Decl. 179.  The Folsom Charter delays the effectiveness of ordinances for 30 days.

On January 10, 2022, the City Attorney moved to dismiss the action. Doc. 1-23 (Exh. W).  The Court denied the motion but directed Plaintiffs to update the complaint by February 22, 2022. Doc. 1-30 (Exh. AD)  Plaintiffs' counsel personally filed and electronically served the First Amended Complaint (Doc. 2-1, Exh. AE) before travelling to Folsom, where he discussed the complaint with the City Attorney before attending the penultimate hearing that night.

On February 25, 2022, the City Attorney filed a second motion to dismiss, falsely stating that he had not been served with the Amended Complaint. Doc. 2-4 (Exh. AH), p.2. On March 3, 2022, Plaintiffs applied for a temporary restraining order. Doc. 2-5 (Exh. AI) In opposition, the City Attorney asserted that

> The district map that will be adopted by City Council on March 8th must be delivered to the Sacramento County Elections Office by July 6th. As such, <u>there is time to litigate this matter</u> - without resort to the extraordinary remedy of enjoining intended legislative action by the City Council. [emphasis added] Doc. 2-7 (Exh. AK), p.5.

The Superior Court relied on this representation, ruling that the legislative action "would *begin a series of actions* by the county registrar and Board of Supervisors to conduct *an election*." [emphasis in original] The Court denied the restraining order without prejudice to a preliminary injunction *after* the ordinance was adopted. Doc. 2-11 (Exh. AO), p.4.

As demonstrated in the attached declaration, the City Attorney was in possession of the First Amendment Complaint on February 22, 2022, three days before he filed the second Motion to Dismiss.  A defense of mootness "was available to the party but omitted from the earlier filing," when it could have been addressed by the state courts.  As such, F.R.C.P.

12(g)(2) and (h)(2) precluded filing a third Motion to Dismiss.  Mootness can only be asserted by filing an answer, in a subsequent motion for judgment on the pleadings, or at trial. F.R.C.P. 12(h)(2), 7(a), 12(c), 81(c)(2).

### III.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

Plaintiffs rely on the traditional four-part test, which clearly shows the need for a preliminary injunction.  (1) Plaintiff will likely prevail on the merits.  (2) They will suffer irreparable harm in the absence of preliminary relief.  (3) The balance of equities tips in their favor.  (4) The injunction sought is in the public interest.  *See* <u>Winter v. National Resources Defense Council</u>, 555 U.S. 7, 20 (2008).  There is no adequate remedy at law because the loss of the right to cast an equal vote cannot be compensated by damages.

A.  Plaintiffs Will Likely Prevail in Proving Folsom's Liability Under the CVRA.

As the City Attorney told the Council, no jurisdiction has ever successfully defended against CVRA liability because none has ever refuted the existence of racially polarized voting.[15]  Plaintiffs presented compelling evidence of racially polarized voting in the demand letter.  If Folsom filed an answer as required by Rules 7(a) and 12(h)(2)(A), it would find it necessary either to admit (1) that racially polarized voting (RPV) exists in Folsom or (2) that it has failed for 18 months to conduct the necessary analysis to determine its existence.

---

[15] Staff Reports, Jan. 12, 2021 and July 27, 2021 at 2: (attached to Rafferty Decl. 157,167) "In passing CVRA, the California Legislature made the process easy for plaintiffs to sue and prevail in lawsuits against public entities that have an at-large election system whenever 'racially polarized voting' can be shown. Racially polarized voting occurs when there is a difference in the choice of candidates that are preferred by voters of a protected class, and in the choice of candidates that are preferred by voters in the rest of the electorate. This phenomenon has been demonstrated consistently in CVRA lawsuits, often and typically without any discriminatory intent. …. Partly (or specifically) due to the extremely low threshold in proving a CVRA violation, <u>no cities have prevailed</u> in defending CVRA lawsuits. If the plaintiff wins the CVRA lawsuit, the court may impose by-district election on the city, and can determine district boundaries with <u>input solely from the plaintiffs' attorney</u> and consultants <u>without input from the City Council</u> or the local community"

1

1.   Racially Polarized Voting (RPV) Is The Only Element Of Liability.

Elections Code, §14028 provides: At large elections violate the CVRA "if it is shown that racially polarized voting occurs in elections for members of the governing body …or in elections incorporating other electoral choices by the voters of the political subdivision." The Supreme Court has held that racially polarized voting (RPV) "refers <u>only</u> to the existence of a correlation between the race of voters and the selection of certain candidates." <u>Thornburg v. Gingles</u>, 478 U.S. 30, 74 (1986).   Therefore, no further showing is essential to prove a violation of the CVRA.  RPV "incorporates neither causation nor intent." 478 U.S. at 62.  It is sufficient to show "that the correlations did not happen by chance." 478 U.S. at 53 & n.21. "[W]here a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." 478 U. S. at 61 & n.25.  The Supreme Court discounted results after a claim had been made, warning that established interests might "manipulat[e] the election of a safe minority candidate … [to] forestall single-member districting." 478 U.S. at 78; *see also* §14028(a) (prior elections "are more probative").  In <u>Gingles</u>, the Supreme Court relied on bivariate regressions of precinct results to demonstrate the correlation, which is the methodology used by Folsom's demographer.    In California, the Legislature has commissioned a database to tabulate voters in each election by ethnicity (but not race), which provides data on the independent variable for each precinct.  Plaintiff obtained election results by precinct from the Sacramento County Registrar (for the dependent variable) and ethnic vote tabulations by precinct from the official Statewide Database (for the independent variable) and analyzed these data with bivariate ecological regressions.

2.   Racially Polarized Voting Occurred in Folsom.

Plaintiffs' notice of violation, received by Folsom in October 2020, provided a statistical analysis showing that, in the 2018 gubernatorial election, race explains 89% of the variation among precincts.  The methodology and results are detailed in the attached declaration of Scott Rafferty and are summarized below.  Folsom has not claimed to produce any study

refuting these results.

In 2018, YK Chalamcherla received 69% of the Asian vote.[16]  Latinos also supported YK in coalition with Asian voters, but he was defeated because only 2% of non-Asian Anglos voted for him.  In gubernatorial elections, each ballot allows three votes.  If each voter chooses three candidates, none can receive more than 33% of the vote.  For YK to win 65% of the Asian vote, a much larger percentage of Asian voters had to support him alone (or perhaps with one other candidate).  Only 2% of non-Asian Anglo voters made YK even a third-place choice.

There is a statistical margin of error associated with these point estimates.  One recent



case held that the absence any overlap between these margins at the "80 percent confidence interval provided 'sufficiently reliable results' to support a finding of RPV." <u>Yumori-Kaku v. City of Santa Clara</u>, 59 Cal. App. 5th 385, 406 (6th Dist. 2020).   These estimates do not overlap at the 99.999999999% confidence level.

The first Asian candidate, Jaya Badiga, lost in 2010, receiving 30% of Asian votes, but only  5% of non-Asian votes.[17]  In this case, there is no overlap between these estimates at the 99.9% confidence level.  Badiga received an even larger share (approximately 67%) of the

---

[16] Each voter could cast up to three votes, and an additional 25% of the Asian vote was uncast, suggesting that an even larger percentage of Asian voters supported YK.  (Some may have "bullet voted" for YK alone).

[17] Three members are elected in gubernatorial years.  The third-ranking candidate was elected with 33% of the total vote.

Indian vote.

In 2020, after Plaintiffs' claim, both Badiga and Chalamcherla ran.  The results still reflect polarization, but to a lesser degree.  This likely reflects a larger number of white crossover voters supporting the desire of the Asian community for representation on the Council.  Ecological regression estimates that YK received 20% of white Anglo votes and 64% of Asian votes.  Ms. Badiga received 8% of white votes and 38% of Asian votes.  Where there are more than one Asian candidate, Section 14028 recommends "groupwide" analysis.  On this basis, race explains 86% of the variation among precincts, even after white voters changed their behavior in light of Plaintiffs' CVRA claim.

These results are extremely robust.  Each of the four races shows a degree of polarization that substantially exceeds normal confidence intervals.

RPV is also evident in Folsom's vote for Congress.  The incumbent, Dr. Ami Bera, is a first generation Indian-American.  The point estimates suggest that in a series of elections, Asians support Dr. Bera almost unanimously, but less than half of non-Asians in Folsom vote for him.  There is a margin of error, but the estimates do not come anywhere near overlap in any of the elections.

|  | 2016 | 2018 | 2020 |
|---|---|---|---|
| weighted regression |  |  |  |
| white | 38% | 37% | 46% |
| 20% Conf | 35-39% | 45-47% | 45-48% |
| Asian | 99% | 98% | 99% |
| 20% Conf | 74-100% | 66-100% | 80-100% |
| r-squared | 0.56 | 0.57 | 0.59 |
| t-stat | 3.42 | 3.42 | 3.84 |
| unweighted regression |  |  |  |
| white | 37% | 45% | 46% |
| 20% Conf | 36-40% | 42-48% | 45-48% |
| Asian | 98% | 93% | 99% |
| 20% Conf | 73-100% | 63-100% | 80-100% |
| r-squared | 0.32 | 0.21 | 0.37 |
| t-stat | 3.43 | 2.51 | 3.97 |

The 2020 presidential ticket included an Asian candidate. At least 86% of Asians in Folsom supported Biden-Harris, but less than half of white voters. In the weighted regression, race explains 64% of the variation among precincts.

The evidence of RPV in Folsom is compelling, but not surprising. The reason that no city has ever refuted RPV is that RPV is a nearly universal phenomenon. Ethnic groups have different life experiences, different needs, and different values. District elections equalize the ability of these groups to aggregate their votes and have more equal influence on the decisions of elected officials. In California, where the Legislature observed that "we are all minorities," (n.13 *supra*) district elections are critical to making democracy in local governing bodies truly representative.

B.  PLAINTIFFS AND ALL RESIDENTS OF FOLSOM WILL BE IRREPARABLY HARMED IF FOLSOM CONDUCTS AN ELECTION WITHOUT A COURT-APPROVED MAP.

The right to cast an equal vote is fundamental and preservative of all other rights. Harper v. Virginia Bd. of Elections, 383 U.S. 663, 667 (1966).  Any abridgement "strikes at the heart of representative government" and "is, by its nature, an irreparable injury." Reynolds v. Sims, 377 U.S. 533, 555, 585 (1964).

This map, with its discriminatory sequence of elections, is not a remedy but only a change in tactics; it maintains a system of noncompetitive elections and unequal influence. The harm flowing from the continued use of a dilutive voting system strikes at the very basis of the democratic system.  "Perpetuating voter dilution [constitutes] irreparable injury." Cook v. Luckett, 575 F. Supp. 479, 484 (S.D. Miss. 1983).  The harm of conducting an election using Preferred Map 2 cannot be undone because it will confer an unfair incumbency advantage over challengers in future elections, even if minority candidates can finance additional campaigns.

C.  THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.

1.  Folsom Will Not Be Harmed By The Issuance Of This Temporary Restraint

Despite serious COVID-related delays in the Superior Court, there could have been a final adjudication by now had Folsom complied by the deadline of October 25, 2021, or by November 12, 2021, as it initially promised.  Any burden they perceive can fairly be attributed to their disregard for the deadlines set forth in §10010(e) and the hearing procedures required by state law.

Folsom still has an opportunity to submit a compliant map and sequence for review by the court prior to the hearing.  The two other jurisdictions that overstayed the cure period (West Sacramento and Santa Clarita) have agreed to court approval. See n.4, supra.  The Dooley map is available only if the court determines that such a plan is an inadequate remedy for the violation of the state constitutional guarantees enforced by the CVRA.  Administrative

inconvenience to a public entity can never outweigh the loss of its citizens' fundamental right to an equal vote. In this case, Folsom has the ability to avoid any inconvenience by timely accepting review and approval of the map and sequence for the November 2020 election.

2.   Folsom's Hearings Limited Public Input in Violation of State Law.

A prompt series of regularly scheduled hearings is essential to sustain public scrutiny and input.  Therefore, Section 10010(a) requires two pre-map hearings within 30 days and two post-map hearings within 45 days.  Section 10010(e) requires all hearings and enactment to complete within 90 days.  Folsom tried to outlast public opposition by repeatedly cancelling and delaying hearings over a 238-day period.

Not a single speaker accepted the City Attorney's position that prior election at-large entitled current office-holders to draw a map designed to ensure their election in the new districts (*see* n.4 *supra*).  His predecessor as City Attorney came out of retirement to protest the departure from neighborhood-based boundaries "in many, many areas" for the purpose of preserving incumbencies. FAC ¶52 (citing 2/15/22 tr., 3:23:10).  Folsom's response to this public opposition was to deny timely access to information needed to permit meaningful input[18], to allow influential allies of the Council to deliver anonymous messages after the opportunity for public comment had closed[19], and ultimately to refuse to entertain any public comment when on the ordinance that adopted the map.[20]  Each of these actions, which affected every hearing, violate the Brown Act, depriving the intended plan of validity under state law.

Plaintiffs filed demand letters under the Brown Act on February 15, March 5, March

---

[18] FAC ¶6.  In violation of Gov. Code, §54957.5(a), the deputy clerk defiantly refused to provide material, non-exempt documents circulated to a majority of council members in advance of the meeting.  Slides prepared by the demographer were also withheld, making it impossible to respond to data flashed on the screen during the meeting.
[19] The City Manager interrupted deliberations to read texts sent by these insiders to her unpublished mobile phone number, in violation of Gov. Code, §54953(e)(2)(B).
[20] This occurred after the FAC and violates Gov. Code, §§54954.2 & 54953(a)(3).

24, April 20, 2022. The city made, but did not honor, a commitment to cease and desist. The Clerk has not yet provided any response to the challenge to the validity of the ordinance. These procedural violations preclude any argument that a court-imposed remedy would disregard public input and deprive the improperly adopted plan of any claim to deference. Since "unnecessary" violations of state law eliminate deference to legislative plans to cure electoral methods that violate the federal constitution or Section 2 (*see* n.2, *supra*), a federal court should not adopt a proposed CVRA cure that reflects substantive or procedural violations of state law.[21]

### 3.   Withholding Pre-election Relief Will Likely Harm All Parties.

If a provisional remedy is withheld, and plaintiffs prevail at trial after the election, precedent supports a remedy that requires a special election that could replace the entire council. *See* United States v. Osceola County, No. 05-cv-1053 (M.D. Fla. December 8, 2006)(§2); Toney v. White, 488 F.2d 310, 311 (5th Cir. 1973)(en banc)(§2)[22]; Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967) (Civil Rights Act of 1964, 52 U.S.C. §10101(a)); Jauregui, supra n.10 (CVRA). This would impose significant costs to the public fisc, office-holders, candidates and supporters alike. Even more critically, delay of relief could deny the citizens of Folsom a government with authority derived from a valid and equitable election.

The mandatory authority of California courts to remedy CVRA violations extends to "pre-election orders of the type approved under [§2]." Jauregui, 226 Cal.App.4th at 807

---

[21] Folsom cannot claim immunity to state court injunctions that conflict with its "legislative plan" to create districts. In Superior Court, Folsom cited Civil Code, §3423(d) and Code of Civil Procedure, §526(b)(4), each of which bar injunctions "to prevent execution of a public statute by officers of the law for the public benefit." Jauregui holds that the CVRA (Elections Code, §14029) is a "later enacted and more specific injunctive relief provision" that "effects a limited repeal" of both statutes and affirmatively authorizes injunctive relief. 226 Cal. App. 4th 806.

[22] *See also* Williams v. City of Texarcana, 32 F.3d 1265, 1268 (8th Cir. 1994); Hellebust v. Brownback, 42 F.3d 1331 (10th Cir. 1994) (elected board discharged, board placed in receivership)

---

(CVRA).   Courts provide immediate pre-election remedies precisely in order to avoid a situation in which an election must later be invalidated.  United States v. City of Cambridge, 799 F.2d 137, 142 (4th Cir. 1986)(§2); Williams v. City of Dallas, 734 F. Supp 1317, 1414 (N.D. Tex. 1990)(§2).

      D.  THE PROPOSED TEMPORARY RESTRAINTS ARE IN THE PUBLIC INTEREST.

Protecting the franchise is in the public interest.  Subjecting the Plaintiffs and the entire population of Folsom to officials elected under an "inequitable" system would be adverse to the public interest. Watson v. Comm'rs of Harrison County, 616 F.2d 105, 107 (5th Cir. 1980).

It is also in the public interest to enforce the deadlines for voluntary compliance. Having failed to comply with §10010(e), Folsom must accept a judgment of liability and implement the court-approved remedy.   If Folsom evades these consequences, other governing bodies will ignore CVRA demands with impunity.  Defiant boards and councils will use unlimited public funds simply to outlast plaintiffs, whose counsel typically serves without advance compensation.  If this strategy fails, they can adopt this type of self-serving map with the intention of reverting to at-large elections once the exposure to litigation has passed.

**IV.   THE DOOLEY MAP IS A MORE EFFECTIVE REMEDY THAN PREFERRED MAP 2.**

In the event the City in unwilling or unable to submit a compliant map and sequence, the Dooley Map complies with the FAIR MAPS Act by respecting neighborhoods throughout the city.  It envisions scheduling the initial election in its remedial district (3) for 2024, so that Asian voters will permanently elect in the presidential year, where their vote share is highest. It does not attach the developing "Plan Area" to the remedial district, so Asian voters will not be quantitatively diluted before the next census.  Plaintiffs support a population trigger that would allow for intra-census redistricting with undated data relying on occupancy permits and official estimates from the State Department of Finance.

A.      The Dooley Map Complies with the FAIR MAPS Act.

The FAIR MAPS Act requires districts to be contiguous, compact, and to respect neighborhoods and communities of interest. Elections Code, §21601(c). As detailed in letters to the Council by Cheryl Davis, and Linda Holderness, and former City Attorney Bruce Cline, the Council disregarded neighborhoods, speaking coarsely of "swapping," "trading," "snagging" and even "grabbing" population, "squishing" entire neighborhoods or dismissing groups of constituents as so "isolated" that it did not matter what district they were in. FAC ¶9.  Mayor Howell dismissed public input because she "did not even know who these people are," while the City Manager repeatedly interrupted the hearing with input texted from the Council's intimate political advisers. *Id.*  Member Koslowski wanted to be isolated from his potential constituents, 98 percent of whom would live on the other side of Folsom prison, connected only by Folsom Dam Road.

The Dooley Map eliminates concerns about a plan that includes departures from state law that are not necessary to comply with federal constitutional and statutory requirements. Its districts are far more compact by quantitative measures of dispersion and indentedness. Garcia Decl.  As described in the Davis Declaration, the Dooley Map follows neighborhoods and clear boundaries.  The deviation in population between the largest and smallest districts in 7.4%, far less than Preferred Map 2.  Deviation results only from legitimate purposes – creating the most cohesive remedial district, respecting neighborhoods, and following clear boundaries.

B.      The Dooley Map Creates Effective Latino-Asian Coalition Districts.

RPV analysis revealed a strong coalition between Latino and Asian voters.  Veteran demographer Jesus Garcia concludes that the Dooley Map provides a more equal opportunity for this coalition to promote its candidates of choice.  Because the Dooley Map boundaries reflect major roads and other borders between neighborhoods, they correspond with concentrations of Latino and Asian voters.  The high Asian district in Dooley also has somewhat better turnout, although it is far below non-Asian Anglo voters.  A mechanism to

change that is grass-roots canvassing for district-based candidates.  This is facilitated in the Dooley Map because its remedial district is 4.8 square miles, less than half the area of the district in Preferred 2 Map that has the highest concentration of Asians eligible to vote.

        C.      The Remedy Should Allow for Redistricting if New Construction Doubles the Population of High-Asian Districts Before the Next Census.

CVRA remedies do not instantly increase minority voter participation or equalize minority influence in a single electoral cycle.  According to the May 2021 projection, the population of the Folsom Plan Area would grow from 905 in the 2020 census enumeration to over 15,000 before the 2024 election. Rafferty Decl. 188.  The pace of growth is likely exaggerated, but to attach practically all new construction in Folsom to the remedial district is calculated to dilute the influence of Asian voters (and their neighbors) quantitatively, impairing any remedy that seeks to equalize their influence.

Elections Code, Section 21605(a)(1) allows courts to order mid-census redistricting.  In Garza, the Court of Appeals for the Ninth Circuit suggests the use of "redistricting between censuses [with] post-census data" when necessary to provide an effective §2 remedy. 918 F.2d at 772.  Because projections of future growth are speculative, they open an "avenue for subterfuge."  Kirkpatrick v. Priesler, 395 U.S. 525, 535 (1968).  But retrospective studies of post-census growth, calculated from occupancy permits of state estimates, are reliable when an appropriate methodology is uniformly applied.[23]  Minority voters should not be "required to wait for the next census" to restore the effectiveness of a voting rights remedy.  Garza, 918 F.2d at 773.

The Dooley Map may avoid this problem.  Unlike Preferred Map 2, it does not attach the Plan Area to the remedial district.

---

[23] Gong v. Kirk, 278 F.Supp. 133, 157 (S.D. Fla. 1967); Secretary of State of California v. Mosbacher, 968 F.2d 974, 979 (9th Cir. 1992); Connor v. Finch, 431 U.S. 407, 417 (1977); Exon v. Tieman, 279 F. Supp. 603 (D. Neb. 1967).

## V.  THE COURT SHOULD NOT REQUIRE A BOND.

This brief restraint imposes no burden on Folsom.  On the contrary, advancing determination of the merits will avoid the costs that would otherwise occur when Folsom does start preparations for the November 2022 election.  A bond in any substantial amount would impose a great burden on Plaintiffs, who seek to vindicate their right to vote with no prospect of financial gain.  Elections Code, Section 14027 precludes prevailing defendants from recovering any costs unless the court finds CVRA action to be frivolous, unreasonable, or without foundation. For these reasons, the Court should dispense with any security requirement.

## VI.  THE COURT SHOULD ADVANCE TRIAL OF THE CVRA CLAIM AND ALLOW ORAL ARGUMENT.

Plaintiffs request oral argument at the hearing on June 6, 2022, and estimate an hour, but possibly more if trial is advanced and defendant presents evidence.  Plaintiffs' counsel requests leave to present evidence and has attached the required written waivers from his clients.  Defense counsel has not yet accepted that the motion is based solely on the CVRA so that the relevant merits at trial are limited to showing RPV.  While they have been unwilling to agree on advancing the hearing, plaintiffs' counsel will confer in hopes that this motion persuades defendant that the motion is limited in scope.

CONCLUSION

The Court should grant a preliminary injunction consistent with the attached proposed order.  District elections will incorporate Folsom's Asian community into local political life for the first time.  With an appropriate map and sequence, neighborhood-based candidates will encourage Asian and Latino citizens to vote.  The high-Asian community will have a dedicated voice on the council, which will be more informed about the values, needs, and preferences of this community.

None of these public benefits can occur without immediate relief.  The current at-large

office-holders plan to entrench a white incumbent this fall, probably with no credible opposition.  The high-Asian district is permanently consigned to midterm elections, when they will have difficulty recruiting a viable challenger.  Almost all of Folsom's population growth would be attached to the remedial district, resulting in further dilution of their influence and voting strength.

Dated: April 6, 2022                                        Respectfully submitted,

                                                            Scott J. Rafferty, Esq.

DOOLEY MAP

