Scott Rafferty (SBD 224389)
1913 Whitecliff Court
Walnut Creek CA 94596
202-380-5525
rafferty@gmail.com
Attorney for PLAINTIFFS

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| HARI SHETTY, KAVITA SOOD, AND NEIGHBORHOOD ELECTIONS NOW<br>PLAINTIFFS,<br><br>vs.<br><br>CITY OF FOLSOM,<br><br>DEFENDANT | Case No. 22-cv-00534-JAM-JDP<br><br>Declaration of Jesus Garcia |

I, Jesus Garcia, do hereby certify and declare as follows:

1. I am a demographer and data specialist. I have a Master's Degree in Urban Planning from the University of California, Los Angeles. I served as demographic statistician for the United States Census Bureau for five years. In anticipation of the 2020 census, I served as a specialist in their partnership program, which works with local governments, as well as community-based and business organizations, to ensure that census

block, block group and tract definitions reflect local needs and to coordinate outreach to hard-to-count populations. In addition to my current practice at La Cresta Demographers, of which I am the owner and CEO, I serve as a demographic consultant to the Dolores Huerta Foundation. I have developed district maps in numerous jurisdictions, either in response to petitions to comply with the California Voting Rights Act or in connection with redistricting. My vita is attached.

2. The facts set forth in this declaration are within my personal knowledge and, if called as a witness, I could and would competently testify as follows.

3. Because, as the Legislature noted when it adopted the CVRA, we are all minorities in California, it is often difficult to demonstrate that a single minority (Latinos, Blacks, Asian-Americans, or Native Americans) can constitute a majority in a possible district. This is particularly true in the Northern California. The CVRA relaxes this restriction, but the remedies it requires are at least as demanding as those required under federal law.

4. Increasing voter turnout was a primary objective of proposed legislation to require district elections throughout the 1980s and 1990s, which culminated in the CVRA. The Joint Senate-Assembly hearing in San Diego on November 5, 1987 was entitled "Low Voter Turnout and District Elections for School Boards." Senator Chacon (at 2) testified:

> Too often citizens who are part of an ethnic, geographical of other minority feel they are disenfranchised by the at-large system… Their voter cannot make a difference in an at-large election where they are always a minority voice.

Civil rights organizations testified that district elections were essential to improve minority voter turnout (at 45-46, 54): "The district election process in the long run will include large numbers of people in voting that haven't been included in the past." Richard Martinez testified for the Southwest Voter Education Project:

> Change from an at-large election to single-member districts, in our opinion and our experience, will not only increase the voter registration at the local level and the voter participation in local offices, but it will also increase the voter participation in Statewide and county-wide offices.

5. On December 9, 1987, another joint hearing in Sacramento on was entitled: "District Elections and Voter Turnout," where Joaquin Avila testified (at 33): "Whenever you convert form at-large to single member districts, voter turnout just goes up."

6. The attached Amicus Letter submitted by the Dolores Huerta Foundation to the California Supreme Court in 2020 provides more historical detail and explains how neighborhood elections allow minority candidates of choice to mobilize communities and increase minority participation up and down the ballot. The suppression of these minority candidates *is* a form of vote dilution.

7. When the Dolores Huerta Foundation proposes a map, improving minority turnout is always a focus. From this perspective, I evaluated two maps proposed for Folsom: Preferred Map 2 and the Dooley Map. I understand that Latino voters are in coalition with Asian voters and strongly supported the Asian candidate elected in 2020.

8. Especially when minority turnout is as depressed as it is in Folsom, it is critical that the initial elections for the remedial districts (those with the highest minority share of Citizens of Voting Age) are scheduled for presidential years. I understand that the only Asian ever elected was defeated in 2018 and elected in 2020, which illustrates that minority candidates are at less of a disadvantage in presidential years. Running the high-Asian district where he lives this year means he will not be able to run for reelection at the end of his term. But even if this candidate had not been elected, Asian voters need to have the remedial district elect in 2024 and subsequent presidential elections. This is essential to achieve the improved turnout that is a fundamental goal.

9. As demonstrated in the attached charts, the Dooley Map corresponds more accurately with areas with relatively high minority turnout in the 2018 election. 2018 because was a midterm election, when minority vote share is usually lower. Preferred Map 2 splits the minority vote among three districts. This limits the number of minority voters that will be mobilized by the campaign of a minority candidate of choice in the remedial district.

10. The Dooley Map is a more effective remedy.

I certify under penalty of perjury that the foregoing is true and correct.
The prepared version of this declaration has been reviewed and approved by Mr. Garcia. A signed version will be supplied

May 6, 2022

**Jesus M Garcia**

**Demographer, Data Analytics – Geographic Information Systems (GIS) Professional**

Extensive experienced US Census demographic data including PL94-171 and ACS, California Statewide Database Voter-Redistricting, California K-12 education data. SAS programming on large databases ArcView GISOnline and desktop ESRI Software, survey research methodology, report writing. Experience communicating data summary results to public policy decision makers, professional colleagues, and community at large for strategic planning and support purposes and community engagement. Demonstrated strong administrator and collaboration skills, supervising staff of diverse backgrounds and abilities. Excellent oral and written communication skills. Bilingual Spanish.

**Education**

      1987 University of California, Los Angeles, CA. M.A., Urban Planning
      1981 University of California, Santa Barbara, CA. B.A., Political Science
      1979 Mt. San Antonio College, Walnut, CA. A.A., Business

      2018 California State University, Bakersfield, CA. Certificate, Geographic Information Systems

**Professional Highlights**

**2019–2020: Partnership Specialist – 2020 Census**, *U.S. Census Bureau, Los Angeles, CA Field Division.*
Encouraged collaborations among community based organizations, local governments, schools and business to outreach with Hard to Count (HTC) communities in support of 2020 Census.

**2018-2019: Chair Data Technology Committee,** *Kern Census Complete Count Committee, Bakersfield, CA*
Provide data analytical/GIS support for in preparation for contacting Census 2020 Hard to Count (HTC) communities.

**2019-Present: Consultant Dolores Huerta Foundation (DHF),** *Bakersfield, CA*
Provide data analytical support to various community and voter engagement projects. Establishment of GIS department, leading DHF effort with 2020 Census countywide and in California Central Valley.

**1994-2018 (retired): Research Services Coordinator, Kern County Superintendent of Schools (KCSOS)** *Bakersfield, CA*
Utilize state-of-the-art technology and processes to help accomplish the office mission "…provide information and analytic support on strategic planning issues to the office of the Superintendent of Schools."

**1989–1994: Demographic Statistician**, *U.S. Census Bureau, Washington, DC*
*Population Division, Economic Census Division, Data User Services Division*.
Final review of 1990 Census statistical variables Hispanic Origin, Place of Birth, Year of Entry, Citizenship and Ancestry.
Economic Census Surveys of Minority Owned Businesses (SMOBE) and Women Owned Businesses (WOB)
P-20 Series Current Population Survey (CPS) reports on the US Hispanic Origin Population. Spokesperson for TIGER Files census data collection geographic boundary layers.

**1985–1989: Research Assistant, Los Angeles Community College District (LACCD),** *Los Angles Ca*
Position with LACCD coincided first analysis of newly implemented California Department of Education school district data collection process California Basic Educational Data Systems (CBEDS) and R30 Language Census. Introduced SPSS and first-generation GIS program on a PC platform, used CBEDS and Language Census data on master's thesis, a study of the need for bilingual education in the colleges of the LACCD in response to Immigration Reform and Control Act of 1986.

**1983–1985: Outreach Counselor UC Partnership Program, Office of Relations with Schools, University of California Los Angeles (UCLA),** *Los Angles Ca*
Outreach representative of UCLA in low socioeconomic and underrepresented schools in East Los Angeles schools.

Jesus M Garcia PO Box 55 Bakersfield, CA, 93302
mail@jesusmgarcia.com * (661) 472-8683

**GIS/Redistricting**

- 2001 and 2011 – Kern County Superintendent of Schools, Kern County Board of Education Trustee Areas
- 2009-2010 – Porterville College Federal Lands student impact analysis
- 2008 College of the Sequoias – Analysis student attendance patterns for college district.
- 2007 Foundation for California Community Colleges – Created original GIS shapefiles for California Community College Districts
- 1985 Citizen's Redistricting GARZA v. COUNTY OF LOS ANGELES, CAL. NOS. CV 88-5143 KN(EX), CV 88-5435 KN(EX). Paragraph 281. Master's thesis data was used as evidence for support of adopted Supervisorial District held by Gloria Molina

Demographic data professional expert Law Offices of Carlos R. Perez
- 2020 Coalinga-Huron Recreation and Parks District– California Voter Rights Act lawsuit requiring establishment of board member districts areas - Pending
- 2020 Hacienda-La Puente Unified School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2019 Nogales Unified School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2019 South Whittier Elementary School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2019 Los Nietos Elementary School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2019 Little Lake Elementary School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2018 Whittier Union High School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas

Demographic data professional expert Law Offices of Melo and Sarsfield, LLP
- 2018 Kern High School District – Federal Voting Rights Act Lawsuit challenging current trustee areas as being gerrymandered to prevent Latino population from having adequate representation on board
- 2018 Tulare County Board of Supervisors – Federal Voting Rights Act Lawsuit challenging current trustee areas as being gerrymandered to prevent Latino population from having adequate representation on board
- 2018 Monterey Peninsula Airport District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2018 Peninsula Health Care District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2018 Palo Verde Elementary School District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2018 San Mateo Harbor District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2017 Sequoia Healthcare District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2017 Sierra View Healthcare District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2017 Washington Township Healthcare District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2017 Exeter Ambulance District – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2016 City of Visalia City Council – California Voter Rights Act lawsuit requiring establishment of board member districts areas
- 2014 San Benito Hospital District – California Voter Rights Act lawsuit requiring establishment of board member districts areas

# DOLORES HUERTA FOUNDATION

August 31, 2020

The Hon. Chief Justice Tani Cantil-Sakauye
   and Hon. Associate Justices
In Care of Honorable Jorge E. Navarrete
Clerk, Supreme Court of California
350 McAllister Street
San Francisco, CA 94102

Re:   *Amicus Curiae* **Letter in Support of Petition for Review**
      <u>*Pico Neighborhood Association, et al. v. City of Santa Monica*</u>, No. S263972
      Court of Appeal, Second Appellate District, Division Eight,
      Case Number B295935

Dear Chief Justice and Associate Justices of the California Supreme Court:

      The Dolores Huerta Foundation, a California 501(c)(3) non-profit community based grass roots organization founded by California civil rights and labor leader Dolores Huerta, respectfully submits this *amicus curiae* letter, pursuant to Rule 8.500(g) of the Rules of Court, in support of plaintiffs-respondents' Petition for Review in this matter.

## INTEREST OF DOLORES HUERTA FOUNDATION

      The Dolores Huerta Foundation recruits, trains, organizes, and empowers local residents in low-income communities to attain social justice through systemic and structural transformation. Throughout California, at-large election methods have historically denied equality of influence to Latino, Asian, black, and Native American communities. Because these structural barriers persist, even in large cities and school districts with substantial minority populations, these communities do not have an equal opportunity to choose their leaders and to elect them to local office.

The Hon. Chief Justice Tani Cantil-Sakauye
 and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -2-

Since the Legislature enacted A.B. 350 in 2016, the Dolores Huerta Foundation has supported petitions that have led school boards and city councils to implement district elections on a no-fault basis.  These petitions detail how Latinos vote differently than non-Latinos, often citing ballot questions.  Most elected officials (and their constituents) understand and accept that Latino electoral choices reflect different values and needs.  The success of this process, which achieves compliance while avoiding litigation cost, is unlikely to continue if petitions must also prove that the very incumbents voting to comply have been elected only because their non-Latino constituents successfully blocked a Latino-preferred candidate.

The Dolores Huerta Foundation is committed to civic engagement.  It conducts voter registration drives that seek to close the shocking gap in participation that separates Latinos and Asians from the rest of the electorate.  As Congressional Representatives Barbara Jordan and Edward Roybal testified 45 years ago, at-large elections in Texas and California suppress Latino turnout because the chronic inability to elect candidates of choice has discouraged these communities.  Even today, when Latinos are the majority of school-age children, only six percent of school board trustees are Latino.  Such a dramatic absence of elected officials signals that Latinos have not yet been incorporated into the political life of our state.

Finally, the Dolores Huerta Foundation supports Latino (and Asian) parents in one of their most distinctive characteristics – the passion to ensure that their children receive the best possible education.   Four years ago, most non-Latino voters opposed Proposition 51, which authorized $9 billion in bonds to improve K-12 schools and community colleges statewide.  Proposition 51 became law solely because of Latino votes.  Few jurisdictions can deny racially polarized voting on this measure, using the test for statistical significance established in <u>Kaku v. City of Santa Clara</u>.[1]  In Santa Monica, Latinos voted for Prop 51 at almost

---

[1] The trial court applied a 95% confidence interval to midpoint estimates for minority and non-minority preferences and found racially polarized voting if there was no overlap.  The city disputes the use of a 95% confidence interval in the appeal (H046105), pending in the Sixth Appellate District.

The Hon. Chief Justice Tani Cantil-Sakauye
and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -3-

twice the rate of non-Latino voters.

## WHY REVIEW SHOULD BE GRANTED

For over a century, at-large elections have impaired the ability of Latino communities to form coalitions with other minorities and to aggregate their votes with like-minded citizens of all races.  As a result, many of our neighborhoods across the state are unrepresented on school boards and city councils.  For this reason, the California Voting Rights Act prohibited at-large elections wherever Latinos (or another protected group) vote differently from the rest of the electorate.  Prior to the reversal of the trial court judgment in <u>Pico Neighborhood Ass'n v. City of Santa Monica</u>, it was clear that this standard did not allow most jurisdictions to defend the use of at-large elections.

A century ago, California Progressives led a nationwide movement to elect city councils and school boards at-large.  State legislatures in the South also adopted at-large voting in the 1960s in order to dilute the votes of newly enfranchised blacks.  In recent decades, all but three of the nation's largest cities have recognized the anti-democratic effects of winner-take-all elections and restored district elections.[2]  But until the CVRA, change in California was slow.  Unless reviewed, the Court of Appeal's opinion in this case could stop voluntary compliance or even reverse the progress that has been made.

This Court should grant review to permit a more thorough briefing of two erroneous conclusions that were critical to the appellate opinion.  First, the panel denied that racially polarized voting is sufficient to condemn at-large voting as a dilution of minority influence, criticizing the plaintiffs for devoting only one sentence to this argument.  But The CVRA is not limited to promoting equal opportunity to elect candidates of choice; it also guarantees equality of influence, particularly the ability of voters to aggregate their votes with like-minded

---

[2] Columbus, Cincinnati, and Portland are still at-large.  Significantly, NAACP LDF has threatened to force Columbus's majority-black city council to abandon at-large, because several black members were elected only after being appointed and are not the black community's authentic candidates of choice.

The Hon. Chief Justice Tani Cantil-Sakauye
  and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -4-

voters.[3] Therefore, at-large systems dilute Latino influence whenever Latinos vote differently than the rest of the electorate. This explains the Legislature's creation of the no-fault liability standard in Section 14028(a), and why no state or federal court has ever read it to permit any additional elements. Second, without reference to the record or any other source, the opinion stated that district elections were "swept away" as a response to "widespread graft and corruption." This contradicts most historic interpretations of the context and consequences of Progressive era election reforms, which excluded immigrants and entrenched incumbents, allowing the political composition of many local governments to resist demographic change for decades. The combined effect of these two erroneous assertions is to validate unfounded objections to district elections and to place at risk the progress made to date in eliminating an electoral system that is undemocratic. The remainder of this letter summarizes our argument on these two issues, which amicus expects to brief if this Court grants review.

  (1) Racially polarized voting is sufficient to establish that an at-large system dilutes minority voters.

The CVRA focuses on using districts to increase minority influence. In contrast to the federal Voting Rights Act, it does not require that changing from the at-large system will immediately allow a single minority group to elect its candidate of choice. Therefore, it eliminated a critical restriction in the federal Voting Rights Act: "the need to prove a geographically compact majority-minority district." Sanchez v. City of Modesto (2006) 145 Cal. App. 4th 660, 669, citing Section 14028(c); Jauregui v. City of Palmdale (2014) 226 Cal. App. 4th 781, 789. Based on these unambiguous terms, even the plaintiff in Higginson v. Beccera (2019) 363 F. Supp. 3d 1118, 1122, agreed that CVRA liability "turned solely on racially polarized voting." Neither the district court nor any party

---

[3] Dean Heather Gerken's article, "Understanding the Right to an Undiluted Vote," 114 HARV. L. REV. 1663, 1680 (2001), explains dilution as impairing the right of minorities "to aggregate their votes effectively." "Single-member districts were historically chosen over at-large precisely to afford electoral minorities a chance to affect the political process." id.

The Hon. Chief Justice Tani Cantil-Sakauye
  and Hon. Associate Justices
Re:    Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -5-

disputed this assertion.  The U.S. Supreme Court declined to review the district court's ruling that establishing liability based on racially polarized voting alone satisfies all constitutional requirements. No 19-1199 (May 20, 2020).

Without distinguishing these cases, the appellate panel claims that the plain meaning of the word "dilution" restores the very requirement of a majority-minority district that the Legislature so clearly eliminated.  The opinion finds it insufficient that Santa Monica's at-large system deconcentrates Latinos voters in the Pico neighborhood from a 30% Latino district into an area seven times as large in which only 14% of voters are Latino.[4]  The panel eviscerates the CVRA by denying liability unless plaintiffs show a majority Latino district, which they assume to be essential to electing a Latino official.

In California, Latinos can seldom be elected without support from other minorities and crossover voters.  A Latino majority is not necessary for districting to increase Latino influence, nor is it sufficient (given the registration gap) to guarantee election of the Latino candidate of choice.  In most California jurisdictions, Latino voting is cohesive and racially polarized, but it is not the case that Latinos vote only for Latinos, as the panel assumes.[5]  Districting allows minorities to build the coalitions that give them procedural equality in the electoral process.

The Legislature created a strong presumption in favor of districting not only to improve minority influence during the campaign, but also to increase the quality and responsiveness of cities and school districts.  The at-large system continues to entrench homogenous incumbents in local government, as it was designed to do more than a century ago.  In many cases, all members live in the

---

[4] One court suggested that "Standard rules enhance consistency, manageability, predictability, and uniformity," and that 25% of voting age population (including non-citizens) is sufficient to qualify an influence district.  Rural W. Tenn. African-American Affairs Council v. McWherter (1995) 877 F. Supp. 1096, 1104 (W.D. Tenn.), aff'd 516 U.S. 801.

[5] Congressman Maxine Waters enjoys overwhelming support from Latinos, who constitute the majority of eligible voters in her district.

The Hon. Chief Justice Tani Cantil-Sakauye
  and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -6-

"better parts of town," often remote from Latino constituents. Ontario and Santa Clarita elected white incumbents in the 20th century, when they were smaller and less diverse, but they are still there. Districting enables Latino neighborhoods to identify natural leaders who can attract funding sufficient to engage voters in much smaller constituents. More competitive elections benefit all neighborhoods and voters of all races.

If this Court grants review, briefing will demonstrate that districting increases the influence of Latinos and other minorities, even in cases where no single minority has a share of eligible voters as high as the 30% in the Santa Monica remedy. In almost every case, districting empowers a new class of neighborhood-based candidates, who can attract funding and endorsements. This allows Latinos to cast a meaningful and effective vote for the very first time.

(2) The Progressive Era elimination of district elections perpetuated corruption and entrenched a white, nativist elite. The at-large method of election continues to exclude racial and ethnic minorities.

The Court of Appeal's opinion turns California history on its head when it argues that the Progressive Era "swept away" district elections due to "widespread graft and corruption." By granting review, this Court can objectively examine the extensive evidence that winner-take-all elections marginalize minorities in Santa Monica and in many city councils and school districts across the state.

For more than two centuries, our nation used district elections to incorporate immigrant communities into local political life. New York City provided for single member constituencies in 1683. Two decades later, 3000 Germans settled Governors Island and could elect their own council member. In recent decades, blacks, Latinos and Asians who began political life as local elected officials have advanced to state and federal offices.

The Hon. Chief Justice Tani Cantil-Sakauye
 and Hon. Associate Justices
Re: Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -7-

Large-scale corporate corruption has been endemic to local governments elected at-large, primarily because campaigning across a large city or school district requires substantial funding. This explains why the Southern Pacific could corrupt San Francisco's at-large board of supervisors in 1905 but was less successful among Los Angeles districted members. Oakland restored district elections after district attorney Earl Warren successfully prosecuted at-large Oakland city commissioners for graft in 1930.[6] More recently, a large school district abandoned at-large elections after decades of construction waste led to an SEC bond investigation that forced the retirement of a long-time trustee.[7]

Governor Hiram Johnson was a visionary political strategist who restructured local elections to entrench the results of his party's 1911 landslide.[8] Across the state, most victors were white, male Protestants from the cities' most established neighborhoods. The change to at-large would prevent leaders from emerging in ethnic neighborhoods and also increase the cost of challenging the new incumbents. Other reforms, some of which had independent merit, made it even more difficult to displace incumbents (and still do).[9] Two tactics were particularly effective. Instead of creating an open seat, retiring members resigned in advance of the election, so their colleagues could fill the vacancy. Completing the slate often deterred anyone from contesting the election.[10] Incumbents also used selective annexation to choose their voters, stranding minority neighborhoods in "unincorporated islands." The California Legislature outlawed this device in 1951, but Tuskegee, Alabama emulated it shortly

---

[6] The corrupt council members belonged to the Ku Klux Klan. Rhomberg, "The 1920s Ku Klux Klan in Oakland, California," 17 *Journal of American Ethnic History* 39, 49 (1988).

[7] *[East Bay Times](), July 31, 2017*.

[8] In 1911, the Progressive Party came to power after two Irish anarchists confessed to bombing the Los Angeles Times. This was particularly remarkable in Los Angeles, where European immigration had tripled the population in the prior decade.

[9] The "short ballot" reduced the number of elected positions (generally to five). Terms were lengthened and staggered. Non-partisanship reduced information about potential challengers.

[10] Blair and Flournoy, LEGISLATIVE BODIES IN CALIFORNIA at 7-4 (1967).

Case 2:22-cv-00534-JAM-JDP   Document 12-4   Filed 05/06/22   Page 14 of 16

The Hon. Chief Justice Tani Cantil-Sakauye
   and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -8-

thereafter.[11]

The racial exclusivity of these reforms is undeniable.[12] Outside of Los Angeles, which restored competitive district elections in 1925, the dominance of the Progressive/ Republican victors of 1911 and their handpicked successors survived decades of demographic and political change. A 1955 study showed that 60% of mayor and council members were Republican, which was by then the reverse of the state's voter registration. The partisan bias was even more extreme in large cities, where 83% of officials were Republican. The study showed that council members were homogenous in other ways; a "substantial majority" were still white, male, Protestant Masons who had lived in "a better part of town" for ten years or more.[13] Even today, the legacy of at-large elections deprives California of the natural diversity of leadership that our democracy requires.

CONCLUSION

This Court should review the appellate opinion because it fails to explain its conflict with state and federal precedents (Sanchez, Jauregui, Higginson, *supra*) that have found racially polarized voting to be the statutory predicate to require district elections. In California, minorities succeed only by building coalitions. Voting may be polarized by race, but minorities do not vote automatically or exclusively for candidates of their own ethnicity. Therefore, the panel errs in assuming that a majority Latino district is necessary to demonstrate

---

[11] Rafferty v. City of Covina (1955) 133 Cal. App. 2d 747, 753; Cal. Stat. 1951, Ch. 1702, p.3915; Gomillion v. Lightfoot (1960) 364 U.S. 339. West Pueblo inside the City of Napa is a surviving example of a Latino island who cannot vote in city elections and are forced to pay more for services.

[12] Latinos had served on Los Angeles city council for 60 years, but during the Progressives' at-large period (1909-1925), the council was 100% Anglo. Most Asians could not vote because Chinese and Japanese had been excluded from citizenship. The CALIFORNIA PROGRESSIVE CAMPAIGN BOOK FOR 1914 (at 24) called New York's assimilation of immigrants "a fearful social blunder California is determined to avoid." It denounced the "delinquency and criminality of the second-generation alien," even though census data showed these birthright citizens to be as literate as "native stock." It warned that the Panama Canal, which opened in August 1914, would begin an "alien flood."

[13] Lee, POLITICS OF NONPARTISANSHIP at 56-57 (1960).

The Hon. Chief Justice Tani Cantil-Sakauye
   and Hon. Associate Justices
Re:   Amicus Curiae Letter
In Support of Petition for Review
Pico v. City of Santa Monica, No. S263972
August 31, 2020
Page -9-

that districting will increase Latino influence.  It is enough to show that Latino precincts vote differently than the rest of the city when we have an electoral choice "that affects [our] rights and privileges." Section 14027(b).

    The CVRA does not attempt to engineer electoral outcomes; it simply enhances equality of opportunity in the electoral process.  In most at-large systems, the citywide majority, almost always white and non-Latino, chooses every elected official, so large parts of many cities are totally unrepresented.  Many of the young people in Latino communities have never met an elected official who lives in their neighborhood.  The cost and futility of challenging longtime Anglo incumbents in citywide elections often frustrates attempts by the Latino community to find and support candidates who are natural leaders.  District elections often create opportunities for candidates from minority neighborhoods.  However, whether or not there is a Latino candidate, districting increases the political influence of our neighborhoods during the campaign and after the election.  The Legislature's desire to improve governance statewide explains its decision to enact the CVRA with such a strong presumption in favor of district elections.  The panel erred in ignoring that legislative judgment.

    This Court should grant review, reverse the appellate opinion, and restore the remedy directed by the superior court.

Sincerely,

_Dolores C. Huerta_ (signature)        _Emilio J. Huerta_ (signature)

Dolores C. Huerta      Emilio J. Huerta
Founder & President      General Counsel


cc:   Scott J. Rafferty, Esq., Counsel
      rafferty@gmail.com

## LATINO-ASIAN COALITION VOTES



## ASIAN VOTERS ALONE

